# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
HERBERT BLACK,

                         Plaintiff,

            -against-                               00 Civ. 0648 (LAK)
                                                  and consolidated cases
CHRISTIE'S, INC., et al.,

                         Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER

LEWIS A. KAPLAN, *District Judge.*

            The Court having conducted a pretrial conference in these actions, all of which

involve common questions of law and fact, it is hereby

            ORDERED, as follows:

## I.

## CONSOLIDATION

            1.   The actions listed on the annexed schedule are consolidated for all purposes

pursuant to Fed. R. Civ. P. 42(a). They shall be referred to collectively as *In re Auction Houses

Antitrust Litigation,* Master File No. 00 Civ. 0648 (LAK).

            2.   No action taken hereunder shall have the effect of making any person, firm

or corporation a party to any action in which s/he or it has not been named, served, or added as such

in accordance with the Federal Rules of Civil Procedure.

2

## II.

### MASTER DOCKET AND SEPARATE ACTION DOCKETS

3.      A Master Docket is hereby established for the consolidated proceedings in the actions consolidated herein and any other actions subsequently consolidated with them either for all purposes or for pretrial purposes (the "Consolidated Actions"). Entries in said Master Docket shall be applicable to the Consolidated Actions, and entries shall be made therein in accordance with the regular procedures of the Clerk of this Court, except as modified by this Order.

4.      When a pleading is filed and the caption, pursuant to this Order, shows that it is applicable to "All Actions," the Clerk shall file such pleading in the Master File and note such filing in the Master Docket. No further copies need be filed nor other docket entries made.

## III.

### MASTER FILE AND SEPARATE ACTION FILES

5.      A Master File is hereby established for the consolidated proceedings in the Consolidated Actions. The Master File shall be Civil Action No. 00 Civ. 0648 (LAK). The original of this Order shall be filed by the Clerk in the Master File herein established. The Clerk shall maintain a separate file for each of the Consolidated Actions and filings shall be made therein in accordance with the regular procedures of the Clerk of this Court except as modified by Section II of this Order. The Clerk shall file a copy of this Order in each such separate file. The Clerk shall mail a copy of this Order to counsel of record in each of the Consolidated Actions.

Case3:07-md-01826-WHA   Document43-1   Filed05/14/07   Page4 of 84

3

## IV.

## NEWLY FILED OR TRANSFERRED ACTIONS

6.      When a case that relates to the same subject matter as the Consolidated

Actions is hereafter filed in or transferred to this Court and assigned to the undersigned, it shall be

consolidated with these actions in the same manner as the cases identified in Section I above

(provided that any case transferred to this Court solely for pretrial proceedings shall be consolidated

only to that extent absent further order of this Court), except as provided below, and the Clerk of the

Court shall:

a.      File a copy of this Order in the separate file for such action.

b.      Mail a copy of the Order of assignment to counsel for plaintiffs and

counsel for each defendant in the Consolidated Actions.

c.      Make an appropriate entry in the Master Docket.

d.      Mail to the attorneys for the plaintiff(s) in the newly filed or

transferred case a copy of this Order.

e.      Upon the first appearance of any new defendant(s), mail to the

attorneys for such defendant(s) in such newly filed or transferred case a copy of this

Order.

7.      The Court requests the assistance of counsel in calling to the attention of the

Clerk the filing or transfer of any case which might properly be consolidated with these actions.

4

## V.

## APPLICATION OF THIS ORDER TO SUBSEQUENT CASES

8.     This Order shall apply to each case alleging claims similar to those set forth

in these actions, which is subsequently filed in or transferred to this Court, and which is assigned to

the undersigned unless a party objecting to the consolidation of that case or to any other provision

of this Order serves an application for relief from this Order or from any of its provisions within ten

(10) days after the date on which the Clerk mails a copy of this Order to counsel for that party.

## VI.

## CAPTIONS

9.     Every pleading filed in the Consolidated Action. and in any separate action

included therein, shall bear the following caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
IN RE AUCTION HOUSES ANTITRUST                              MASTER FILE
LITIGATION
                                                           00 Civ. 0648 (LAK)

This Document Relates To:

                                    -

------------------------------------x

10.     When a pleading is intended to be applicable to all actions to which this Order

applies, the words "All Actions" shall appear immediately after the words "This Document Relates

To:" in the caption. When a pleading is intended to apply only to less than all of such actions, the

docket number for each individual action to which it is intended to apply and the name of the

5

plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption.

## VII.

### FILING AND DOCKETING

11.    When a paper is filed and the caption shows that it is applicable to All Actions, the Clerk shall file it in the Master File and note such filing in the Master Docket. No other docket entries need be made nor copies filed in other files.

12.    When a paper is filed and the caption shows that it is applicable to less than All Actions, the Clerk shall file the original of the paper in the Master File and a copy in the file of each separate action to which it applies and shall note such filing in the Master Docket and in the docket of each such separate action. The party filing such paper shall supply the Clerk with sufficient copies of any paper to permit compliance with this paragraph.

## VIII.

### INTERIM ORGANIZATION OF COUNSEL

13.    Christopher Lovell, Robert A. Skirnick, Robert N. Kaplan, Michael D. Hausfeld, Stanley Grossman, and Fred Furth shall serve as the Plaintiffs' Interim Executive Committee (the "Interim Committee") for all plaintiffs in the Consolidated Actions pending further order of the Court. The Court intends to give further consideration to the appropriate organization of plaintiffs' counsel and the basis for selecting any attorneys to act on behalf of the group or any class that may be certified herein.

6

14.    The Interim Committee shall have the following responsibilities to be carried

out either personally or through such counsel as they jointly may designate:

        a.    Sign any consolidated complaint, motions, briefs, discovery requests,

objections, or notices on behalf of all plaintiffs or those plaintiffs filing the particular

papers.

        b.    Conduct all pretrial proceedings on behalf of plaintiffs.

        c.    Brief and argue motions.

        d.    Initiate and conduct discovery.

        e.    Speak on behalf of plaintiffs at any pretrial conference.

        f.    Employ and consult with experts.

        g.    Conduct settlement negotiations with defense counsel on behalf of

plaintiffs.

        h.    Call meetings of plaintiffs' counsel.

        i.    Coordinate the work of plaintiffs' counsel and perform such other

duties as the Interim Committee deems necessary.

        j.    Distribute to all plaintiffs' counsel copies of all notices, orders, and

decisions of the Court; maintain an up-to-date list of counsel available to all

plaintiffs' counsel on request: keep a complete file of all papers and discovery

materials filed or generated in the Consolidated Actions which shall be available to

all plaintiffs' counsel at reasonable hours.

15.    The Interim Committee shall perform its work and coordinate the activities

of plaintiffs' counsel in such a manner as to promote the orderly and efficient conduct of the

7

litigation and to avoid unnecessary or duplicative work.

## IX.

## SCHEDULE

16. Plaintiffs shall file a consolidated amended complaint within 21 days of the date of this order.

17. Further proceedings in the Consolidated Actions and any actions subsequently consolidated with them shall be governed by the following schedule, which will not be modified absent substantial reason:

    a. Plaintiffs' class action motion shall be filed on or before March 22, 2000.

    b. No amendments to the pleadings or joinder of additional parties shall be permitted after April 15, 2000.

    c. All fact discovery shall be completed and reports of proposed expert witnesses served on or before October 23, 2000.

    d. Reports of any proposed rebuttal expert witnesses, and any supplements to reports of other experts in light of reports of adversary experts, shall be served on or before November 22, 2000.

    e. The joint pretrial order, any motions for summary judgment, and any requested jury instructions (if applicable) shall be served on or before November 22, 2000.

    f. Depositions and any other discovery of proposed expert witnesses

8

shall be completed on or before December 22, 2000.

    g.    The case is set for trial at 9:30 a.m. on February 27, 2001.

## X.

## DISCOVERY

    18.    Discovery disputes are to be raised with the Court by letter in accordance with the individual practices of the undersigned only after counsel have exhausted their ability to resolve them by agreement. The Court assumes that competent counsel will be able to resolve virtually all such disagreements in a spirit of cooperation and compromise.

    19.    Tardy presentation of discovery issues to the Court by the party seeking discovery may be regarded as sufficient reason for denial of the discovery at issue.

## XI.

## DOCUMENT PRESERVATION AND TIME RECORDS

    20.    Pending the entry of any superseding stipulation or order, each party shall take all reasonable steps to preserve all currently existing documents (as that term is defined in Fed. R. Civ. P. 34) in its possession, custody or control that are relevant to the Consolidated Actions. Counsel are encouraged meet and agree concerning categories of documents the preservation of which are unnecessary.

09May 2000 22:03 FROM:Enhanced          TO:6877714          Ro   D. Kaplan     PAGE 019

MAY-09-00 20:30 FROM:                              ID:                PAGE  19/67

9

21.    The Court reserves the right to deny any attorney's fee application that

hereafter may be made if it is unsupported by contemporaneous time records reasonably describing

the services performed.

Dated:  February 23, 2000

———————————————
Lewis A. Kaplan
United States District Judge

10

## SCHEDULE

The actions now subject to this order are:

| Name of First Named Plaintiff | Docket No. (00 Civ.) |
|---|---|
| Black | 648 |
| Kass | 677 |
| Zabarkus | 748 |
| Meadow | 756 |
| Madoff | 766 |
| Freedom Trust Co. | 767 |
| Glauberman | 775 |
| Rush | 796 |
| Haberman | 798 |
| Wigglesworth | 799 |
| Daly | 827 |
| Cafesjian | 835 |
| Shaninian | 837 |
| Donoghue | 838 |
| Schiffrin | 850 |
| Ackerman | 886 |
| Abrahams | 891 |
| Flander's Contemporary Art | 892 |
| Noble | 904 |
| Mintz | 931 |
| Brett Mitchell Collection | 934 |
| Marior | 939 |
| Stern | 941 |

11

| Name of First Named Plaintiff | Docket No. (00 Civ.) |
|---|---|
| Heffler | 944 |
| Sayers | 945 |
| Afben Associates | 947 |
| Goldberg | 950 |
| Black | 951 |
| Rush | 952 |
| Kelley | 1013 |
| Pridemore | 1047 |

LEWIS A. KAPLAN
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

## COMMUNICATIONS

For questions concerning general calendar matters, call the Deputy Clerk, Ms. Ana Reyes before 9:30 a.m. or after 4:30 p.m. at (212) 805-0104.

*Counsel are not to communicate with Chambers by phone except in case of emergency.*  Copies of correspondence between counsel *should not be sent to the Court.*

Except as otherwise provided herein, the Court's procedures are governed by the Local Rules of this Court and the Federal Rules of Civil Procedure. *Counsel should not call the Judge's law clerks with respect to procedural questions.*

## CONFERENCES

*The attorney who will serve as principal trial counsel must appear at all conferences with the Court.*

Unless the parties are otherwise notified, a pending motion cancels any previously scheduled status conference.

## MOTION RULES AT A GLANCE

| | |
|---|---|
| Pre-motion conference: | Discovery disputes |
| Motion returnable: | Motions are to be filed without a return date. |
| Courtesy Copies: | Deliver two copies to the Mail Room, 500 Pearl Street (8th floor) at the time the originals are filed. |

## MOTION RULES AND PROCEDURES

### Discovery Disputes

A conference must be requested before the filing of any motion relating to a discovery dispute. Counsel wishing to make such a motion should send a letter to the Court concisely describing the basis for the proposed motion and requesting a conference. The party opposing the relief sought may respond within two (2) business days by letter briefly describing why the relief sought should not be granted. Letters seeking such conferences and responses thereto shall not exceed three (3) pages. Counsel should be prepared to discuss with the Court the matters raised by such letters, as the Court will seek to resolve discovery disputes quickly and without the filing of formal motions.

### Return Dates and Special Filing Rules

All motions, unless brought on by an Order to Show Cause, should be made without a return date.

The original of all motion papers, opposition papers, and replies should be filed in the Clerk's office. Two (2) courtesy copies for the use of Chambers should be delivered to the Mail Room at 500 Pearl Street (8th floor) at the time of filing of the originals.

### Orders to Show Cause and TROs

All applications for orders to show cause and temporary restraining orders shall first be brought to the Orders and Appeals Clerk for approval and then to Chambers. Applications for temporary restraining orders will be entertained only after notice to the adversary absent a persuasive showing that the giving of notice itself is likely to result in immediate and irreparable injury.

### Briefs and Motion Papers

Citations to New York and United States Supreme Court cases shall contain citations to the official reports and parallel cites to New York Supplement and Supreme Court Reporter, respectively. Citations to unreported cases not available on WESTLAW should be accompanied by a copy of the case cited.

Memoranda of law in support of or in opposition to motions may not exceed thirty-five (35) pages, double spaced, in length and, if in excess of ten (10) pages, should contain tables of contents and authorities. Reply memoranda may not exceed ten (10) pages, double spaced, in length. All exhibits should be tabbed and indexed. A copy of the complaint should accompany the moving papers. Requests to file memoranda exceeding the page limits set

forth herein must be made *in writing* five (5) days prior to the due date except with respect to reply briefs, in which case the time is the day prior to the due date.

*Answering papers* are to be served two (2) weeks after receipt of the moving papers. *Reply papers*, if any, are to be served five (5) business days later. At the time reply papers are due, counsel shall advise the Court of any Monday morning within the next six (6) week period when they would be *unavailable* for oral argument.

### Oral Argument

After answering papers are received, the Court will notify counsel of the time and place for oral argument if the Court regards oral argument as helpful. Counsel should understand that the Court will have reviewed the papers prior to argument.

### Adjournments/Extensions

All requests for extensions of time or adjournment of motions, pretrial conferences, and other matters must be made *in writing* with copies to all counsel and received in chambers not less than two business days before the scheduled time. Such requests must include the number and disposition of any prior requests for similar extensions and state whether opposing counsel consents to the extension or adjournment. If the extension request is made with the consent of all parties, a stipulation should be submitted setting out the schedule to which counsel have agreed; a request for an extension without the consent of all counsel may be made by letter to the Court. Requests to adjourn the date for oral argument will be granted only under the most compelling circumstances if made less than one week prior to the scheduled date.

*The Court will not advise the parties by telephone or mail of the disposition of requests for extensions and adjournments. Counsel are responsible for checking the docket sheet in the Clerk's office in person, by use of a service, or through use of the Court's electronic access PACER system.*

### Notice of Rulings and Calls

Judge Kaplan is participating in the trial of the CourtWeb system. Notice of most orders (other than scheduling orders), decisions and stipulations is posted on the World Wide Web and may be accessed through the Court's web site:

http://www.nysd.uscourts.gov

Although most orders will be posted to the CourtWeb site, counsel are responsible for knowledge of *all* orders entered on the docket.

4

## PRETRIAL AND TRIAL RULES AND PROCEDURES

### Discovery Schedule

Notices inviting the parties to stipulate to a discovery schedule will be sent to plaintiff's counsel (or, in the case of removed actions, defendant's counsel) shortly after the filing of the action. If the parties can agree upon a schedule providing for prompt completion of pretrial proceedings, the Court ordinarily will incorporate the agreement in a Scheduling Order.

Counsel are responsible for being aware of the contents of the formal Scheduling Order and any amendments thereto irrespective of whether they are sent to counsel by the Clerk of the Court.

### Copies of Pleadings

The parties are to submit a courtesy copy of the complaint, answer and any other pleading (but not discovery requests and responses) to chambers promptly after service.

### Pretrial Order

Counsel are to file a *joint* pretrial order, with two (2) courtesy copies for chambers delivered to the 8th floor mail room, on or before the date set by the Court. The pretrial order shall be prepared in accordance with the outline attached as Annex A. Failure to submit the pretrial order may result in dismissal or a default judgment, as appropriate. *The filing of a motion for summary judgment does not excuse or extend the time for filing the pretrial order unless the Court otherwise directs. Such applications are disfavored.*

### Ready for Trial

Counsel must be prepared to proceed to trial on twenty four (24) hours telephone notice once the pretrial order has been filed. Any party with a scheduling problem should bring it to the Court's attention by letter at the time the pretrial order is filed.

### Bench Trials

In bench trials, counsel shall prepare and exchange statements containing the direct testimony of each witness they intend to call. These witness statements shall be used at trial in accordance with the following procedure.

5

### Form of Statement

For each witness whose direct testimony will be presented in statement form, counsel shall prepare a statement setting forth in declaratory form all of the facts to which that witness will testify.  The facts shall be stated in narrative, rather than question and answer, form.  The statement shall contain all of the relevant facts to which the witness would testify including facts necessary to establish the foundation for the testimony.  It need not be sworn or notarized.

### Use of Statements

At the trial, each witness whose direct testimony previously has been submitted in statement form shall take the stand and under oath shall adopt the statement as true and correct.  The party offering that witness then shall offer the statement as an exhibit, subject to appropriate objections by the opposing party on which the court will then rule.

The witness then will be allowed to supplement his or her statement by any additional live direct testimony considered necessary by counsel.

Thereafter cross-examination and any redirect shall proceed in the ordinary course.

### Exceptions to Use of Statement

Statements will be required of the parties and other witnesses under their control.  They are not to be used for adverse parties or for persons whose attendance must be compelled by subpoena.

### Exhibits

Documents to be offered as exhibits shall not be attached to witness statements but shall be pre-marked and exchanged along with other proposed exhibits in the usual fashion.

### Jury Selection

Juries ordinarily will be selected by the struck panel method.

Revised 1/98

**Annex A -- Form of Pretrial Order**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

[caption]                                     XX Civ. XXXX (LAK)


The parties having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.


## I.  NATURE OF THE CASE

[Set forth a brief statement of the general nature of the action and the relief sought by each party.]


## II.  JURY/NON-JURY

[State whether a jury is claimed, whether there is any dispute as to whether the action should be tried to a jury, and the estimated length of the trial.]


## III.  STIPULATED FACTS

[Set forth any stipulated facts.]


## IV.  PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

A.     Plaintiff's Contentions

[Set forth a brief statement of the plaintiff's contentions as to all ultimate issues of fact and law.]

B.     Defendant's Contentions
[Set forth a brief statement of the defendant's contentions as to all ultimate issues of fact and law.]

## V.  ISSUES TO BE TRIED

[Set forth an agreed statement of the issues to be tried.]

## V.  PLAINTIFF'S EXHIBITS

## VI.  DEFENDANT'S EXHIBITS

No exhibit not listed below may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.

[Each side shall list all exhibits it intends to offer on its case in chief.  The list shall include a description of each exhibit.  All exhibits shall be premarked.

[In cases likely to involve substantial numbers of deposition exhibits, the parties are encouraged to agree at the outset of discovery to assign a unique exhibit number or letter to each exhibit marked at any deposition so that exhibit designations used in deposition transcripts may be used without change at trial.  Absent use of such a system, plaintiff's trial exhibits shall be identified by Arabic numerals and defendant's by letters (e.g., PX 1, DX 1, D-Jones A, D-Smith C).]

## VIII.  STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Any objections not set forth herein will be considered waived absent good cause shown.

[The parties shall set forth any stipulations with respect to the authenticity and admissibility of exhibits and indicate all objections to exhibits and the grounds therefor.]

## IX.  PLAINTIFF'S WITNESS LIST

## X.  DEFENDANT'S WITNESS LIST

The witnesses listed below may be called at trial.  No witness not identified herein shall be permitted to testify on either party's case in chief absent good cause shown.

[Each party shall list the witnesses it intends to call on its case in chief and, if a witness's testimony will be offered by deposition, shall designate by page and line numbers the portions

of the deposition transcript it intends to offer. Each party shall set forth any objections it has to deposition testimony designated by the other and the basis therefor.]

## XI.  RELIEF SOUGHT

[The plaintiff shall set forth the precise relief sought, including each element of damages. If the plaintiff seeks an injunction, the proposed form of injunction shall be set forth or attached.]

Dated:

_____

                                        U.S.D.J.

[Signatures of counsel]

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | **Case No. 1:02CV0844** |
| | : | |
| **SCRAP METAL ANTITRUST** | : | **JUDGE O'MALLEY** |
| **LITIGATION** : | | |
| | : | |
| | : | **MEMORANDUM & ORDER** |
| | : | |

As series of putative antitrust class actions have been transferred to and consolidated before this

Court. It is now incumbent upon the Court to establish procedures for the pre-trial management of those

cases.

At a hearing on Wednesday, July 24, 2002, alternative case management plans were presented

by Plaintiffs' counsel. Counsel for Bic Manufacturing and Talan Products, Inc. submitted a proposal

whereby the Court would appoint John R. Climaco of Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co.,

L.P.A. as lead counsel and would create an executive committee consisting of lead counsel and two

attorneys from each of the four consolidated cases.[1]  Counsel for Profile Grinding, Inc., The Lincoln

---

[1]  In its original proposal, the executive committee would have been comprised of two attorneys from only
three of the consolidated cases. This proposal, however, was submitted to the Court prior to the filing of
the fourth case that has been consolidated. Thus, the Court construes this proposal also to encompass two
attorneys from this later-filed case.

Electric Co., and Shiloh Industries, Inc. also submitted a proposal whereby the law firms of Boies, Schiller

& Flexner, LLP and Scott & Scott, LLC would serve as co-lead counsel and the firm of McDonald,

Hopkins, Burke & Haber Co., L.P.A. would serve as liaison counsel. Although counsel for Midwest

Materials did not submit a proposal prior to the hearing, it joined Profile Grinding, Lincoln Electric, and

Shiloh Industries in recommending the appointment of Boies, Schiller and Scott & Scott as co-lead counsel.

The Manual for Complex Litigation, Third (1995), recommends the appointment of lead counsel

to coordinate the prosecution of complex class actions. Lead counsel has the "major responsibility for

formulating (after consultation with other counsel) and presenting positions on substantive and procedural

issues during the litigation," as well as working with opposing counsel and coordinating discovery. *Id.* §

20.221. The Manual counsels that the Court should make sure that the attorney appointed as lead counsel

has the qualifications, experience, and respect to fill this role. *Id.* § 20.224. While more than one attorney

can serve as lead counsel, the Manual recommends limiting the number so as not to defeat the purpose of

appointing a lead counsel. *Id.* § 20.221.

One of the proposals presented to the Court regarding the appointment of Boies, Schiller and Scott

& Scott was characterized as a negotiated deal between counsel, combining counsel representing the first-

filed complaint and counsel representing the Plaintiff with the largest alleged damages. There are several

problems with such a proposal. First, the Manual warns the Court against accepting deals of counsel at

face value without making an independent evaluation. *Id.* § 20.224. Second, the limited number of named

Plaintiffs and of counsel in this case suggest that the appointment of one firm as lead counsel would be both

sufficient and most efficient. Finally, consideration of the "first-to-file" status when making lead counsel

determinations has been rejected by many courts. *See In re Century Business Servs. Secs. Litig.*, 202

2

F.R.D. 532, 536–37 (N.D. Ohio 2001) (noting that one of the primary purposes behind the Private

Securities Litigation Reform Act was to eliminate this rule). Absent evidence that the first-to-file should be

credited with conducting substantial investigative efforts to ferret out the alleged improprieties, no weight

is generally accorded to the timing of a particular plaintiff's complaint. *In re Auction Houses Antitrust*

*Litig.*, 197 F.R.D. 71, 82 (S.D.N.Y. 2000). Here, given the long history of governmental investigation and

prosecution of the scrap metal industry in the relevant market, and the respective timing of all of the filings,

first-to-file status is simply not meaningful. *Id.*

The Court finds that all three firms asking to be appointed lead counsel have the qualifications and

experience to fill that role. The resumes submitted to the Court amply demonstrate that all three firms and

their lawyers are more than capable, as they have in the past, of acting as lead counsel in complex class

actions. Given the excellence of the proposed lead counsel, the Court must turn to other factors to

determine which firm it should appoint as lead counsel.

The Court initially considered requesting, as mentioned in the Manual, competitive bids. After

further consideration, however, the Court finds that such an approach, in this case, would be inappropriate.[2]

There appears to be limited information regarding the potential damages involved in this action, and, as

such, the Court is concerned that it will be difficult at this stage for counsel to accurately assess any

potential recovery when determining its bid. Without such information, a potential conflict of interest can

be created between the class and its counsel if counsel's initial projections turn out to be inaccurate. The

Court is also concerned that the small number of firms participating would not be sufficient to create the

---

[2] That is not to say, however, that under different circumstances the Court would find such a competitive
bidding process an appropriate mechanism for selecting lead counsel.

type of "market" envisioned by the competitive bidding process.

Thus, although not binding, the Court turns to the Private Securities Litigation Reform Act ("PSLRA") for guidance.[3] Under the PSLRA, the Court would determine the most adequate plaintiff and look to its choice of counsel. The most adequate plaintiff is the one that has filed a timely motion for appointment as lead plaintiff, has the largest stake in the case, and satisfies the prerequisites for maintaining a class action under Fed. R. Civ. P. 23(a). 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa)–(cc). A plaintiff meeting all three requirements is presumed to be the most adequate or lead plaintiff. In this case, Lincoln Electric has submitted a proposal for the appointment of lead counsel, is conceded to be the plaintiff with the largest stake in the litigation, and otherwise appears to satisfy the requirements of Rule 23(a). Thus, the Court considers Lincoln Electric to be the "most adequate plaintiff" and looks to its recommendations for the appointment of lead counsel. Presumably, the plaintiff with the largest stake in the litigation will be more likely to monitor and control its counsel, and be more likely to demand that counsel seek only reasonable fees in connection with any settlement or award in this matter. It is clear, moreover, that these presumptions are not merely hypothetical—Lincoln Electric's in-house counsel both appeared at the hearing and addressed the Court regarding the scope of its stake in the litigation. While Lincoln Electric has recommended that the firms of Boies, Schiller and Scott & Scott serve as co-lead counsel, its retained counsel is only the former. As previously noted, moreover, the Court is disinclined to appoint more than

---

[3] The Court invited suggestions from counsel regarding alternative mechanisms for assessing the economic impact of its choice of lead counsel. Although counsel recognized the need for the Court to make such an assessment and had differing views as to the benefits of the bidding process, no alternative to that process was proposed. While the Court has resolved the lead counsel question through other forms of inquiry, it remains concerned with and will remain vigilant with respect to the economic impact of its choice on the class.

4

one lead counsel in this case.[4]

Taking the above factors and proposals into consideration, the Court makes the following rulings:

1. The Court appoints the firm of Boies, Schiller & Flexner, LLP to serve as lead counsel.

2. The Court appoints the firm of McDonald, Hopkins, Burke & Haber Co., L.P.A. to serve as liaison counsel.

3. The Court appoints an executive committee comprised of Richard Drubel and William Isaacson of Boies, Schiller & Flexner, LLP; John R. Climaco of Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A.; David Scott of Scott & Scott; Steven M. Weiss of the Law Office of Steven M. Weiss; and Edmund Searby of McDonald, Hopkins, Burke & Haber Co., L.P.A.

4. Lead counsel shall be responsible for:[5]

   a. coordinating the activities of Plaintiffs during pretrial proceedings;

   b. determining the position of Plaintiffs on all matters arising during the pretrial proceedings and presenting such positions orally or in writing to the Court and opposing parties (personally or by a designee);

   c. coordinating the initiation and conduct of discovery on behalf of Plaintiffs consistent with the requirements of the Federal Rules of Civil Procedure;

   d. conducting settlement negotiations on behalf of Plaintiffs;

   e. delegating responsibilities for specific tasks to other counsel for Plaintiffs in a manner to

---

[4] It is also true that, while all counsel are certainly well qualified, the Boies, Schiller firm seems to have an edge in terms of experience in the antitrust arena.

[5] The Court does not, at this point, make any determination with respect to lead counsel's trial and post-trial responsibilities.

5

assure that pretrial preparation for plaintiffs is conducted effectively, efficiently, and economically;

f.    monitoring the activities of co-counsel to assure the schedules are met and unnecessary expenditures of time and expense are avoided; and

g.    performing such other duties as may be incidental to proper coordination of Plaintiffs' pretrial activities or authorized by further order of the Court.

5.    Liaison counsel shall be responsible for:

a.    coordinating communications between the Court and counsel;

b.    convening and organizing meetings of counsel;

c.    advising parties of developments of the case; and

d.    otherwise assisting in the leadership and prosecution of class allegations.

6.    The executive committee shall consult regularly with lead counsel, working to coordinate all aspects of the litigation with lead counsel, including the formulation and drafting of discovery, pleadings, briefs, and motion papers. It remains, however, lead counsel's responsibility to direct the overall structure, position, and direction of the litigation.

7.    All Plaintiffs' counsel shall, by no later than the tenth day of each month, submit a record of time expended and expenses incurred the immediately preceding month to lead counsel. All such submissions shall be made in a manner and form directed by Plaintiffs' lead counsel. The Court will seek periodic reports from lead counsel with respect to these matters.

8.    By August 15, 2002, Plaintiffs shall file and serve a consolidated amended complaint (the "Consolidated Complaint") on counsel for Defendants. Defendants shall answer, object or

otherwise respond with respect to the Consolidated Complaint no later than thirty (30) days after it is filed. A motion to dismiss, if filed, will not relieve Defendants of the obligation to file an answer to the Consolidated Complaint and will not operate to stay discovery. Any motion to stay discovery or any other proceeding in this action must be filed within fourteen (14) days of the filing of the Consolidated Complaint. Defendants shall not respond to the complaints already filed in the related cases pending in this district.

9. Plaintiffs will make a determination of whether Ferrous Processing & Trading Co. will be voluntarily dismissed by a date no later than the date on which the Consolidated Complaint is filed.

10. When a case that relates to the subject matter of the consolidated actions is hereafter filed in this Court or transferred here from another court, the Clerk of this Court shall:

   a. Place a copy of this Order in the separate file for such action.

   b. Mail a copy of the Order of assignment to counsel for plaintiffs and to counsel for defendants in the consolidated actions.

   c. Mail to the attorneys for plaintiffs in the newly filed or transferred case a copy of this Order and to any new defendant(s) in the newly filed or transferred case.

   d. Make an appropriate entry in the Master Docket.

11. This Court requests the assistance of counsel in calling to the attention of the Clerk of the Court the filing or transfer of any case that might properly be consolidated as a part of this action.

12. This Order shall apply to each case subsequently filed in this Court or transferred to this Court unless a party objecting to the consolidation of such case or to any other provision of this Order shall, within ten days after the date upon which a copy of this Order is mailed to counsel for such

7

party, file an application for relief from this Order or any provision herein and this Court deems it

appropriate to grant such application.

13.    Notwithstanding the Court's earlier order, the consolidated cases shall be captioned *In Re: Scrap*

*Metal Antitrust Litigation.*

As to the remaining case management issues, the Court orders the following:

1.    The consolidated cases are assigned to the complex tract.

2.    The consolidated cases are designated for electronic filing.

3.    The consolidated cases are not suitable for Alternative Dispute Resolution mechanisms at this time.

4.    The parties do not consent to the jurisdiction of a United States Magistrate Judge, pursuant to 28

U.S.C. § 636(c).

5.    The non-expert discovery cutoff date is March 28, 2003.[6]

6.    Rule 26 disclosures are due by September 25, 2002.[7]

7.    Motions for class certification are due by November 13, 2002.  Opposition briefs are due by

December 13, 2002.  Reply briefs are due by December 27, 2002.

8.    Expert reports from the party bearing the burden of proof on the issue for which expert testimony

is proffered are due no later than March 28, 2003.  Responsive expert reports are due no later

than May 12, 2003.  The expert discovery cutoff date is June 26, 2003.

---

[6]  Discovery on the merits will proceed simultaneously with discovery on issues relating to the propriety of class certification.

[7]  Rule 26 obligations are mandatory in the absence of an order by the Court staying those obligations.

8

9.    The cutoff for joining new parties and amending the pleadings is December 13, 2002.

10.   The dispositive motion cutoff date is August 11, 2003.  Opposition briefs are due by September

10, 2003.  Reply briefs are due by September 25, 2003.

11.   The Court sets a status hearing for October 9, 2002 at 12:30 p.m. in Room 16A, U.S.

Courthouse, 801 West Superior Avenue, Cleveland, Ohio.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley

**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

S:\02cv0844.lead counsel.wpd                        9

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

IN RE: STATIC RANDOM ACCESS (SRAM)          NO. C 07-01819 CW
ANTITRUST LITIGATION,

**MINUTE ORDER**
Date: 5/3/07

**The Honorable Claudia Wilken, Presiding**
**Clerk: Sheilah Cahill    Court Reporter:** David Disbrow, pro tem

**Appearances for Plaintiff:**
see attached

**Appearances for Defendant:**
see attached

### Motions:

| | | |
|---|---|---|
| Direct Purchaser Class | Mo. to appoint interim lead class counsel | Granted in part |
| Plaintiff Chip-Tech Ltd. | Cross-mo. for appointment of interim lead counsel and entry of pretrial order no. 1 | Granted in part |
| Plaintiffs Westell Technologies, Inc. and Telular Corp. | Cross-mo. to appoint interim lead class counsel | Granted in part |
| Indirect Purchaser Plaintiffs | Mo. for appointment of interim class counsel | Granted in part |

Order to be prepared by:  Counsel to submit proposed Pretrial
Order No. 1

Notes:   Motions to appoint interim lead class counsel are
granted in part.  Court appoints Joseph Cotchett and his firm as
lead and liaison counsel for direct purchasers; Court will also
appoint steering committee with one chairperson; Court appoints
Joseph Cotchett as Chairperson.  Committee will be made up of
firms representing direct purchasers.   Court will appoint one
firm as lead counsel for indirect purchasers; Mr. Scarpulla will
be lead counsel for indirect purchasers.  Court inclined to sign

Pretrial Order No. 1 with paragraph 9 included; any opposition will be referred to a Magistrate Judge. **The Case Management Conference presently set for 6/1/07 at 2:00 p.m. will apply to all cases including cases transferred by the MDL Panel from other districts and cases directly filed in this district.** Counsel to submit joint CMC statement with table; defense counsel to include liaison counsel for defendants in CMC statement. Department of Justice will have to file a motion for any discovery.

Copies to:  Chambers

Appearances by Plaintiffs:

Frances Scarpulla and Craig Corbitt for indirect purchaser
plaintiffs
Terry Gross for indirect purchaser plaintiffs
Natalie Finkelman Bennett for indirect purchaser plaintiffs
Michael P. Lehmann for indirect purchaser plaintiffs
Daniel C. Girard for indirect purchaser plaintiff Lawrence Markey
Susan G. Kupfer for indirect purchaser plaintiffs
Scott J. Yundt and Derek G. Howard for plaintiff David Perez
B. Mark Fong for plaintiff James Barnes
Michele C. Jackson for plaintiff Katz (indirect plaintiff)
Colleen Duffy Smith for indirect plaintiffs Reedy and Krietzer
Bruce L. Simon for Alexander Ma/Direct Purchaser Action
Steven J. Greenfogel for direct plaintiff Berezin
Guido Saveri and Lisa Saveri for plaintiff Alexander Ma
Michael Freed and Steven A. Kanner for Westell and Telular
Joseph W. Cotchett and Steven N. Williams for plaintiff Alexander
      Ma and indirect purchaser class
Steven Sidener and Paul Bennett for plaintiff Chip-Tech (direct
      purchaser cases)
Anthony D. Shapiro for plaintiffs Alexander Ma and Berezin
Robert S. Green for plaintiff Autotime


Appearances by Defendants:

Roxane A. Polidora for Sharp Electronics Corp.
Stuart c. Plunkett for Fujitsu Ltd.
James AL. McGinnis for Samsung
Maura L. Rees for Cypress Semiconductor
Edward V. Anderson for ST Microelectronics
Stephen V. Bomse for Sony Electronics
Robert Pringle and Paul Griffin for NEC Electronics
Steven H. Morrissett for Winbond Electronics
Michael F. Tubach for Hynix
G. Charles Nierlich for Micron Technology
Lucas A. Messenger for Epson Electronics
Kevin C. McCann for Alliance Semiconductor
Belinda S. Lee for Toshiba America

# EXHIBIT 4

Boies, Schiller & Flexner LLP is a national litigation firm specializing in complex litigation and national and international arbitration. The Firm has approximately 220 attorneys in offices in New York, Washington, D.C., Florida, New Jersey, New Hampshire, Nevada and California. The Firm was founded in 1997 by David Boies and Jonathan Schiller, both of whom were nationally renown antitrust and international litigators. Donald Flexner joined the Firm in 1999, bringing with him years of experience litigating antitrust actions in private practice and prosecuting antitrust violators as former Deputy Assistant Attorney General for the Antitrust Division of the United States Department of Justice. These three named partners and the other attorneys who make up the Firm are among the best litigators in the country, with decades of experience and proven track records in trying complex cases and arbitrating national and international disputes.

Boies, Schiller & Flexner's litigation practice is divided approximately equally between representing plaintiffs and representing defendants in federal and state courts throughout the United States, and in arbitrations in the United States and abroad. The Firms' clients are among the largest and most sophisticated in the world, including: AOL, Alcoa, Caithness, CBS, Credit Guardsmark, Host Marriott, Howard Milstein, Level 3, Northwest Airlines, Philip Morris, Prudential, Raytheon Engineers and Constructors, SB Corporation, Siemens Westinghouse Power Corporation, Solow Building Company, Southwestern Bell, The City of Los Angeles, The New York Yankees, Unisys, WORLDSPAN and 3Com. The Firm also represents the State of Alaska, Columbia University, Fannie Mae, the Republic of France, and the Public Broadcasting System.

Boies, Schiller & Flexner has served as lead or co-lead plaintiff's counsel in numerous complex class actions. These class action cases have involved a variety of claims relating to such matters as antitrust and securities fraud. The Firm enjoys one of the most selective and successful class action practices in the country. Since its inception, Boies, Schiller & Flexner has negotiated record settlements and won substantial verdicts on behalf of class members in several prominent cases. In the last four years, attorneys from Boies, Schiller & Flexner took to trial and won verdicts on behalf of class members almost $200 million post-trebling. Some of the cases in which the firm has played a leading role include:

- In 1999, the firm successfully acted as one of three co-lead counsel in recovering a billion dollars on behalf of class plaintiffs in *In re Vitamins Antitrust Litigation*, MDL 1285 (D.D.C.), which is considered to be the largest settlement of a private antitrust case in history. In 2003, the firm, acting as co-lead counsel, took the remaining four defendants to trial in D.C. federal court and won a $53 million verdict, pre-trebling.
- In 2005, the firm, after negotiating settlements totaling over $10 million, went to trial in U.S. District Court in Cleveland, winning

a verdict of $11 million, pre-trebling, for class members in *In re Scrap Metal Antitrust Litigation*, (N.D.Ohio).

- In 2000, BSF was lead counsel in *In re Auction Houses Litigation* (S.D.N.Y.) and negotiated a $512 million settlement on behalf of the plaintiff class, which was described by another plaintiff's counsel as "the most outstanding result I have ever heard of in the history of the antitrust laws."

- In a securities class action, Richard Drubel, one of the firm's senior partners, acted as lead counsel for the Plaintiff Class in *In re Terra-Drill Partnerships Litigation*, MDL 791, C.A. No. H-86-3808 (S.D. Tex. 1989), which went to trial and resulted in a $72 million judgment for the Class. The <u>National Law Journal</u> called this verdict "one of the most significant verdicts of the year."

. Boies, Schiller & Flexner has extensive experience in pharmaceutical class action matters. The firm has served as co-lead counsel in *In re Cardizem CD Antitrust Litigation*, MDL No. 1278, Civil Action No. 99-cv-732589 and 99-cv-73870 (E.D. Mich. 2002) ($110 million settlement), in *In re Buspirone Antitrust Litigation,* MDL No. 1413, Civil Action No. 01-CV-7951 (JAK) (S.D.N.Y. 2002) ($220 million settlement), and *In re Terazosin Hydrochloride Antitrust Litigation*, MDL No. 1317, Civil Action No. 99-7143-Civ-Seitz (S.D. Fla.)($75 million settlement).

Boies, Schiller & Flexner currently represents plaintiff classes of securities holders in *Rory Riggs and John Lewis v. Termeer, Genzyme Corp., et al.,* No. 03-CV-4014 (LLS) (S.D.N.Y.) and purchasers of the prescription drug Hytrin. Boies, Schiller & Flexner served as co-lead counsel for plaintiff shareholder classes in *In re Alcatel Alsthom Securities Litigation*, MDL No. 1263, Civil Action No. 4:98-CV-320 (E.D. Tex. 2001) ($75 million settlement) and in *Lalor et al. v. Omtool, Ltd. et al.,* C.A. No. 1:99-cv-469-M, (D.N.H. 2001) ($6 million settlement).

Boies, Schiller & Flexner's ability to operate effectively as plaintiffs' counsel is reinforced by its experience representing defendants in securities class actions. Boies, Schiller & Flexner has represented major corporations, including Unisys Corporation in *In re: Unisys Corporation Securities Litigation*, C.A. No. 99-5333 (E.D. Pa.) (favorably settled class action); 3Com Corporation in *Hirsch, et al v. 3Com Corporation,* CV764977 (Cal. Superior Court (Santa Clara Co.)) (class action dismissed on summary judgment); Qwest in *In re Quest Communications International, Inc. Securities Litigation,* CV No. 01-RB-1451 (PAC) (D. Co.) (currently in pre-trial proceedings); and WebMD in *In re Initial Public Offering Securities Litigation*, 21 MC 92(SAS) (S.D.N.Y.) (consolidated cases currently in pre-trial proceedings).

# EXHIBIT 5

 **THE WALL STREET JOURNAL.**
*O N L I N E*

FORMAT FOR PRINTING
sponsored by    TOSHIBA
Don't copy. Lead.*

**February 10, 2006**

## PAGE ONE

### *Planned Economy*
# As China's Trade Clout Grows, So Do Price-Fixing Accusations

**Manufacturers of Vitamin C
And Mineral Used in Steel
Are Cited in U.S. Civil Suits**

**The Opposite of Dumping**

**By JOHN R. WILKE in Washington and KATHY CHEN in Beijing**
*February 10, 2006; Page A1*

**DOW JONES REPRINTS**

⟨R⟩ This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

Ten years ago, China's pharmaceutical firms had a sliver of the world's market for vitamin C. Today, China is the OPEC of vitamin C.

Chinese manufacturers currently supply more than 85% of the vitamin C used in the U.S. Just like the oil cartel, they can heavily influence world prices. After a 2001 agreement among China's four largest producers, spot prices for vitamin C rose to as high as $9 a kilogram from lows of less than $3.

Cooperation among competitors is illegal in the U.S. when it leads to higher prices for consumers. So far, about half a dozen civil antitrust suits have been filed against Chinese vitamin C manufacturers in various U.S. courts. Federal prosecutors in Texas are reviewing similar allegations, though the Justice Department hasn't yet decided whether or not to pursue criminal charges, people close to the inquiry say.

As China becomes ever more dominant in manufacturing, its ability to dictate the prices of industrial and consumer products is steadily rising. As a result, Chinese manufacturers are increasingly running afoul of Western antitrust law in products from vitamin C to a mineral used in steel production. These legal struggles could become another point of tension in the U.S.-China relationship, which has been tested by disagreements over matters from textile tariffs to the trade deficit.



**Stormy Cs**
Average wholesale price per kilogram of vitamin C imports from China.

November 2001: Industry group formed

Chinese companies deny breaking U.S. law and have hired U.S. law firms to mount a defense. The companies are expected to argue they are acting as agents of the Chinese government and therefore aren't subject to antitrust law. A Chinese industry executive says the companies raised prices to stave off accusations they were "dumping," or illegally selling products abroad at below cost to win market share.

There are signs the vitamin C model is migrating to other Chinese exports. In a meeting of Chinese makers of the pain reliever acetaminophen, the companies "fervently indicated their wish to

use the example of vitamin C industry self-regulation," according to minutes posted on the group's Web site. Prices subsequently jumped 20%. Chinese makers of saccharin, rayon and magnesite -- a mineral used in steel production -- recently formed similar alliances. Magnesite producers also are being sued in the U.S.

In the case of saccharin, Chinese producers had been accused by the U.S. Commerce Department of dumping. Then in March 2003, five companies formed a "Saccharin Sub-committee" of the China Chamber of Commerce, a quasigovernment body. They declared that low prices no longer made sense now that they had overtaken their U.S. and South Korean rivals.

"Due to disorderly internal competition...various enterprises lost huge profits" and had to pay antidumping duties levied by the U.S., according to minutes of the meeting posted on the group's Web site. The companies agreed to raise export prices and said "self-regulation should continue into 2004 to prevent the mutual slaughtering of aggressive competition."

William Isaacson, a Washington lawyer who filed the first of the civil lawsuits against Chinese producers of vitamin C and magnesite, says these aren't isolated instances. "Once Chinese companies can control a market, this becomes their business model," he contends. His vitamin C case is pending in federal court in Brooklyn, N.Y. The magnesite case was filed in U.S. District Court in Newark, N.J.

American courts have been increasingly willing to claim jurisdiction across international borders in antitrust cases if harm can be shown to U.S. consumers. U.S. companies that use vitamin C include makers of dietary supplements, soft drinks and animal feed.

Monopolies remain active in parts of China's economy, even though price-fixing was formally outlawed in 1998. A sweeping new antimonopoly law is being drafted in Beijing. Its adoption has been slowed by squabbling among Chinese government agencies forced to give up the ability to set prices. It isn't clear if the new law would bar price collusion in the vitamin market.

China's state-run pharmaceutical companies began making vitamin C in 1958 catering to domestic demand. In the late 1970s, Chinese government researchers found a way to speed up the basic production process, which is done by fermenting ascorbic acid. Chinese companies then could make vitamin C in two steps rather than five, as was common in the West.

**Looking Abroad**

Vitamin C, thus, was among the first Western drugs for which China developed its own intellectual property and a clear cost advantage over foreign rivals. With its new technology, Chinese producers began to look for sales abroad. The promise of export profits attracted new producers. Production lines multiplied and volume soared.

Northeast Pharmaceutical Group Co. was one of the first to begin exporting. Based in the gritty industrial city of Shenyang, 800 miles northeast of Beijing, Northeast is among the biggest Chinese vitamin C producers and boasts that it is one of China's best-known pharmaceutical brands. It employs 8,000 workers making products from antibiotics to the AIDS drug AZT. Vitamin C is its best seller, with more than 15,000 tons a year under production.

China's vitamin makers got a big break in 1997, thanks to an earlier antitrust dispute. After a long investigation, the U.S. Justice Department accused European and Japanese companies of price-fixing in a dozen vitamins, including vitamin C. It became the largest-ever criminal antitrust case, resulting in nearly

Case3:07-md-01826-WHA   Document43-1   Filed05/14/07   Page41 of 84

$1 billion in government fines and several jail terms for executives.

With the European-Japanese cartel broken, Chinese companies flooded the market with low-price vitamin C, forcing plant closings and consolidation among European and Japanese firms. Chinese companies, who previously had been overshadowed by their bigger rivals, quickly captured much of the world market.

Prices fell sharply from the high of $12 a kilo established by the European and Japanese cartel members in 1996. By late 2001, competition pushed prices down to $2.80 a kilo. (A kilogram equals 2.2 pounds.)

People familiar with the matter say China's vitamin C makers were told at that time by the Chinese government to deal with Western complaints about price dumping. They say the companies took that to mean they should coordinate to raise prices.

Ma Xiaoye, director of independent think tank Shanghai Academy for World Watch and a former Chinese trade official, says the government routinely encourages Chinese companies to "coordinate" to avoid price wars that often spark antidumping charges, a practice he says is legal. He says these requests aren't binding and that the groups don't usually set specific prices.

Mr. Ma says these efforts often don't result in any agreement. "Vitamin C was an exception, because there are only a few companies," Mr. Ma says. "It was easier" for them to agree on an approach.

In November 2001, the four largest Chinese producers formed the Vitamin C Chapter of the China Chamber of Commerce of Medicines & Health Products Importers & Exporters. On its Chinese-language Web site, the chapter announced a "self-discipline agreement...to stabilize and raise export prices."

Soon after, spot prices for vitamin C shot up to as high $7 a kilo. By 2003, rising demand and supply shortages pushed the price higher.

Guan Ningyun, legal director of the China Chamber of Commerce of Medicines & Health Products Importers & Exporters denies the group sets prices, saying in an interview that "it's the market force that pushes prices up."

The rise enticed a few Chinese producers to grab market share by cutting their prices, according to the U.S. civil suits. U.S. import data show a noticeable price dip in mid-2003.

In November, the Vitamin C trade group held an "emergency meeting" in which members again agreed not to cut prices, according to allegations in the U.S. civil suits. Spot prices rose to as high as $9 a kilo by the end of December. As U.S. lawyers readied lawsuits at the end of 2004, prices again drifted downward. It also is possible that some Chinese producers were backsliding on their promises. In recent months, as antitrust scrutiny increased, U.S. prices have fallen to as low as $3.80 a kilo.

Bulk purchasers of vitamin C in the U.S. were buffeted by the price swings. "We were paying about $4 a kilo, then within a year it was $8," says Bradley Reynolds, a vice president at Animal Science Products Inc., Nacogdoches, Texas, who says the higher costs hurt profits. The family-owned, feed-supplement company blends vitamins for customers from catfish farmers to pet-food makers.

Mr. Reynolds's family firm is a lead plaintiff in one of the civil lawsuits against the Chinese vitamin C makers. It was among the U.S. businesses that won damages in the European vitamin case. Though he won't divulge the amount, Mr. Reynolds says, "it wasn't near as much as they stole."

Livestock feed accounts for about 10% of U.S. vitamin C consumption. About a third goes to food and beverage makers, where it is used as a preservative as well as a nutrient. The rest is used in pharmaceuticals and diet supplements.

The proliferation of private antitrust suits against Chinese companies has brought teams of U.S. lawyers to China seeking to defend them. Attorneys looking to defend Chinese magnesite producers recently took part in a bake-off in Beijing. The first round included 30-minute pitches in an auditorium at the China Chamber of Commerce of Metals, Minerals & Chemicals. In later meetings, held in ornate ceremonial rooms over rounds of steaming chrysanthemum tea, lawyers made individual presentations about their defense strategy.

The Chinese executives rarely spoke, the U.S. participants say, but appeared to understand every word. Their Chinese lawyers quizzed the U.S. attorneys closely about U.S. law and cited the latest cases and law-review articles. A similar competition was held for law firms seeking to represent Chinese vitamin C manufacturers.

Some attorneys maintain that antitrust law still is largely an alien concept for Chinese companies. "China today is where Japan or [South] Korea were a decade ago -- they don't fully appreciate the seriousness of these lawsuits and possible criminal investigations," says Kirby Behre, a Washington, D.C., lawyer with Paul, Hastings Janofsky & Walker LLP, which has numerous clients in China.

James Serota, an attorney with Greenberg Traurig LLP in New York, who is representing Northeast Pharmaceutical, declines to comment, citing the pending civil cases. Other vitamin C makers who have been sued decline to comment. In the past, many have said they have done nothing wrong. North China Pharmaceutical Group Ltd. called the suits "groundless" in reports carried by Xinhua, the official China news agency, in June. In Xinhua reports, Shijiazhuang Pharmaceutical Group Ltd. said the suits were "deliberately provocative."

**One Possible Defense**

A recent court filing by Northeast Pharmaceutical in a Massachusetts state court signals one possible defense. The filing says Northeast is "supervised and directed" by the Shenyang municipal government and should be treated by U.S. courts as an "agent or instrumentality" of the People's Republic of China.

Under international law, sovereign nations are immune from antitrust enforcement by another country. That is why lawsuits against the Organization of Petroleum Exporting Countries are routinely dismissed. Although they have a number of different shareholders, the vitamin C makers are overseen by state officials and a majority of their stock is still held by government groups, according to Northeast's court filing.

It isn't clear how close these ties remain. A high-level official in the local government office that oversees North China Pharmaceutical says the government no longer "interferes" in management. "We don't help set prices, that concept is 20 or 30 years old," says the official. "They do what it takes to earn money."

Plaintiffs' lawyers are expected to challenge the immunity defense on the grounds that it doesn't apply to companies indirectly owned by the state or state-owned companies that engage in purely commercial activity.

China's chambers of commerce could be major figures in the cases. Many of the price agreements were set up under their auspices. These days, the chambers awkwardly combine their old role in China's

centrally planned economy, in which they set prices and market standards, with their new one as champion of the country's newly privatized businesses. In some ways, they symbolize the learning process the country is undergoing as it becomes a key player in global trade.

"China's chamber of commerce has two personalities," says Wang Ming, deputy dean of School of Public Policy & Management at Tsinghua University.

U.S. trial lawyers are examining other Chinese industries for evidence of price fixing. Two of the firms that filed cases against Chinese vitamin C makers -- Boies Schiller & Flexner LLP, and Cohen, Milstein Hausfeld & Toll PLLC -- earlier won settlements of $1.2 billion for U.S. businesses overcharged by the European vitamin cartel. They included drug giant Abbott Laboratories and cereal maker General Mills Inc.

The team of prosecutors and FBI agents looking into Chinese vitamin C is the same one responsible for breaking up the European vitamin cartel. But criminal price-fixing cases are extraordinarily difficult to prove. Witnesses and evidence are often beyond the reach of investigators. This case, in particular, would be fraught with political and economic complications.

"These civil suits are probably going to go forward," predicts Mr. Behre, the Paul, Hastings lawyer. "But whether or not the government decides to bring a criminal case becomes a political question."

Mr. Reynolds, the Texas feed-supplement maker, doesn't think it's all that complicated. "If China is going to be a world player, they've got to play by the rules."

**—Jane Zhang in Washington and Zhou Yang in Beijing contributed to this article.**

**Write to** Kathy Chen at kathy.chen@wsj.com[1]

**URL for this article:**
http://online.wsj.com/article/SB113954082130170389.html

**Hyperlinks in this Article:**
**(1)** mailto:kathy.chen@wsj.com

**Copyright 2006 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our
**Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones
Reprints at 1-800-843-0008 or visit **www.djreprints.com.**

# EXHIBIT 6

1   Guido Saveri (SBN 22349; guido@saveri.com)
    R. Alexander Saveri (SBN 173102, rick@saveri.com)
2   SAVERI & SAVERI, INC.
    111 Pine Street, Suite 1700
3   San Francisco, CA  94111
    Telephone:  (415) 217-6810
4   Facsimile:  (415) 217-6913

5   Bruce L. Simon (SBN 96241; bsimon@psswplaw.com)
    Esther L. Klisura (SBN 221171; eklisura@psswplaw.com)
6   PEARSON, SIMON, SOTER, WARSHAW & PENNY, LLP
    44 Montgomery Street, Suite 1200
7   San Francisco, CA  94104
    Telephone:  (415) 433-9000
8   Facsimile:  (415) 433-9008

9   Steve W. Berman (*pro hac vice*, steve@hbsslaw.com)
    Anthony D. Shapiro (*pro hac vice*, tony@hbsslaw.com)
10  HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Fifth Avenue, Suite 2900
11  Seattle, WA  98101
    Telephone:  (206) 623-7292
12  Facsimile:  (206) 623-0594

13  Michael D. Hausfeld (mhausfeld@cmht.com)
    Andrea L. Hertzfeld (ahertzfeld@cmht.com)
14  COHEN MILSTEIN HAUSFELD & TOLL, PLLC
    1100 New York Avenue, NW
15  Suite 500 West Tower
    Washington, DC  20005
16  Telephone:  (202) 408-4600
    Facsimile:  (202) 408-4699

17
    [Additional counsel listed on signature page]
18  *Counsel for Direct Purchaser Plaintiffs and*
    *the Proposed Class*

19                 **UNITED STATES DISTRICT COURT**

20      **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

21

22  IN RE TFT-LCD (FLAT PANEL)           Master File No. C07-1827 SI
    ANTITRUST LITIGATION
23                                       MDL No. 1827

24  ———————————————————                  **NOTICE OF MOTION AND MOTION**
                                         **TO APPOINT INTERIM LEAD CLASS**
25  This Document Relates to:            **COUNSEL**

    ALL DIRECT PURCHASER ACTIONS
26                                       Date:    June 8, 2007
                                         Time:    9:00 a.m.
27                                       Ctrm:    10, 19th Floor
                                         Honorable Susan Illston
28

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................... 3

II. BACKGROUND .................................................................................................... 3

III. ARGUMENT ........................................................................................................ 4

    A. The Appointment of Interim Lead Class Counsel is Permitted Under Rule 23(g) ................................................................................................ 4

    B. Proposed Interim Lead Class Counsel Have Extensive Antitrust Class Action Experience .............................................................................................. 5

        1. Saveri & Saveri, Inc. .................................................................................. 5

        2. Pearson, Simon, Soter, Warshaw & Penny, LLP ....................................... 7

        3. Hagens Berman Sobol Shapiro LLP ........................................................... 9

        4. Cohen Milstein Hausfeld & Toll, PLLC ................................................... 11

    C. Proposed Interim Lead Class Counsel Have Taken Significant Steps to Advance This Litigation ................................................................................... 13

    D. Proposed Interim Lead Class Counsel Have the Resources and Geographic Coverage to Effectively Prosecute This Litigation ............................................. 14

    E. Proposed Interim Lead Class Counsel Affirm Their Commitment to Work Cooperatively With All Counsel ....................................................................... 14

    F. Proposed Interim Lead Class Counsel Have a Case Management Plan for this Case ..................................................................................................... 14

        1. Proposed Interim Class Counsel will Coordinate with Counsel for the Indirect Purchaser Class ........................................................................... 15

        2. Coordination of the Direct and Indirect Cases .......................................... 16

        3. Coordination with the DOJ ....................................................................... 19

        4. Additional Plaintiffs ................................................................................. 19

        5. Trial ......................................................................................................... 20

        6. Proposed Interim Class Counsel's Meet and Confer Efforts ..................... 21

IV. CONCLUSION ..................................................................................................... 22

NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL
Master File No. C07-1827 SI

1
2

## NOTICE OF MOTION AND MOTION

3   **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

4         **PLEASE TAKE NOTICE** that on June 8, 2007 at 9:00 a.m., or as soon thereafter as the

5   matter may be heard before the Honorable Susan Illston of the United States District Court,

6   Northern District of California, 450 Golden Gate Avenue, San Francisco, the undersigned law

7   firms will and hereby do move the Court for an order appointing them as Interim Lead Class

8   Counsel for the putative *direct purchaser* class in these actions and an order establishing pretrial

9   procedures to govern before the first case-management conference and entry of a more

10  comprehensive case-management order.  This motion is brought pursuant to Rule 1 and Rule 23(g)

11  of the Federal Rules of Civil Procedure.  The grounds for this motion are that this complex case

12  will benefit from the appointment of interim lead class counsel, and that the undersigned proposed

13  interim lead class counsel are well qualified for the position due to their extensive experience in

14  antitrust class action litigation and trials.  This motion is based on this notice of motion and motion,

15  the supporting memorandum of points and authorities, the accompanying declaration of Bruce L.

16  Simon and attached exhibits, any papers filed in reply, the argument of counsel, and all papers and

17  records on file in this matter.

18

19  DATED:  May 4, 2007                    Respectfully submitted,

20

21                                 By:    /S/ Bruce L. Simon
                                          Bruce L. Simon
22                                        Esther L. Klisura
                                          PEARSON, SIMON, SOTER, WARSHAW
23                                            & PENNY, LLP
                                          44 Montgomery Street, Suite 1200
24                                        San Francisco, CA  94104
                                          Telephone:   (415) 433-9000
25                                        Facsimile:    (415) 433 9008

26                                        *Counsel for Direct Purchaser Plaintiffs Phelps*
                                          *Technologies, Inc. and Marshall Myers and the*
27                                        *Proposed Direct Purchaser Plaintiff Class*

28
                                          -1-

1

2

3

4

5

Guido Saveri
R. Alexander Saveri
Lisa M. Waste
Cadio Zirpoli
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:   (415) 217-6810
Facsimile:    (415) 217-6913

6

7

*Counsel for Direct Purchaser Plaintiffs Crago
Corporation and Orion Home Systems, LLC and
the Proposed Direct Purchaser Plaintiff Class*

8

9

10

11

12

Steve W. Berman
Anthony D. Shapiro
George W. Sampson
Ronnie S. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:   (206) 623-7292
Facsimile:    (206) 623-0594

13

14

15

Reed Kathrein
HAGENS BERMAN SOBOL SHAPIRO LLP
425 Second Street, Suite 500
San Francisco, CA 94107
Telephone:   (415) 896-6300
Facsimile:    (415) 896-6301

16

17

18

*Counsel for Direct Purchaser Plaintiff Home
Technologies Bellevue LLC and the Proposed
Direct Purchaser Plaintiff Class*

19

20

21

22

Michael D. Hausfeld
Kathleen M. Konopka
Andrea L. Hertzfeld
COHEN MILSTEIN HAUSFELD & TOLL, PLLC
1100 New York Avenue, NW
Suite 500 West Tower
Washington, DC 20005
Telephone:   (202) 408-4600
Facsimile:    (202) 408-4699

23

24

25

*Counsel for Direct Purchaser Plaintiffs Art's TV
& Appliance, Omnis Computer Systems, and
Magic Video, Inc. and the Proposed Direct
Purchaser Plaintiff Class*

26

27

28

- 2 -

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

1

## I.     INTRODUCTION

2        Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the law firms of Saveri &

3   Saveri, Inc. ("Saveri"), Pearson, Simon, Soter, Warshaw & Penny, LLP ("Pearson Simon"), Hagens

4   Berman Sobol Shapiro LLP ("Hagens Berman"), and Cohen, Milstein, Hausfeld & Toll, PLLC

5   ("Cohen Milstein"), respectfully seek appointment as Interim Lead Class Counsel for the ***direct***

6   ***purchaser*** class in this consolidated multidistrict litigation ("MDL").  The appointment of interim

7   lead class counsel here will faciliate the orderly and efficient prosecution of this proceeding, which

8   involves approximately 130 separately filed class actions and over two dozen defendants.  The four

9   firms proposed here are well qualified for this appointment.  Each firm has a proven track record of

10  experience, knowledge, and commitment of resources in similar antitrust class actions.  Each of the

11  proposed interim class counsel has experience prosecuting antitrust class actions against the

12  semiconductor industry and have undertaken substantial investigations into these cases.

13  Significantly, three of the four proposed interim class counsel, held leadership positions in *In re*

14  *Dynamic Random Access Memory (DRAM) Antitrust Litigation* (N.D. Cal., MDL. 1486), which

15  presented many of the same issues that will come up here and was settled for over $325 million to

16  the direct purchaser class, an "extraordinary" recovery.[1]  Finally, the proposed interim lead class

17  counsel, each having conducted numerous trials, have a plan to efficiently handle and prosecute

18  this proceeding through the time of trial.  As set forth more fully below, they have already begun to

19  meet-and-confer with defense counsel and counsel for the indirect plaintiffs to organize this case.

20

## II.     BACKGROUND

21        This MDL proceeding arises from the alleged price-fixing of Thin Film Transistor Liquid

22  Crystal Display ("TFT-LCD") products used as display screens in televisions, computer monitors,

23  mobile phones, and other electronic devices.  Defendants are foreign and domestic TFT-LCD

24  manufacturers and affiliated companies.  Plaintiffs allege that defendants' price-fixing conspiracy

25  began in approximately 1998 and may be continuing to the present.  The United States Department

26

27        [1]     At a final settlement approval hearing in that case, Judge Phyllis Hamilton described the
direct purchaser plaintiffs' settlement as "extraordinary," and stated, "I don't think I've seen one
28  quite so high."  *See* Exhibit F to the declaration of Bruce L. Simon, page 7.

- 3 -

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

1    of Justice ("DOJ") is currently investigating possible antitrust violations in the TFT-LCD industry

2    out of its San Francisco office. *See* declaration of Bruce Simon, ¶ 2.

3          The first class action alleging this conspiracy was filed on December 11, 2006 on behalf of

4    indirect purchasers. On December 13, 2006, the Saveri firm filed the first direct purchaser action

5    on behalf of Crago Corporation, who bought TFT-LCDs as a component for the manufacture of

6    computers. Shortly thereafter, each of the proposed interim class counsel filed direct purchaser

7    class actions on behalf of their separate clients. Meanwhile, several dozen similar class actions

8    were filed in judicial districts across the country. *See Id.* ¶ 3.

9          On December 22, 2006, a Motion for Transfer and Consolidation was filed pursuant to 28

10   U.S.C. Section 1407, requesting that these cases be consolidated or coordinated and transferred to

11   the Northern District of California. Cross-motions and substantial briefing ensued. On April 17,

12   2007, the JPML transferred these cases to this Court. Approximately 104 of the cases in this MDL

13   are *indirect* purchaser actions and 24 are *direct* purchaser actions. *See Id.* ¶ 4. The four firms

14   proposed here collectively represent a substantial number of direct purchaser plaintiffs and are

15   supported by counsel in other direct purchaser cases as well. *See Id.* ¶ 5. The first case

16   management conference in this proceeding is scheduled for June 8, 2007.

17                        **III.    ARGUMENT**

18   **A.    The Appointment of Interim Lead Class Counsel is Permitted Under Rule 23(g)**

19         Rule 23(g) of the Federal Rules of Civil Procedure provides that a court "may designate

20   interim counsel to act on behalf of the putative class before determining whether to certify the

21   action as a class action." Fed. R. Civ. P. 23(g)(2)(A). Where, as here, there are multiple class

22   actions pending, "appointment of class counsel is necessary to protect the interests of class

23   members." *Donaldson v. Pharmacia Pension Plan*, 2006 U.S. Dist. Lexis 28697, at *2-3 (S.D. Ill.

24   May 10, 2006).

25         It is particularly important in this case that interim lead class counsel be appointed now.

26   Given the breadth of this litigation, appointing experienced and knowledgeable interim lead class

27   counsel is critical to the orderly conduct of the litigation and to ensure that the proposed direct

28   purchaser class will be fairly and adequately represented from the start. For example, under

                                    - 4 -

1    Federal Rules of Civil Procedure 16 and 26, and Civil Local Rule 16-9, counsel for the parties are

2    required to meet and confer on many subjects and to reach agreement on matters such as service of

3    process on international defendants, a pretrial and trial schedule, and discovery issues, including

4    the preservation and availability of electronically stored information. However, under the Local

5    Rules, unless otherwise ordered by the Court, **only** lead trial counsel may engage in these

6    discussions. *See* Civil Local Rule 16-3. For these reasons, the time is ripe to appoint interim lead

7    class counsel in order to begin the organization and implementation of a long-range plan to

8    adjudicate this matter. In fact, the proposed interim lead class counsel have started that process.

9        Attorneys appointed to serve as interim class counsel "must fairly and adequately represent

10   the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In selecting lead or interim class counsel,

11   the court must consider the following factors: (1) the work counsel has done in identifying or

12   investigating potential claims in the action; (2) counsel's experience in handling class actions, other

13   complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the

14   applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P.

15   23(g)(1)(C)(i). As set forth below, each of these factors support appointment of the proposed

16   interim lead class counsel.

17
18   **B.    Proposed Interim Lead Class Counsel Have Extensive Antitrust Class Action
            Experience**

19       **1.    Saveri & Saveri, Inc.**

20       The Saveri firm has over 45 years of complex, multidistrict and class action litigation

21   experience and specializes in antitrust litigation. The firm was actively involved in such landmark

22   antitrust cases as *Nisley v. Union Carbide and Carbon Corp.*, 300 F.2d 561 (10th Cir. 1960) and

23   *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962), both forerunners

24   of present class action litigation. These cases led to the development of present Federal Rule of

25   Civil Procedure 23 and some of the most important decisions in the field of antitrust law. The

26   *Nisley* case was a class action tried before a jury both on liability and damages and resulted in a

27   verdict for the class. *Nisely* is often referred to as a model for the trial of class actions and has been

28

-5-

1    repeatedly followed in later antitrust class action cases which have gone to trial.  The attorneys

2    from the firm who will be working on this case include:

3                    a.    **Guido Saveri**

4             Since founding the Saveri firm in 1959, Guido Saveri has devoted his entire career to

5    antitrust and other corporate and complex litigation.  Mr. Saveri was one of the trial attorneys in

6    *Nisely* and *Continental Ore* cases.  Additionally, he was one of the principal attorneys in

7    *Sacramento Municipal Utility District v. Westinghouse Elec. Corp.*, 1962 Trade Cas. ¶ 70,552

8    (N.D. Cal. 1962), one of a group of cases which have come to be known as the "Electrical

9    Equipment Cases."  From 1961-1965, Mr. Saveri represented clients including the State of

10   Washington, Sacramento Municipal Utility District, and the Modesto Irrigation District.  Mr.

11   Saveri tried several of these cases and worked extensively in the coordinated program instituted by

12   the Murrah Committee under the direction of the then Chief Justice of the United States Supreme

13   Court.  As a result of his experience in these cases, Mr. Saveri participated in drafting legislation

14   that created the JPML.

15            Mr. Saveri has been appointed co-lead counsel or chair of committee of plaintiffs' counsel

16   in numerous antitrust class actions including *In re Dynamic Random Access Memory (DRAM)*

17   *Antitrust Litigation* (N.D. Cal., MDL No. 1486), where Judge Phyllis Hamilton appointed him co-

18   lead counsel on behalf of direct purchasers; *In re Methionine Antitrust Litigation* (N.D. Cal., MDL

19   No. 1311), where Judge Charles Breyer appointed him co-lead counsel on behalf of a nationwide

20   class of direct purchasers; and *In re Citric Acid Antitrust Litigation* (N.D. Cal., MDL No. 1092),

21   where Judge Fern Smith appointed him co-lead counsel on behalf of a certified class of direct

22   purchasers of citric acid alleging price-fixing.  In 1998, Mr. Saveri participated as one of the four

23   lead trial counsel in *In re Brand Name Prescription Drugs Antitrust Litigation* (N.D. Ill., MDL No.

24   997).  This case was tried for more than two months and settled for $700 million in cash and $25

25   million in product.

26            In *Nancy Wolf vs. Toyota Motor Sales USA, Inc. et. al.*, (N.D. Cal., Case No. C-911-1377

27   MHP), in which Mr. Saveri served as one of the co-lead counsel, the Honorable Charles B.

28   Renfrew (Ret.), acting as Special Master commented, "If one were to compile a list of the

- 6 -

NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL
Master File No. C07-1827 SI

1   prominent plaintiffs anti-trust class action attorneys, the three lead counsel in the actions here

2   would be at the top of any nationwide list." Mr. Saveri has testified before the Federal Judiciary

3   Committee on antitrust matters and has lectured before the Association of Trial Lawyers of

4   America, The Federal Practice Institute, and other lawyer associations.  He has also written

5   extensively on antitrust topics.

6                    **b.    R. Alexander Saveri**

7          Managing partner R. Alexander Saveri has specialized in antitrust class actions for more

8   than 10 years. Mr. Saveri has served as, or is serving as, court appointed co-lead or liaison counsel

9   in many cases, including *In re Intel Corp. Microprocessor Antitrust Litigation* (D. Del., MDL No.

10  1717), an MDL proceeding on behalf of consumers who purchased Intel x86 microprocessors; and

11  *In re Vitamin C Antitrust Litigation* (E.D. NY., MDL No. 1738), an MDL antitrust class action on

12  behalf of purchasers of Vitamin C.

13                   **2.    Pearson, Simon, Soter, Warshaw & Penny, LLP**

14         Pearson Simon is a civil litigation firm with offices in Los Angeles and San Francisco.  The

15  firm specializes in complex litigation, including federal multidistrict litigation.  The firm handles

16  both national and multi-national class actions that present cutting edge issues in both substantive

17  and procedural areas.  Its attorneys have extensive experience in antitrust, consumer protection,

18  securities fraud, and unlawful employment practices.  They have expertise in litigating difficult and

19  large cases in an efficient and cost effective manner.  The attorneys from the firm who will be

20  working on the case are:

21                   **a.    Bruce L. Simon**

22         Named partner Bruce L. Simon specializes in complex cases involving antitrust, consumer

23  fraud, and securities cases.  He has served as lead or co-lead counsel in several nationwide class

24  actions including *In re Sodium Gluconate Antitrust Litigation*, an antitrust case involving a food

25  additive product; *In re Methionine Antitrust Litigation*, an antitrust class action that resulted in over

26  $100 million in settlements; *In re Citric Acid Antitrust Litigation,* which resulted in over $80

27  million in settlements for direct purchasers; *In re Louisiana Pacific Corp. Inner-Seal OSB Trade*

28  *Practices Litigation*, a product defect case involving a plywood substitute known as oriented strand

- 7 -

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

1    board; and *In re Behr Wood Sealant Litigation*, which resulted in a $107 million settlement of

2    claims alleging that certain sealants were defective. In addition, he recently served as co-chair of

3    discovery in *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*.

4         Mr. Simon has also litigated and tried many complex business cases. He tried the Osborne

5    Securities case in Santa Clara County and won a multi-million dollar jury verdict. That case

6    involved critical issues about the responsibilities of accountants and eventually went to the

7    Supreme Court, setting standards for accounting liability in California. He also represented Union

8    Bank in a case against a national accounting firm, and obtained a $7 million jury verdict that was

9    upheld on appeal.

10        Mr. Simon is a frequent speaker on trial strategies in business cases, and has lectured

11   throughout the United States and internationally. He is a past chair of the California State Bar's

12   Antitrust and Unfair Competition Section and the Business Torts Section of the American Trial

13   Lawyers Association. Mr. Simon is the co-author of the *Matthew Bender Practice Guide:*

14   *California Unfair Competition and Business Torts* (2004), which provides in-depth and practical

15   coverage of the state's Unfair Competition Law, as well as antitrust law and other commonly

16   prosecuted business torts. He currently serves on the Board of Directors for Hastings College of

17   the Law.

18                    **b.    Esther L. Klisura**

19        Associate Esther L. Klisura practices antitrust, consumer protection, and business litigation.

20   She has significant federal motion practice experience and has briefed both procedural and

21   substantive issues in antitrust class actions. Her experience also includes large electronic document

22   productions, and the taking of Rule 30(b)(6) and percipient witness depositions in an antitrust tying

23   case. Additionally, she has briefed class certification, structured class settlements, and created

24   notice plans. Recently, Ms. Klisura assisted in the trial preparation for *In re Dynamic Random*

25   *Access Memory (DRAM) Antitrust Litigation*. She is currently working on antitrust cases arising

26   from the price-fixing of SRAM, flash memory, and digital music. Ms. Klisura is a member of the

27   State Bar of California's Antitrust & Unfair Competition Section, and she participates in the

28   Northern District of California's Pro Bono Project.

- 8 -

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

3. **Hagens Berman Sobol Shapiro LLP**

Hagens Berman is a Seattle-based law firm with 6 offices nationwide, including San Francisco. The firm has represented plaintiffs in numerous antitrust class actions, and is particularly experienced in managing multi-state and nationwide class actions through an organized and coordinated approach. Hagens Berman has been recognized as one of the nation's leading plaintiffs' law firms by the *National Law Journal*. The firm has litigated some of the largest cases in history, including the *Enron ERISA* litigation, which has become a model for complex litigation, and landmark tobacco litigation, representing 13 states and resulting in the largest nationwide settlement in history. The lawyers from the firm who will be working on the case are:

a. **Steve W. Berman**

Managing and named partner Steve Berman is regarded as one of the country's top civil litigators. He was recently recognized as one of the "Top 100 Influential Lawyers in America," by the *National Law Journal*. He served as a Special Assistant Attorney General for 13 states in the tobacco litigation which resulted in the largest settlement in history. He is experienced in trying large scale cases. He was in the eighth week of trial of the Washington tobacco trial when defendants agreed to a global settlement. He has experience in MDL trials as well. He was part of the trial team in the *WPPS Litigation* (a four-month trial) and is the lead trial lawyer for several classes in claims against 22 pharmaceutical companies in the *Average Wholesale Price Litigation* (D. Mass., MDL No. 551). He has concluded the first six week trial in that MDL and is set to begin the second. In recognition of his prominence, Mr. Berman was also retained by Microsoft to be part of the core national team representing the company in antitrust class actions resulting from the DOJ's antitrust case against the company.

b. **Anthony D. Shapiro**

Partner Anthony Shapiro concentrates on antitrust and complex commercial matters. Mr. Shapiro recently served as co-lead counsel in the *DRAM Antitrust Litigation*, shepherding the case through motion practice, discovery, and trial preparation. That case resulted in over $325 million in settlements for the direct purchaser class. Mr. Shapiro has been significantly involved in other notable antitrust class actions, such as *In re Brand Name Prescription Drug Antitrust Litigation*,

- 9 -

producing nearly $800 million in compensation to class members; *In re Visa/MasterCard Antitrust Litigation*, producing $3 billion payment to the class of retail merchants in addition to significant injunctive relief; *In re Carbon Dioxide Antitrust Litigation*; *In re Carpet Antitrust Litigation*; *In re Infant Formula Antitrust Litigation*; *In re Medical X-Ray Film Antitrust Litigation*; *In re High Fructose Corn Syrup Antitrust Litigation*; *In re Commercial Tissue Products Antitrust Litigation*; *In re Flat Glass Antitrust Litigation*; *In re Lease Oil Antitrust Litigation*; *In re Bromine Antitrust Litigation*; *In re Linerboard Antitrust Litigation*; *In re OSB Antitrust Litigation*; and *In re Hydrogen Peroxide Antitrust Litigation*.

### c.    Reed Kathrein

Partner Reed Kathrein heads Hagens Berman's San Francisco office. Mr. Kathrein has more than 30 years of experience in complex litigation involving antitrust, securities fraud and consumer class actions. He has developed a reputation as one of Northern California's most successful attorneys in complex litigation and large class action cases. Mr. Kathrein has been lead or co-lead counsel in numerous class actions and complex litigation including *In re Sun Microsystems Securities Litigation*, which settled for over $30 million; *In re AMD Securities Litigation*, which settled for over $30 million; and *In re 3Com Securities Litigation*, which settled for over $250 million. He currently plays a lead role in the *In re National Security Agency Telecommunications Records Litigation*. Mr. Kathrein has also served as lead or co-lead counsel in federal courts throughout the nation, such as *In re Abbott Laboratories Securities Litigation* (N.D. Ill.); *In re Pemstar Securities Litigation* (D. Minn.); *In re AOL 5.0 Litigation* (S.D. Fl.); *In re Sony DRM Litigation* (E.D. NY.); and *Watson v. Dell* (W.D. Wash.).

### d.    George W. Sampson

Mr. Sampson is a partner at Hagens Berman where he has worked since 1994. He has served as co-lead counsel in the *Disposable Contact Lens Litigation* and the *Visa/MasterCard* debit card case, which settled on the eve of trial and resulted in the largest antitrust recovery in history. Prior to joining Hagens Berman, Mr. Sampson served as Chief of the Antitrust Bureau for the New York Attorney General's Office. Mr. Sampson oversaw a 22 person staff and managed case selection and investigation for all civil and criminal prosecutions. His position as chief involved a

- 10 -

1    heavy trial practice, primarily in federal courts and often in conjunction with several states. He

2    also served as Attorney General Liaison to the Federal-State Executive Working Group-Antitrust.

3    Mr. Sampson sits on the Executive Committee of the Antitrust and Consumer Protection of the

4    Washington State Bar Association and frequently speaks on antitrust issues. He is admitted before

5    the United States Supreme Court and numerous state bars and federal courts of appeal.

6              **e.       Ronnie S. Spiegel**

7              Associate Ronnie Spiegel has over 7 years of experience managing and litigating antitrust

8    class actions. Most recently, she worked on the *In Re DRAM Antitrust Litigation*, for which she

9    drafted many of the substantive pleadings, including class certification and plaintiffs' summary

10   judgment oppositions, and helped prepare the case for trial. Her experience also includes extensive

11   work on other antitrust price-fixing litigation, including *In re Vitamins Antitrust Litigation, In re*

12   *Brand Name Prescription Drug Antitrust Litigation, In re Commercial Tissue Paper Antitrust*

13   *Litigation, In re Flat Glass Antitrust Litigation, In re Linerboard Antitrust Litigation, In re High*

14   *Fructose Corn Syrup Antitrust Litigation*, and *In re NASDAQ Market Makers Antitrust Litigation*.

15             **4.       Cohen Milstein Hausfeld & Toll, PLLC**

16             Cohen Milstein has more than 35 years of experience litigating some of the nation's most

17   complicated antitrust cases and has recovered billions of dollars in overpayments made by its

18   clients to monopolists, price-fixers, and other violators of the antitrust laws. In 2002 and 2003, the

19   *National Law Journal* named Cohen Milstein one of the top 25 plaintiffs' firms in the nation, and

20   in 2006, named the firm as one of the top 11 plaintiffs' firms in the nation. Cohen Milstein has

21   more than 50 attorneys, with offices in Washington, D.C., New York, Philadelphia, and Chicago.

22   A substantial portion of its practice – indeed, its largest practice group – is devoted to antitrust

23   class actions.

24             Cohen Milstein has served or is serving as lead counsel in many important antitrust cases,

25   including *In re Intel Corp. Microprocessor Antitrust Litigation* (D. Del., MDL No. 1717); *In re*

26   *Vitamins Antitrust Litigation* (D.D.C., MDL No. 1285), which resulted in a landmark partial

27   settlement of $1.1 billion; *Pease v. Jasper Wyman & Son, Inc.* (Knox County, Maine Superior

28   Court, Case No. 00-015), which resulted in a jury verdict in favor of plantiffs; *In re Domestic Air*

- 11 -

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

1   *Transportation Antitrust Litigation* (N.D. Ga., MDL No. 861), which resulted in a $458 million

2   cash settlement for a class of approximately 12 million individuals and businesses; and *In re*

3   *Relafen Antitrust Litigation* (D. Mass. Case No. 01-12239). The attorneys from the firm who will

4   be working on the case include:

5      **a.**  **Michael D. Hausfeld**

6     Named partner Michael Hausfeld is regarded as one of the country's top civil litigators. He

7   was recently recognized as one of the "Top 100 Influential Lawyers in America," by the *National*

8   *Law Journal*. Chief Judge Edward Korman of the Eastern District of New York has stated that he

9   is one of the two "leading class action lawyers in the United States." Furthermore, the *New York*

10  *Times* has referred to him as one of the "most prominent antitrust lawyers" in the nation.

11  Mr. Hausfeld is featured in *Done Deal* (Platinum Press 2005) as one of the world's best

12  negotiators. In 2003, Mr. Hausfeld was the only private attorney permitted to attend the European

13  Commission's closed hearings in the Microsoft investigation, where he represented the interests of

14  consumers worldwide.

15     **b.**  **Andrea L. Hertzfeld**

16    Associate Andrea Hertzfeld practices primarily within the International and Antitrust

17  practice groups at Cohen Milstein. Ms. Hertzfeld currently works on several complex antitrust

18  class action cases, including *In re Air Cargo Shipping Services Antitrust Litigation* in the Eastern

19  District of New York and *In re Air Passenger Antitrust Litigation* in the Northern District of

20  California. She has experience in federal motion practice and in briefing substantive and

21  procedural issues in large complex class action litigations, including class certification briefing.

22  Ms. Hertzfeld has worked on several federal antitrust class actions, including *In re New Motor*

23  *Vehicles Canadian Export Antitrust Litigation* and *In re EPDM Antitrust Litigation*. In addition,

24  she is currently involved in other litigation in the electronics industry alleging price-fixing claims

25  against manufacturers of SRAM. Ms. Hertzfeld is also the co-author of a forthcoming article that

26  will be published in the European Business Law Review.

27

28

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

**C.    Proposed Interim Lead Class Counsel Have Taken Significant Steps to Advance This Litigation**

Proposed interim lead class counsel have already taken significant steps to identify and investigate plaintiffs' claims and to advance litigation. They were among the first to investigate the TFT-LCD industry and bring suit against the defendants. They have performed substantial work in investigating the merits. They have also advanced the case. For example, proposed interim lead class counsel have completed service of Orion Home Systems, LLC's complaint on all 10 domestic defendants and on 8 of the 17 foreign defendants, a costly undertaking. They are in the process of effecting service on the remaining foreign defendants.

Immediately after their cases were filed, proposed interim lead class counsel began coordinating with both defense counsel and other plaintiffs' counsel, to organize and streamline what was to become this MDL proceeding. These discussions included future management of the case after transfer. Each of the firms here agreed to uniform stipulations to extend the time to file responsive pleadings, and each firm submitted briefs to the JPML in support of consolidation of these cases. In preparation for the upcoming case management conference, they have had discussions with attorneys representing indirect purchasers about the creation of a unified case management plan to present to the Court. These early efforts have resulted in a draft case management order, which is attached as Exhibit A to the accompanying declaration of Bruce L. Simon.[2]

---

[2]    Several of the general case scheduling and pretrial management topics contained in the draft case management order have been raised with defendants, although not at the level of detail set forth in the draft order. In addition, the proposed order draws from the experience proposed interim lead class counsel has had with the same defense counsel in other cases, and has stipulated language in those cases. The topics covered by the draft order fall within the ambit of the standardized contents of the "Standing Order For All Judges Of The Northern District of California – Contents of Joint Case Management Statement." The joint case management statement in this case is due on June 1, 2007. Proposed interim lead class counsel will meet and confer with counsel for all defendants to work out the details of the case management statement and will present a revised proposed case management order reflecting any consensus achieved during those negotiations.

- 13 -

1

2

**D.    Proposed Interim Lead Class Counsel Have the Resources and Geographic Coverage
to Effectively Prosecute This Litigation**

3     Collectively, proposed interim lead class counsel provide a network of attorneys in 14

4   offices located across the country.  Their geographic coverage makes them uniquely capable of

5   marshaling other plaintiffs' counsel and overseeing discovery matters, wherever they arise.

6   Proposed interim lead class counsel include some of the largest plaintiffs firms in the world and

7   have a proven track record of committing resources to prosecute litigation through rigorous motion

8   practice, discovery, class certification, and trial.  Furthermore, three of the proposed interim lead

9   class counsel – Saveri, Pearson Simon, and Hagens Berman – have offices in San Francisco, which

10  will further facilitate the efficient scheduling of hearings, conferences, and other activities with the

11  Court and defense counsel.

12

13

**E.    Proposed Interim Lead Class Counsel Affirm Their Commitment to Work
Cooperatively With All Counsel**

14     While the four firms proposed here believe they can provide the most fair and adequate

15  leadership structure for the class, they have an inclusive management style that will necessarily

16  seek and welcome the participation of the many other firms involved in this litigation.  Proposed

17  interim lead class counsel are committed to a cooperative approach among all counsel, and with the

18  permission of the Court, will work to establish an executive committee of counsel to ensure that the

19  direct purchaser class is adequately represented.  In doing so, proposed interim lead class counsel

20  will use all efforts to avoid waste and duplication in favor of efficiency.

21  **F.    Proposed Interim Lead Class Counsel Have a Case Management Plan for This Case**

22     Since the passage of the Class Action Fairness Act of 2005 ("CAFA"), federal courts have

23  been presented with the challenge of fashioning a case management plan that deals with the

24  intersection of direct purchaser actions, indirect purchaser actions, foreign purchaser actions, and

25  sometimes multi-governmental investigations.  As set forth herein, proposed interim lead class

26  counsel have extensive experience in organizing and prosecuting cases that present these

27  substantive and procedural issues, and hereby present a plan for efficiently and expeditiously

28  managing this proceeding through the time of trial.

- 14 -

1    One threshold issue remains constant from both before and after the passage of CAFA.

2    Under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), there must be a separation between lead

3    counsel for U.S. direct and indirect purchasers. The legitimacy of both interests mandates a

4    separate structure in order to avoid potential conflicts of interest presented in common

5    representation of both direct and indirect purchasers. For example, federal claims in violation of

6    the antitrust laws prescribe exclusive recovery for the entirety of antitrust damage to the first direct

7    purchaser, regardless of whether that illegal overcharge may have been passed on to downstream

8    purchasers. Certain states have authorized recovery for antitrust damages on behalf of indirect

9    purchasers where it can be established that the original illegal overcharge was passed-on to them

10   through the chain of distribution. Antitrust injury to indirect purchasers under these laws is

11   derivative of the original impact in the market of first purchasers. Consequently, there will be

12   differences in the markets analyzed and the measure of proof required to establish the existence

13   and magnitude of injury. These differences will in turn be reflected in discovery and other pretrial

14   matters.

15       Because of differences between these claims, they benefit from separate representation

16   throughout all phases of the litigation, whether it be in preparing the pleadings, engaging in

17   discovery, certifying classes, or allocating settlement monies. However, this does not mean that

18   the direct and indirect cases cannot be coordinated with respect to these pretrial matters, so as to

19   save the Court and counsel time and expense. There are common questions that apply to all classes

20   of plaintiffs, such as proof of the existence of a price-fixing conspiracy, its participants, the

21   duration of the conspiracy, and how it operated. Coordination in these areas presents the

22   opportunity to achieve efficiency and economy without jeopardizing fairness to the parties.

23

24   **1.    Proposed Interim Class Counsel will Coordinate with Counsel for the
            Indirect Purchaser Class**

25       The case management plan outlined herein, proposes the parallel appointment of separate

26   interim lead class counsel for direct purchasers and indirect purchasers. This is an organizational

27   structure that has been adopted in numerous other antitrust MDLs. *See e.g. In re Air Cargo*

28   *Shipping Services Antitrust Litigation* (E.D. NY., MDL No. 1775); *In re Methyl Methacrylate*

- 15 -

1    *(MMA) Antitrust Litigation* (E.D. Pa., MDL No. 1768); *In re Vitamin C Antitrust Litigation* (E.D.

2    NY., MDL No. 1738); and *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,

3    (N.D. Cal., MDL No. 1486).

4        **2.    Coordination of the Direct and Indirect Cases**

5          Even though it is a pre-CAFA case, the *DRAM Antitrust Litigation* had the convergence of

6    many of the issues presented here and is thus a good template for how the coordination between the

7    direct and indirect cases can be managed.  In fact, three of the proposed interim lead class counsel

8    here held leadership positions in *DRAM*.  One prominent feature of the counsel organization in

9    *DRAM* that should be adopted in this case as well is coordination between direct and indirect

10   purchaser plaintiffs' lead counsel with respect to issues commonly effecting both groups.  For

11   example, Bruce L. Simon, co-chair of discovery for the direct purchasers in *DRAM*, and Allan

12   Steyer, one of the co-lead counsel representing the indirect purchasers in *DRAM*, served as liaisons

13   on behalf of their respective plaintiffs' classes to coordinate discovery.  Under the supervision of

14   the two groups of co-lead counsel, Messrs. Simon and Steyer helped organize not only the schedule

15   for depositions, but also consulted on the documents to be used in depositions, the order in which

16   depositions were taken, and the allocation of time for questioning.  Using this collaborative

17   approach, the direct and indirect purchaser plaintiffs took over 100 coordinated depositions with

18   little or no involvement by the court.  In fact, the court commented on multiple occasions how few

19   were the times that the court was needed to intervene in any discovery disputes.  A similar liaison

20   structure was adopted by the court in *In re Vitamins Antitrust Litigation* (D.D.C., MDL No. 1285).

21         The proposed interim lead class counsel here believe that a similar degree of coordination

22   among lead class counsel for the direct purchasers and lead class counsel for indirect purchasers

23   here will achieve both economic and time efficiencies.  Accordingly, they suggest that this Court

24   provide for systematic, organized coordination between the two lead counsel groups with respect to

25   all issues commonly affecting direct and indirect purchaser plaintiffs.  This coordination would

26   include the following significant points:

27       **a.    Designation of Coordination Counsel**

28         Upon appointing separate lead counsel groups to represent both the direct purchaser

NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL
Master File No. C07-1827 SI

1    plaintiffs and the indirect purchaser plaintiffs, proposed interim lead class counsel recommend that

2    the Court order each such group to select and submit to the Court to review and approve the names

3    of two attorneys to serve as coordination counsel between the direct and indirect actions.[3]

4    Coordination counsel's role would be to facilitate coordination among the lead counsel for each

5    group of plaintiffs and to divide work common to the two groups among their respective lead

6    counsel.[4]  The two attorneys selected to serve as coordination counsel would also serve as liaison

7    counsel between their respective plaintiff groups and the Court.  To assure that the case

8    management plans are implemented with an eye toward how the trial will be presented, trial

9    counsel will be involved in case management conferences with the Court.

10           **b.    Coordination vs. Consolidation**

11           The plan developed by proposed interim lead class counsel, in consultation with counsel for

12   the indirect plaintiffs, calls for the filing of separate consolidated amended complaints – one for the

13   direct purchaser class and one for the indirect purchaser class.  In both cases, counsel would have

14   to agree that there will be one trial for all direct purchaser claims, and another trial for the indirect

15   purchaser claims, notwithstanding the holding of *Lexecon Inc. v. Milberg Weiss Bershad Hynes &*

16   *Lerach*, 523 U.S. 26 (1998).  In this regard, the Court would consolidate all direct purchaser claims

17   for pretrial proceedings and trial, and separately consolidate the indirect purchaser claims.

18           The main intent of the case management plan that is attached as Exhibit A to the

19   accompanying declaration is to have separate, but coordinated, tracks for the direct and indirect

20   cases, with one trial for each case so as to avoid duplication of work and expenses regarding issues

21   common to both plaintiff classes.  In order to accomplish this, the parties and the Court must

22   fashion a procedure to keep the cases in one Court rather than be transferred back for trial to the

23   districts where they were originally filed pursuant to *Lexecon, supra*.  One means to achieve this

24   goal is to adopt a procedure similar to that employed in the *In re Mutual Funds Investment*

25    [3]   Proposed interim lead class counsel herein are informed that Allan Steyer, who was

26   instrumental in coordination the *DRAM* litigation, will be suggested as coordination counsel for the
     indirect purchaser plaintiffs in this proceeding.

27    [4]   Of course, proposed interim lead class counsel contemplate that where issues affecting the
     two groups of plaintiffs differently or singly arise, selected co-lead counsel for each group would
28   be permitted to resolve such issues independently of lead counsel for the other group.

                                        - 17 -

1     *Litigation* (D. Md., MDL No. 1586). There, in order to have a single Court handle the litigation

2     and to avoid transfer under *Lexecon,* Judge Frederick Motz and the four judge panel presiding over

3     multiple tracks of litigation against defendant mutual fund managers adopted a pretrial order which

4     required all parties to agree to a consolidated amended complaint that would be deemed originally

5     filed in the District of Maryland where the case was transferred. By doing so, the panel assured

6     that there would be one trial per track.[5]

7             **c.**      **Coordination of Discovery, Briefing and Other Pretrial Proceedings**

8           Proposed interim lead class counsel submit that coordination of those issues and

9     proceedings which commonly affect both direct and indirect plaintiff groups should continue

10    throughout pretrial proceedings with respect to discovery and briefing of common issues. This

11    coordination would include, for example, creation of a single document depository to which both

12    groups would have equal access. It is anticipated that counsel will opt for an electronic depository

13    consistent with the new ESI rules. Of course, proposed interim lead class counsel contemplate that,

14    should issues arise requiring document discovery particular to only one group of plaintiffs, lead

15    class counsel for that plaintiffs group would be permitted to establish a supplemental depository for

16    those class-specific documents. The same principle would govern any other discovery affecting

17    only one group of plaintiffs—its own lead counsel would independently address such issues. In

18    addition, proposed interim lead class counsel's case management plan provides that all discovery

19    should be conducted under the governance of a single protective order negotiated jointly with

20    defendants by coordination counsel for both direct and indirect plaintiffs, on behalf of their

21    respective lead counsel groups. Similarly, to further facilitate maximum coordination, proposed

22    interim lead class counsel proposed that when issues common to all plaintiff groups require the

23    filing of motions or briefs, those motions and briefs should be filed jointly.

24

25

26       [5]    One anticipated issue that will need to be addressed in the proposed case management plan

27    is the filing of state court indirect purchaser actions that are not removed, or are remanded. The
proposed plan calls for a stipulation by indirect purchaser counsel to either submit to federal

28    jurisdiction or stay those cases until the completion of the proceedings in this case.

NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL
Master File No. C07-1827 SI

### 3.    Coordination with the DOJ

Another issue that the proposed interim lead class counsel are prepared to address is the government investigation and the accompanying concerns arising from investigative and grand jury privileges.  It is quite common to have the government ask for a stay of the civil litigation, which must be balanced against civil plaintiffs' need to pursue their case before evidence becomes stale.  The matters that are likely to arise, and which need to be in the case management order issued by the Court, include: (1) the production of the grand jury documents by defendants; (2) the sequencing of depositions to avoid interference with the government's investigation; and (3) the amnesty applicant's cooperation with the civil plaintiffs, as required under the relevant statute.  With respect to the latter, such cooperation would include, among other things, a proffer of facts potentially relevant to the civil action and the production of documents.  Coordination will avoid multiple identical proffers, document productions, and interviews.  To this end, proposed interim lead class counsel propose that contact with the amnesty applicant regarding such cooperation be made solely by court-appointed lead counsel for the direct and indirect purchasers plaintiffs, will prevent duplicative efforts.  Again, proposed interim lead class counsel have dealt with these issues before and have successfully worked with the DOJ to ensure that the interests of both the criminal and civil cases are met.  In *DRAM*, this coordination was achieved through a stipulation with the DOJ.

### 4.    Additional Plaintiffs

In the event that foreign purchaser plaintiffs assert their claims in the consolidated amended complaints, proposed interim lead class counsel submit that the same procedures for coordination summarized above should apply equally to the foreign purchaser class.  Specifically, proposed interim lead class counsel request that, should the claims of foreign plaintiffs be included in this litigation, that the Court appoint lead counsel to represent them, that coordination counsel be selected to serve in the role as described, and that, where issues common to foreign and domestic direct and indirect purchasers arise, that they be litigated in a coordinated fashion.

Proposed interim lead class counsel is familiar with the procedures by which such coordination of foreign and domestic purchaser claims can be achieved, as such procedures are

- 19 -

NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL
Master File No. C07-1827 SI

1   currently being implemented in the *In re International Air Transportation Surcharge Antitrust*

2   *Litigation* (N.D.Cal., MDL No. 1793) before Judge Breyer in the Northern District of California, as

3   well as in the *In re Air Cargo Shipping Services Antitrust Litigation* (E.D. NY., MDL No. 1775)

4   before Judge Carol Amon in the Eastern District of New York, both of which assert claims on

5   behalf of domestic and foreign purchasers.  One of the proposed interim lead class counsel,

6   Michael D. Hausfeld, is presently co-lead counsel in both cases, and is also co-lead counsel

7   principally responsible for foreign purchasers in the *Air Cargo* litigation.  Accordingly, he is well-

8   experienced in managing coordination of foreign and domestic purchaser claims throughout all

9   stages of litigation.

10          **5.    Trial**

11          The proposed coordination of the direct and indirect plaintiffs' claims will likely result in

12   the completion of pretrial discovery on common issues at the same time.  However, because of

13   differences in the claims asserted in each litigation, the direct and indirect plaintiffs may not be

14   ready for trial simultaneously.  Historically, the pretrial process is generally completed in direct

15   actions before it is completed in indirect actions.  Consequently, direct claims typically have been

16   able to be, and have been, tried first.

17          Despite the fact that trials by direct and indirect plaintiffs are generally separate, the

18   liability of cartel members for fixing prices in a market that immediately impacted direct

19   purchasers is an issue common to both set of claims.  Means consistent with due process should be

20   explored which would obviate the need to relitigate that fundamental issue of liability, from which

21   all injury, direct and indirect, is derived.  Although it is not necessary to determine at this early

22   stage of the litigation exactly what process should be used to achieve this objective, the Court may

23   wish to consider the following options:

24          (1)    **Joint Agreement.**  In a subsequent trial of indirect claims, the indirect plaintiffs and
               defendants may agree to be bound by the finding of the jury in the direct plaintiffs'
25             litigation as to the existence, scope and nature of the conspiracy.

26          (2)    **Offensive Collateral Estoppel.**  At the conclusion of the trial by the direct plaintiffs,
               if the jury finds that there was a conspiracy by defendants, the indirect plaintiffs may
27             assert the principle of offensive collateral estoppel with respect to the factual issues
               of the existence, scope and nature of the conspiracy.

28

- 20 -

1

2

3

4

5

6

     (3)    **Summary Judgment**. After a full trial on the merits, rather than relitigating the issues of fact determined by the jury, either party, the indirect plaintiffs or defendants, may submit the trial record to the Court on a motion for summary judgment. The usual requirements of the Federal Rules of Civil Procedure would control with respect to the determination of the motion. In other words, the party opposing the summary judgment motion would have the opportunity to present any facts disputing the motion, but would be limited to presentation of facts not submitted to the jury in the trial of the direct claims that the opposing party contends were not considered by the jury and that would, if they had been so considered, have made a difference in the jury's determination.

7     **6.**    **Proposed Interim Class Counsel's Meet and Confer Efforts**

8     In anticipation of the June 8, 2007 case management conference, the proposed interim

9    counsel have already begun the meet and confer process with counsel for the indirect plaintiffs and

10    to a more limited degree with counsel for defendants. The following areas will be discussed and

11    addressed in detail in the joint case management statement:

12     (1)    the establishment of a master docket and captions for the direct and indirect cases;

13     (2)    the organization of plaintiffs' counsel and their respective responsibilities;

14     (3)    the organization of defendants' counsel and their respective responsibilities;

15     (4)    whether there will be any motions for remand to decide;

16     (5)    the filing of consolidated and amended complaints;

17     (6)    a briefing schedule for motions to dismiss;

18     (7)    the manner in which papers are to be served;

19     (8)    the admission of attorneys licensed to practice in other districts;

20     (9)    the entry of a preservation order;

21     (10)   the entry of a protective order;

22     (11)   possible evidentiary stipulations, such as the early production of grand jury

23         documents and sales data for each defendant;

24     (12)   the coordination of discovery between counsel for the direct purchaser plaintiffs, the

25         indirect purchaser plaintiffs, and the foreign plaintiffs;

26     (13)   the procedure for obtaining and management of amnesty cooperation;

27     (14)   the protocols governing electronic discovery;

28     (15)   the creation of document depositories;

- 21 -

NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL
Master File No. C07-1827 SI

1      (16)  the phasing of the direct and indirect cases and the sequencing of the civil actions in

2      relation to the government action; and

3      (17)  the nature of the trials that will occur, including the possibility of trying all common

4      issues of liability only in the direct purchaser action, whether by application of

5      collateral estoppel, stipulation, or summary judgment.

## IV.   CONCLUSION

For the foregoing reasons, Saveri, Pearson Simon, Hagens Berman, and Cohen Milstein respectfully request appointment as interim lead class counsel for these consolidated direct purchaser class actions.

DATED:  May 4, 2007                  Respectfully submitted,

By:   /S/ Bruce L. Simon
      Bruce L. Simon
      Esther L. Klisura
      PEARSON, SIMON, SOTER, WARSHAW
        & PENNY, LLP
      44 Montgomery Street, Suite 1200
      San Francisco, CA  94104
      Telephone:   (415) 433-9000
      Facsimile:    (415) 433 9008

*Counsel for Direct Purchaser Plaintiffs Phelps Technologies, Inc. and Marshall Myers and the Proposed Direct Purchaser Plaintiff Class*

Guido Saveri
R. Alexander Saveri
Lisa M. Waste
Cadio Zirpoli
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA  94111
Telephone:   (415) 217-6810
Facsimile:    (415) 217-6913

*Counsel for Direct Purchaser Plaintiffs Crago Corporation and Orion Home Systems, LLC and the Proposed Direct Purchaser Plaintiff Class*

- 22 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steve W. Berman
Anthony D. Shapiro
George W. Sampson
Ronnie S. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:    (206) 623-7292
Facsimile:    (206) 623-0594

Reed Kathrein
HAGENS BERMAN SOBOL SHAPIRO LLP
425 Second Street, Suite 500
San Francisco, CA  94107
Telephone:    (415) 896-6300
Facsimile:    (415) 896-6301

*Counsel for Direct Purchaser Plaintiff Home
Technologies Bellevue LLC and the Proposed
Direct Purchaser Plaintiff Class*

Michael D. Hausfeld
Kathleen M. Konopka
Andrea L. Hertzfeld
COHEN MILSTEIN HAUSFELD & TOLL, PLLC
1100 New York Avenue, NW
Suite 500 West Tower
Washington, DC  20005
Telephone:    (202) 408-4600
Facsimile:    (202) 408-4699

*Counsel for Direct Purchaser Plaintiffs Art's TV
& Appliance, Omnis Computer Systems, and
Magic Video, Inc. and the Proposed Direct
Purchaser Plaintiff Class*

- 23 -

**NOTICE OF MOTION AND MOTION TO APPOINT INTERIM LEAD CLASS COUNSEL**
Master File No. C07-1827 SI

# EXHIBIT 7

1   Laurence D. King
    KAPLAN FOX & KILSHEIMER LLP
2   555 Montgomery Street
    San Francisco, CA 94111
3   Tel: (415) 772-4700
    Fax: (415) 772-4707
4   lking@kaplanfox.com

5   Robert N. Kaplan
    Gregory K. Arenson
6   Linda P. Nussbaum
    KAPLAN FOX & KILSHEIMER LLP
7   805 Third Avenue
    22nd Floor
8   New York, NY 10022
    Tel: (212) 687-1980
9   Fax: (212) 687-7714
    rkaplan@kaplanfox.com
10  garenson@kaplanfox.ocm
    lnussbaum@kaplanfox.com
11

12  *Attorneys for Proposed Interim Class Counsel for Direct Purchaser Plaintiffs*

13              **UNITED STATES DISTRICT COURT**

14           **NORTHERN DISTRICT OF CALIFORNIA**

15  _____

16  IN RE TFT-LCD (FLAT PANEL)          )   CASE NO.: C-07-1827 SI
    ANTITRUST LITIGATION                )
17                                      )   MDL No. 1827
                                        )
18  This Document Relates to:           )   **MEMORANDUM OF POINTS AND**
                                        )   **AUTHORITIES IN SUPPORT OF**
19  ALL DIRECT PURCHASER ACTIONS        )   **PLAINTIFF CMP CONSULTING**
                                        )   **SERVICES, INC.'S CROSS-MOTION TO**
20                                      )   **APPOINT KAPLAN FOX & KILSHEIMER**
                                        )   **LLP AS INTERIM CLASS COUNSEL FOR**
21                                      )   **DIRECT PURCHASER PLAINTIFFS**
                                        )
22                                      )   Date:  June 8, 2007
                                        )   Time:  9:00 a.m.
23                                      )   Courtroom 10, 19th Floor
                                        )   Honorable Susan Illston
24                                      )
                                        )
25  _____)

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   BACKGROUND ................................................................................................2

III.  ARGUMENT ....................................................................................................3

    A.  The Standard To Be Applied To The Selection of Interim Class Counsel .................3

    B.  Kaplan Fox Is The Best Choice for Interim Class Counsel Under The Criteria of Rule 23(g)(1)(C) ....................................................................................................4

        1.  Kaplan Fox's Experience in Prosecuting Antitrust Matters ...........................4

            a.  Robert N. Kaplan .............................................................................6

            b.  Gregory Arenson .............................................................................7

            c.  Linda Nussbaum ..............................................................................7

        2.  Kaplan Fox Has No Conflicts .......................................................................8

    C.  Kaplan Fox Has Investigated The Merits of the Direct Purchasers' Claims ...........8

        1.  Kaplan Fox Will Work Collegially With All Other Plaintiffs' Counsel ...........9

        2.  Kaplan Fox Partners are Experienced in Coordinating the Efforts of Various Groups of Counsel ................................................................................10

IV.   CONCLUSION .................................................................................................10

1

# TABLE OF AUTHORITIES

2

3  **CASES**

4  *Hill v. The Tribune Co.,*
5     No. 05 C 2602 *et al.*, 2005 WL 3299144 (N.D. Ill. Oct. 13, 2005) ..................................................3

6  *In re Carbon Black Antitrust Litig.,*
7     Nos., 03 Civ A. 10191 (DPW), MDL 1543, 2005 WL 102966 (D. Mass. Jan. 18, 2005)................7

8  *In re Flat Glass Antitrust Litig.,*
9     385 F.3d 350 (3d Cir. 2004)...........................................................................................1, 5

10 *In re High Fructose Corn Syrup Antitrust Litig.,*
11    295 F.3d 651 (7th Cir. 2002)...........................................................................................1, 5

12 *Parkinson v. Hyundai Motor Am.,*
13    No. CV06-345AHS (MLGX) *et al.*, 2006 WL 2289801, (C.D. Cal. Aug. 7, 2006).........................3

14 *Williamson Oil Co. v. Philip Morris USA,*
15    346 F.3d 1287 (11th Cir. 2003);.......................................................................................1

16 **STATUTES**

17 Class Action Fairness Act of 2005, 109 Pub.L. No.2, 119 Stat. 4 ....................................................10

18 **OTHER AUTHORITIES**

19 *Manual for Complex Litigation, Fourth* (2004) ...............................................................2, 3, 4, 9

20 **RULES**

21 Federal Rules of Civil Procedure Rule 23(g) .......................................................................1, 3, 4

22

23

24

25

26

27

28

ii

1    Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, plaintiff CMP Consulting

2  Services, Inc. ("CMP Consulting") respectfully submits this memorandum in support of its cross-

3  motion to appoint Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") as interim class counsel for the

4  direct purchaser class plaintiffs in this consolidated multidistrict litigation. A proposed order for

5  appointment of Kaplan Fox as interim class counsel is submitted as Exh. A.

6                    **I.     INTRODUCTION**

7    Rule 23(g)(2)(B) of the Federal Rules of Civil Procedure requires the Court to appoint

8  interim class counsel "best able to represent the interests of the class." Kaplan Fox is that counsel

9  based on its attorneys' unique skill, experience, and substantive and technical expertise.

10   Of the three leading Circuit Court of Appeals decisions issued since 2002 regarding class

11 actions alleging horizontal price-fixing conspiracies – *In re Flat Glass Antitrust Litig.*, 385 F.3d 350

12 (3d Cir. 2004) (Chertoff, J.); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir.

13 2003); and *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) (Posner,

14 J.) – Kaplan Fox has been lead counsel in two of these actions. Partners Robert Kaplan and

15 Gregory Arenson argued and won the *Flat Glass* and *Fructose* cases clarifying the summary

16 judgment standard to be applied in such cases. Kaplan Fox attorneys then led the extensive

17 preparation for trial of both these complicated antitrust cases until they settled within sight of trial

18 for totals of $122 million and $531 million, respectively. At the end of the *Fructose* case, the

19 district judge complimented plaintiffs' lead counsel, including Messrs. Kaplan and Arenson, stating:

20          I've said many times during this litigation that you and the attorneys
            who represented the defendants here are as good as it gets. Very
21          professional. At least in my presence or in my contacts with you,
            you've always been civil. You've always been cutting to the chase
22          and not wasting my time or each other's time or adding to the cost of
            the litigation.

23

24 *See* Declaration of Gregory K. Arenson ("Arenson Decl.") at para. 10. Kaplan Fox's antitrust

25 attorneys are as good as it gets.

26

27

28

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT          CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

## II.     BACKGROUND

This action arises out of a conspiracy to fix prices and commit other unlawful and anticompetitive practices with respect to the sale of thin film transistor liquid crystal display products ("TFT-LCD"), which are used in televisions, computer monitors, mobile telephones, personal digital assistants, and other devices. Plaintiffs allege that defendants, manufacturers of foreign and domestic TFT-LCD, and affiliated companies engaged in a price-fixing conspiracy designed to artificially raise, maintain or stabilize the price of TFT-LCD products beginning in 1998.

Kaplan Fox filed one of the first direct purchaser antitrust actions on behalf of CMP Consulting in the Southern District of New York ("SDNY"). Subsequent to the filing of the CMP Consulting action, approximately 10 additional direct purchaser actions were filed in various district courts throughout the United States.

Kaplan Fox moved the Judicial Panel on Multidistrict Litigation ("JPML") for transfer of all actions to the SDNY. Following briefing and argument on the Kaplan Fox and various other transfer motions, seeking transfer to various jurisdictions, on April 17, 2007, the JPML transferred all cases to this Court for pre-trial proceedings.

Prior to any organizational meeting to discuss a proposed counsel structure, as encouraged in the *Manual for Complex Litigation, Fourth* (2004), on May 4, 2007, the Saveri Group filed the first motion for appointment as interim class counsel for the direct purchaser plaintiffs with this Court. *See* §10.22 of *Manual of Complex Litigation, Fourth* (2004) at 24.[1] CMP Consulting's counsel was prepared to work with all parties to develop a proposed counsel structure for the putative class and has been in contact with various plaintiffs' counsel and defendants' counsel

---

[1] The "Saveri Group" refers to a group of attorneys that moved this Court to be appointed Interim Lead Counsel on behalf of direct purchasers of TFT-LCD in the actions alleging antitrust violations by TFT-LCD manufacturers. The Saveri Group is composed of Saveri & Saveri, Inc.; Pearson, Simon, Soter, Warshaw & Penny, LLP; Hagens Berman Sobol Shapiro LLP; and Cohen Milstein Hausfeld & Toll, PLLC.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT     CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

1   regarding coordination as an efficient means to prosecute these cases.  As other motions have

2   already been filed, and in light of this Court's June 8 scheduled conference, plaintiff CMP

3   Consulting submits its motion now, in support of appointment of its counsel, Kaplan Fox as interim

4   class counsel for the direct purchaser plaintiffs.  Kaplan Fox believes that it is not efficient to have

5   any more than four (4) co-lead counsel appointed, and has successfully served as a lead counsel in

6   many structures where either a sole, two or three lead counsel were appointed by the Court.

7                               **III.    ARGUMENT**

8   **A.    The Standard To Be Applied To The Selection of Interim Class Counsel**

9         Rule 23(g)(2)(A) of the Federal Rules of Civil Procedure provides for the appointment of

10   interim class counsel on behalf of a putative class.  The *Manual for Complex Litigation, Fourth*

11   suggests that when "a number of lawyers may compete for class counsel appointment" the

12   "designation of interim counsel clarifies responsibility for protecting the interests of the class during

13   pre-certification activities, such as making and responding to motions, conducting any necessary

14   discovery, moving for class certification, and negotiating settlement." *Manual for Complex*

15   *Litigation, Fourth* (2004) §21.11 at 246.

16         The same factors that apply in choosing class counsel at the time of class certification apply

17   in selecting interim class counsel. *See Parkinson v. Hyundai Motor Am.*, No. CV06-345AHS

18   (MLGX) *et al.*, 2006 WL 2289801, at *2 (C.D. Cal. Aug. 7, 2006); *Hill v. The Tribune Co.*, No. 05

19   C 2602 *et al.*, 2005 WL 3299144 at *3 (N.D. Ill. Oct. 13, 2005).

20         Therefore, in appointing class counsel, the Court must consider:  (i) the work counsel has

21   done in identifying or investigating potential claims in the action; (ii) counsel's experience in

22   handling class actions, other complex litigation, and claims of the type asserted in the action; (iii)

23   counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to

24   representing the class, as well as any other matter pertinent to counsel's ability to fairly and

25   adequately represent the interests of the class. *See* Rule 23(g)(1)(C).

26

27

28

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT   CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

1    In a situation such as this, when there is more than one adequate applicant, Rule 23(g)(2)(B)

2    charges that "the Court *must* appoint the applicant *best* able to represent the interests of the class."

3    (Emphasis added.) *See also Manual for Complex Litigation, Fourth*, at § 21.271 at 279 ("the

4    Court's task is to select the applicant best able to represent the interests of the class"). The

5    Advisory Committee Notes to Rule 23(g)(2)(B) add:

6            [I]n the multiple applicant situation the court is to go beyond
scrutinizing the adequacy of counsel and make a comparison of the
7            strengths of the various applicants. . . . [N]o single factor should be
dispositive . . . .

8

9    Under these factors, Kaplan Fox is the applicant best able to represent the interests of the

10    direct purchaser class and thus should be appointed as interim class counsel.

11  **B.**    **Kaplan Fox Is The Best Choice for Interim Class Counsel Under The Criteria of Rule**
**23(g)(1)(C)**

12

13    By appointing Kaplan Fox as interim class counsel, the Court will be providing the direct

14    purchaser plaintiffs with the best representation available. Kaplan Fox, one of the nation's

15    preeminent plaintiffs' class action firms with offices in San Francisco, New York, Los Angeles and

16    Chicago, has the resources, talent and experience to provide the leadership necessary to efficiently

17    and expertly litigate this case to maximize any recovery for the direct purchaser plaintiffs.

18    **1.**    **Kaplan Fox's Experience in Prosecuting Antitrust Matters**

19    Kaplan Fox attorneys have extensive experience in antitrust class action and other complex

20    litigation, including significant expertise in economic analysis, a critical discipline in any such

21    actions. *See* Arenson Decl.. This firm, because of its widely recognized expertise, has played

22    substantial roles in some of the largest and most successful antitrust class actions in the country. In

23    this particular litigation, Kaplan Fox has already done extensive industry and economic analysis,

24    preliminary research regarding legal issues likely to arise, and is ready, willing and able to

25    immediately assume leadership and coordination of the 14 direct purchaser plaintiff class actions

26    presently before the Court. This will not be a new role for Kaplan Fox. It has served as co-lead

27

28

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT    CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

1  counsel in *Flat Glass* and *High Fructuose Corn Syrup*, two of the most complex, and ultimately

2  most successful, antitrust class actions ever litigated.

3       Kaplan Fox attorneys also have served as members of plaintiffs Executive Committee in *In*

4  *re Brand Name Prescription Drugs Antitrust Litig.*, MDL No. 997 (N.D. Ill. Sep. 9, 1999), where

5  recovery for the class exceeded $700 million, as a member of plaintiffs' Executive Committee in *In*

6  *re Linerboard Antitrust Litig.*, MDL No. 1261 (E.D. Pa. Dec. 9, 2003), where recovery for the class

7  set an Eastern District of Pennsylvania record of $202 million, and as a member of plaintiffs' trial

8  team in *Dynamic Random Access Memory Antitrust Litig.*, MDL No. 1486 (N.D. Cal. Apr. 17,

9  2007), where recovery for the class approximates $320 million.

10      Kaplan Fox attorneys are currently either a co-lead counsel or a member of plaintiffs'

11 executive or steering committees representing direct purchasers in the following complex antitrust

12 litigations, among others:  *In re Air Cargo Shipping Services Antitrust Litig.*, MDL No. 1775

13 (E.D.N.Y. Dec. 4, 2006) (one of four co-lead counsel); *In re Plastics Additives Antitrust Litig.*,

14 MDL No. 1684 (E.D.Pa. Sept. 3, 2003) (one of four co-lead counsel); *In re Hydrogen Peroxide*

15 *Antitrust Litig.*, MDL No. 1682 (E.D. Pa. Aug. 15, 2005) (one of four co-lead counsel); *In re*

16 *Nifedipine Antitrust Litig.*, MDL No. 1515 (D.D.C. June 30, 2003) (one of three co-lead counsel); *In*

17 *re Neurontin Antitrust Litig.*, MDL No. 1479 (D.N.J. Aug. 16, 2002) (one of two co-lead counsel);

18 *In re Metoprolol Succinate Direct Purchaser Antitrust Litig.*, 06-CV-52 (D. Del. Mar. 29, 2007)

19 (GMS) (one of three co-lead counsel); *In re Plavix Direct Purchaser Antitrust Litig.*, 06-CV-202

20 (S.D. Ohio Mar. 8, 2007) (MHW) (one of two co-lead counsel); *In re Oxycontin Antitrust Litig.*,

21 MDL No. 1603 (S.D.N.Y. Mar. 1, 2007) (member of executive committee); and *Meijer, Inc. v.*

22 *Eisai Co., Ltd.*, 06-cv-11511 (GEL) (S.D.N.Y. Mar. 5, 2007) (one of three co-leads); *In re DDAVP*

23 *Antitrust Litig.*, No. 05 Civ. 2987 (CLB) (S.D.N.Y. Feb. 27, 2007) (one of three co-leads).

24      Kaplan Fox has the human and financial resources necessary to effectively prosecute this

25 litigation for the optimal benefit of the class.  The members of Kaplan Fox possess the requisite

26 experience, background and skill needed to effectively prosecute and, if need be, try this litigation.

27

28

1  Moreover, Kaplan Fox has litigated class actions in federal district courts nationwide and maintains

2  offices in various districts, including an office located in the Northern District of California.  Few

3  other litigation firms offer the breadth and depth of experience that Kaplan Fox offers.

4          The attorneys from the firm who will be controlling the prosecution of this matter include

5  Robert N. Kaplan, Gregory Arenson, and Linda Nussbaum.  Mr. Kaplan has nearly 40 years

6  experience in antitrust litigation; Mr. Arenson also has been litigating cases for over 30 years and

7  has a strong economic background and procedural expertise applicable to antitrust cases; and Ms.

8  Nussbaum is a skillful, seasoned litigator with 25 years of broad-based class action litigation

9  experience.  They have served as lead counsel in numerous antitrust class actions and have shown

10  leadership, persistence and excellence in the cases they have litigated.  They have tried antitrust

11  cases.  They have settled major antitrust cases.  They have been involved in litigating significant,

12  complex, and on occasion novel antitrust cases from inception to conclusion.

13              **a.    Robert N. Kaplan**

14          Mr. Kaplan is a senior member of the plaintiffs' antitrust bar.  At the outset of his career in

15  the late 1960s, he was a trial attorney for four years in the Antitrust Division of the United States

16  Department of Justice, where he participated in numerous civil and criminal antitrust litigations,

17  including a two-month trial in *United States v. Venn*.  In private practice, Mr. Kaplan has tried a

18  number of antitrust cases, including *B.A.M. Liquors, Inc. v. Satenstein*, 71 Civ. 4149 (S.D.N.Y.),

19  and *In re Fleets Antitrust Litig.*, (N.D. Ill., MDL No. 65).  He was co-lead counsel in *Fructose* and

20  *Flat Glass*, as well as in *In re NBR Antitrust Litig.*, No. 03 Civ. 1898 (W.D. Pa., Mar. 26, 2004), and

21  he is co-lead counsel in the ongoing cases of *Air Cargo*, *Plastics Additives* (in recently granting

22  plaintiffs' motion for attorneys fees and costs, Judge Legrome D. Davis stated that co-lead counsel

23  had represented plaintiffs' interests with "commendable skill and diligence"), *Hydrogen Peroxide*

24  and *In re Linens Antitrust Litig.*, No. 03 Civ. 7823 (GEL) (S.D.N.Y. Oct. 3, 2003).  Mr. Kaplan is

25  also a senior member of the plaintiffs' securities class action bar, having been selected last year as

26  lead counsel in *Cohen v. Escala Group, Inc.*, No. 06 Civ. 3518 (AKH) (S.D.N.Y. Aug. 31, 2006),

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT      CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

1  where Judge Alvin K. Hellerstein concluded, "So your firm, which I'm familiar with and which has

2  a fine reputation, will be lead counsel." *See* Arenson Decl. Other securities cases in which Mr.

3  Kaplan has been co-lead counsel include *In re 3Com Securities Litig.*, No. 97 Civ. 21083 (EAI)

4  (N.D. Cal. Feb. 23, 2001), in which $259 million was recovered, and *In re Informix Securities*

5  *Litig.*, No. 97 Civ. 129 (CRB) (N.D. Cal. Oct. 29, 1999), in which $136.5 million was recovered.

6          **b.      Gregory Arenson**

7          Mr. Arenson's economics background has provided a foundation for his recognized

8  expertise in handling economic issues in antitrust cases, both at class certification and on the merits.

9  Not only did he handle the economic experts and *Daubert* motions in *Fructose* and the economic

10  experts in *Flat Glass*, as well as the class certification motions in *NBR* and currently in *Plastics*

11  *Additives* and *Hydrogen Peroxide*, he has also been asked in several cases in which Kaplan Fox has

12  not had a leadership role to be involved with economic issues and experts on class certification and

13  on the merits, including *In re Foundry Resins Antitrust Litig.*, MDL No. 1638 (S.D. Ohio), in which

14  an opinion certifying a direct purchaser class was issued on May 2, 2007, and *In re Carbon Black*

15  *Antitrust Litig.*, Nos., 03 Civ A. 10191 (DPW), MDL 1543, 2005 WL 102966 (D. Mass. Jan. 18,

16  2005). *See* Arenson Decl.

17          **c.      Linda Nussbaum**

18          Linda Nussbaum joined Kaplan Fox as a partner in February 2007. Prior to joining Kaplan

19  Fox, she had been the resident partner in the New York office of Cohen, Milstein, Hausfeld & Toll,

20  P.L.L.C.

21          Ms. Nussbaum has recently served as sole or co-lead counsel in the following leading

22  antitrust cases which resulted in substantial recoveries in the hundreds of millions of dollars on

23  behalf of classes of direct purchasers: *In re Microcrystalline Cellulose Antitrust Litig.*, Nos. 01 Civ.

24  111, MDL 1402 (E.D. Pa. Feb. 8, 2001); *Oncology & Radiation Associates, P.A. v. Bristol Myers*

25  *Squibb Co.*, No. 01 Civ. 02313 (D.D.C. Nov. 6, 2001); *North Shore Hemotology-Oncology*

26  *Associates, P.C. v. Bristol-Myers Squibb Co.* No. 04 Civ. 00248 (D.D.C. Nov. 30, 2001); *In re*

27

28

7

1    *Children's Ibuprofen Oral Suspension Antitrust Litig.*, No. 04 Civ. 0535 (D.D.C Apr. 24, 2006); *In*

2    *re Relafen Antitrust Litig.*, No., 01 Civ. 12239 (D.Mass. Feb. 13, 2004); *In re Remeron Antitrust*

3    *Litig.*, No. 03 Civ. 00085 (D.N.S. Nov. 9, 2005); *In re Lorazepam & Clorazepate Antitrust Litig.*,

4    No. 99 Civ. 00276 (D.D.C.).

5        Ms. Nussbaum is presently in leadership positions in several significant antitrust direct

6    purchaser class actions, including: *Meijer v. Warner Chilcott Holdings Co., III,* No. 05-CIV-2195

7    (CKK) (D.D.C.); *In re DDAVP Direct Purchaser Purchaser Antitrust Litig.*, No. 06-CIV-202

8    (S.D.N.Y.); *Metoprolol Succinate* No. 06-CIV-52 (D. Del. Mar. 29, 2007); and *Meijer, Inc. v. Eisai*

9    *Co., Ltd.*, No. 06-CIV-11511 (GEL) (S.D.N.Y. Mar. 5, 2007). In addition, she represents

10   significant individual plaintiffs in *In re Payment Card Interchange Fee & Merchant Dis. Antitrust*

11   *Litig.*, No. 05 Civ. 01720 (JG) (JO) (E.D.N.Y) and *In re Neurontin Mktg., Sales Practices & Prods.*

12   *Liability Litig.*, Nos. 04 Civ. 10981, MDL 1629 (D.Mass.).

13       Ms. Nussbaum has lectured exclusively about various aspects of Antitrust law. In the past

14   several months, she participated in a mock jury panel at the 55th Antitrust Law Spring Meeting of

15   the ABA in Washington, D.C., and in a panel at the New York State Bar Association Antitrust

16   Annual Meeting.

17       **2.    Kaplan Fox Has No Conflicts**

18       Kaplan Fox has absolutely no conflicts in litgating this matter effectively. It has not and

19   does not represent any indirect purchasers in this or any possibly related action. It is not a lead

20   counsel in any other matter against any of these defendants where, due to limited funds available to

21   satisfy a judgment, it might be in a position to favor any other class over the interests of this class.

22   **C.    Kaplan Fox Has Investigated The Merits of the Direct Purchasers' Claims**

23       Prior to filing the action on behalf of the direct purchaser class, Kaplan Fox conducted a

24   thorough investigation into the merits of the claims. Kaplan Fox employs an in-house investigator

25   who has been collecting information to support the claims of the direct purchaser class and did

26   extensive industry research.

27

28

1       Upon filing of the class action complaint, Kaplan Fox continuously monitored events

2 affecting the claims of the direct purchaser class. Indeed, Kaplan Fox has already taken signficant

3 steps to protect the interest of its client and the class. For instance, it has employed an economist to

4 conduct an analysis of the TFT-LCD market. Moreover, Kaplan Fox has been in contact with

5 counsel for the domestic corporate defendants LG Philips LCD America; NEC Electronics; Chi Mei

6 Optoelectronics USA Inc; Toshiba America Inc; Toshiba Information Systems Inc.; Sharp

7 Electronics Corp; and AU Optronics Corporation America to grant them an extension of time to

8 respond to plaintiff's complaint. In return, each agreed that they would not raise insufficiency of

9 service as a defense. Stipulations of the agreement were submitted to the SDNY. These steps

10 demonstrate that Kaplan Fox will fairly and adequately represent the interest of the direct purchaser

11 class.

12       Subsequent to the transfer by the MDL panel to this Court, Kaplan Fox has contacted

13 counsel for various defendants to discuss the scheduling and coordination items to be reported upon

14 to this Court in the upcoming case management conference.

15     **1.**    **Kaplan Fox Will Work Collegially With All Other Plaintiffs' Counsel**

16       Generally in complex matters such as these, counsel for the parties hold an organizational

17 meeting to discuss counsel structure to determine whether the parties can all agree to a structure.

18 This is encouraged because it alleviates unnecessary motion practice. *See* §10.22 of *Manual of*

19 *Complex Litigation, Fourth* (2004) at 24. Unfortunately here, no organizational meeting with all

20 counsel for plaintiffs was held before the initial lead counsel motion was filed by the Saveri Group.

21 *See See* §10.21 of *Manual of Complex Litigation, Fourth* (2004) at 23 ("Counsel need to fulfill their

22 obligations as advocates in a manner that will foster and sustain good working relations among

23 fellow counsel and with the court. They need to communicate constructively and civilly with one

24 another and attempt to resolve disputes informally as often as possible.")

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT    CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

1    Kaplan Fox, as interim class counsel, will work, as it has in the past, in a collegial fashion

2 with other plaintiffs' counsel to efficiently and effectively prosecute this action and avoid any

3 unnecessary duplication of work.

4    The partners at Kaplan Fox who will litigate this matter have decades of experience in

5 pulling together the plaintiffs' class action bar to work in a fair collaborative fashion in complex

6 litigations. They have served in structures as sole lead counsel (*Taxol, Platinol, Children's*

7 *Ibuprofen*), co-lead counsel (*Microcrystalline, Remeron, Relafen*), three lead counsel (*High*

8 *Fructose Corn Syrup, DDAVP*), and four lead counsel (*Flat Glass, Plastic Additives, Air Cargo,*

9 *Hydrogen Peroxide*). Kaplan Fox is ready, willing and able to work as a lead counsel in any

10 structure that this Court deems appropriate, from one to four lead counsel or any other governing

11 structure.

12    **2.    Kaplan Fox Partners are Experienced in Coordinating the Efforts of Various**
         **Groups of Counsel**

13

14    Although the passage of the Class Action Fairness Act of 2005 ("CAFA") has made

15 complex coordinated actions with various constituencies of plaintiff classes more common, this is in

16 no way a new or unusual occurrence. For example, in pharmaceutical antitrust litigations, in which

17 Ms. Nussbaum has consistently served as a sole or co-lead counsel, there have routinely been claims

18 by classes of direct and indirect purchasers (both consumers and third-party payors) in addition to

19 claims by various government agencies (States Attorneys General and the FTC) and large individual

20 plaintiffs. Structures established years ago in the earlier pharmaceutical antitrust actions led by Ms.

21 Nussbaum have served as the paradigm for matters, such as this, which have resulted from the

22 passage of CAFA. Thus, the level of sophistication and coordination anticipated here will be

23 nothing new for Kaplan Fox's partners.

24                          **IV.    CONCLUSION**

25    Kaplan Fox is the best firm to be appointed interim class counsel for the direct

26 purchaser plaintiffs. Kaplan Fox brings unparalleled experience and expertise in antitrust class

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT          CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS

1    actions to the table.  It has the financial and human resources and skills needed to effectively and

2    efficiently prosecute this litigation on behalf of the direct purchaser plaintiffs.  Kaplan Fox does not

3    possess any conflicts of interest that would prevent it from diligently representing the class of direct

4    purchaser plaintiffs in this litigation.  For these reasons, CMP Consulting respectfully requests that

5    the Court grant its motion and appoint Kaplan Fox as interim class counsel for direct purchaser

6    plaintiffs.

7    DATED: May 9, 2007                              Respectfully Submitted,

8

9                                                          /s/
                                                    Laurence D. King
10                                                  KAPLAN FOX & KILSHEIMER LLP
                                                    555 Montgomery Street
11                                                  San Francisco, CA 94111
                                                    Tel: (415) 772-4700
12                                                  Fax: (415) 772-4707

13                                                  Robert N. Kaplan
                                                    Gregory K. Arenson
14                                                  Linda P. Nussbaum
                                                    KAPLAN FOX & KILSHEIMER LLP
15                                                  805 Third Avenue, 22nd Floor
                                                    New York, NY 10022
16                                                  Tel: (212) 687-1980
                                                    Fax: (212) 687-7714
17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION TO APPOINT          CASE NO.: C-07-1827 SI
KAPLAN FOX AS INTERIM CLASS COUNSEL FOR DIRECT PURCHASER PLAINTIFFS