1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE GRAPHICS PROCESSING
UNITS ANTITRUST LITIGATION

_____/

This Order Relates To:

ALL ACTIONS

_____/

No. C 06-07417 WHA

MDL No. 1826

**PRETRIAL ORDER NO. 5**

**ORDER GRANTING IN PART
AND DENYING IN PART
MOTIONS TO DISMISS**

**INTRODUCTION**

      In this multi-district antitrust proceeding, all defendants have moved to dismiss the
direct purchasers' complaint as well as the indirect purchasers' complaint. One of the
prominent issues presented is the proper application of the recent decision in *Bell Atlantic Corp.*
*v. Twombly*, ___ U.S. ____, 127 S. Ct. 1955 (May 21, 2007). The motions are **GRANTED IN**
**PART AND DENIED IN PART** for the reasons stated below.

**STATEMENT**

      Taking all well-pled facts as true, the complaints establish the following. Defendants
are producers of graphics processing units, or GPUs, used in many types of consumer
electronics. Defendant Nvidia Corporation, a Delaware corporation, has its headquarters in
Santa Clara (DPC ¶ 17).[1] Defendant ATI Technologies, Inc., is a business entity organized

---

[1] "DPC" refers to the direct purchasers' Second Consolidated and Amended Class Action Complaint.
"IPC" refers to the indirect purchasers' First Consolidated Class Action Complaint.

United States District Court

For the Northern District of California

under the laws of Canada (*id*. at ¶ 18).  Defendant Advanced Micro Devices, Inc., a Delaware corporation, has its principal place of business in Sunnyvale (*id*. at ¶ 19).  On July 24, 2006, AMD and ATI announced a plan for AMD to acquire ATI.  The deal closed on October 25, 2006 (*ibid*.).  The acquisition was financed through approximately two billion dollars in debt, as well as 56 million shares of AMD stock (*ibid*.).  Direct and indirect purchasers allege that AMD assumed ATI's existing liabilities pursuant to the acquisition and, as a result, AMD is liable for ATI's conduct (*ibid*., IPC ¶ 41).

Direct-purchaser plaintiffs are individuals and businesses who allege that they purchased GPUs directly from defendants or their co-conspirators (DPC ¶¶ 12–15).  Indirect-purchaser plaintiffs, in contrast, allege that they purchased defendants' GPUs indirectly, *i.e.*, through intermediaries, with some of them alleging that they purchased the graphics card itself, while others allege that they purchased computers containing defendants' products (IPC ¶¶ 10–38).  Indirect purchaser plaintiffs reside in the following states:  Michigan, Florida, California, New York, South Dakota, Minnesota, Arizona, Wisconsin, Kansas, Washington D.C., Oregon, Vermont, and New Mexico (*ibid*.).

GPUs are dedicated graphics-rendering devices for computers, workstations, servers, game consoles, and mobile devices such as personal digital assistants and cellular phones (DPC ¶ 8).  GPUs process and display computer graphics, including graphics for three-dimensional and video applications (*id*. at ¶ 9).  Defendants sell GPUs to original equipment manufacturers, original design manufacturers, and directly through retail channels.  Plaintiffs allege that even when incorporated into computers, a GPU is a physically discrete component that does not undergo any significant alterations (IPC ¶ 49).  It can be physically unplugged from the computer's motherboard (*ibid*.).

Looking at the market for GPUs, plaintiffs allege that Nvidia has a 53% share of the market, while ATI has a 47% share of the market (*id*. at ¶ 54).  Both Nvidia and ATI are "fabless" semiconductor companies that license the actual production of graphics cards to independent manufacturers (*id*. at ¶ 55).  They then sell the products under their own brand names.  Plaintiffs allege that the market for GPUs has been characterized by price stability

United States District Court

For the Northern District of California

and upward pricing trends since at least 2002, while most consumer electronics are characterized by downward pricing trends (*id*. at ¶ 56).  Direct purchasers allege that the price of the primary components for defendants' products — semiconductors and random-access memory — has been declining in recent years (DPC ¶ 95).  Additionally, there is alleged excess capacity in the GPU market (*id*. at ¶ 96).

GPU design and production is a highly complex and expensive line of business requiring large amounts of labor and capital for research and development (*id*. at ¶ 45, IPC ¶ 71). Numerous incidents can delay, halt, or speed up the research and development process (IPC ¶ 72, DPC ¶ 46).  Plaintiffs allege that in a competitive market, firms would rush to release next-generation products ahead of competitors to capture sales and market share (IPC ¶ 72, DPC ¶ 46).  According to plaintiffs, the exact opposite has been occurring. Instead of rushing new products to market at the lowest possible prices, ATI and Nvidia have been releasing products at approximately the same times and at similar price points (IPC ¶ 73, DPC ¶ 48).

Plaintiffs allege that ATI, AMD, and Nvidia have conspired to fix prices and to coordinate the release of new like products.  Purportedly, ATI and Nvidia held a series of secret meetings and communications during which they restrained trade by:  (1) agreeing to reduce competition with each other to maintain and increase their margins; (2) agreeing to fix prices; and (3) coordinating the timing of the release of similar products into the market (DPC ¶ 32).  Plaintiffs allege that executives and employees from ATI and Nvidia attended some of the same industry meetings and conferences.  Shortly after attending those conferences, plaintiffs contend, the companies released new products at nearly the same times and at the same price points.  Specifics surrounding the agreement, however, are not alleged.

Plaintiffs allege that ATI and Nvidia slowed the pace of research and development and innovation starting in the spring of 2003.  Notably absent from the complaints are contentions of defendants' behavior *before* the alleged conspiracy commenced.  Plaintiffs make the

3

following allegations in support of their contention that defendants had an agreement to restrain trade:

- **2002:**  Members of PCI-SIG (Peripheral Component Interconnect Special Interest Group, a standard-setting organization dealing with high performance data transfer), which included both ATI and Nvidia, met to discuss implementation of PCI standard.  "This meeting provided opportunities for representatives of ATI, Nvidia, and/or AMD to conspire about the introduction and pricing of GPUs and the graphics cards in which they are used" (IPC ¶ 78).

- **March 2003:**  ATI's Radeon 9800 was announced to go on sale "priced *around $400*," Nvidia FX 5800 GPU also announced in March, was "priced *at $400* as well" (IPC ¶ 58).

- **March 4–8 2003:**  Khronos Group (of which ATI, Nvidia, and AMD were members) sponsored the Game Developers Conference in San Jose (IPC ¶ 80).  "Executives of ATI and Nvidia attended the Game Developer's Conference" (DPC ¶ 52).

- **April 2003:**  ATI announced that its Radeon 9600 "would be priced *around $200*."  Also Nvidia announced that its GeForce 5600 "would appear in stores in April of 2003, priced at $200 as well" (IPC ¶ 59).

- **Spring 2003:**  Representatives of ATI and Nvidia secretly met to slow the pace for releasing products (IPC ¶ 75).

- **June 2–3, 2003:**  "Meeting involving PCI-SIG members" at PCI-SIG conference in San Jose.  These meetings "provided opportunities for representatives of ATI, Nvidia and/or AMD to conspire about the introduction and pricing of GPUs and the graphics cards in which they are used" (IPC ¶ 79).  "[R]epresentatives of ATI and Nvidia attended" the conference (DPC ¶ 54).

- **August 2003:**  "Representatives of" ATI and Nvidia attended "broader" PCI-SIG meeting (DPC ¶ 54).

- **October 2003:**  Nvidia postponed the release of NV40 technology and ATI postponed release of R400 technology, both expected to be released that year (IPC ¶ 75; DPC ¶ 56).

- **2004:**  ATI posted on its website a draft marked "Confidential" prepared by an executive that contained internal notes commenting on ATI's strategies, including some notes relating to Nvidia (DPC ¶ 60).

- **February 23–26, 2004:**  3GSM World Congress in Cannes, France, hosted by Khronos Group (IPC ¶ 80).  "[R]epresentatives of ATI and Nvidia attended" the conference (DPC ¶ 57).

- **March 22, 2004:**  "Meeting involving PCI-SIG members" at  PCIe Technology Seminar or Technical Training Day (IPC ¶ 79).

4

- **March 22–26, 2004:** Khronos Group sponsored Game Development Conference (IPC ¶ 80). "[R]epresentatives of ATI and Nvidia attended" the conference (DPC ¶ 58).

- **April-May 2004:** ATI and AMD released next-generation technologies at the same time for the first time. These were the Radeon X800 Pro and the Nvidia GeForce 6800 GT, both made available at $399 each (DPC ¶ 61–63).

- **May 2004:** ATI announced that its Radeon X800 Pro "would be available for a retail price of *approximately $399*" and that Nvidia's comparable GeForce 6800 GT "would be released in June 2004 for *approximately $399* as well" (IPC ¶ 61).

- **May 2004:** Nvidia's NV40 technology and ATI's R400 technology were released within weeks of each other (IPC ¶ 76).

- **June 14–15, 2004:** "Meeting involving PCI-SIG members" at PCI-SIG conference in San Jose. These meetings "provided opportunities for representatives of ATI, Nvidia and/or AMD to conspire about the introduction and pricing of GPUs and the graphics cards in which they are used" (IPC ¶ 79; DPC ¶ 65).

- **August 12, 2004:** Nvidia announced the release of its GeForce 6600 GT at $199. "The Radeon X600 XT *had been released only a few months earlier* and was also priced at $199" (IPC ¶ 62). Nvidia announced the release of the GeForce 6600 GT at a retail price of $199, "this product *was matched* by ATI's Radeon X600 XT, which was priced at $199 as well" (DPC ¶ 66).

- **Second Quarter 2004:** Nvidia "released the GeForce 6800 Ultra for $499 while ATI released the Radeon X800 XT PE for $499 as well" (IPC ¶ 63).

- **December 6, 2004:** "Meeting involving PCI-SIG members" at the PCIe Technology Seminar or Technical Training Day (IPC ¶ 79).

- **2005:** ATI and Nvidia joined the board of directors of PCI-SIG. They had been members of the group previously (IPC ¶ 78). "Executives of ATI and Nvidia" joined the board of directors of PCI-SIG (DPC ¶ 53).

- **March 7–11, 2005:** Nvidia and ATI attended Game Developers Conference in San Francisco (DPC ¶ 67).

- **April 2005:** Nvidia and ATI attend PCI-SIG conferences in Tokyo and Taipei (DPC ¶ 68).

- **April–June 2005:** Nvidia and ATI became "platinum sponsors" of PCI-SIG (DPC ¶ 68).

- **June 6–7, 2005:** "Meeting involving PCI-SIG members" at PCI-SIG conference in San Jose. These meetings "provided opportunities for representatives of ATI, Nvidia and/or AMD to conspire about the introduction and pricing of GPUs and the graphics cards in which they are used" (IPC ¶ 79).

- **July 2005:** Nvidia GeForce 6200 GT was "released at a price of $140." ATI's Radeon 9550, with similar specifications, "was released . . . also priced at $140" (IPC ¶ 64). The Nvidia product "*came on the heels of* ATI's introduction in April 2005 of the Radeon 9550, which . . . was also priced at $140" (DPC ¶ 69).

- **September 2005:** ATI announced release of its CrossFire cards, including Radeon X800 XL CrossFire and Radeon X800 CrossFire priced at $299 and $199 respectively. "The comparable Nvidia products were GeForce 6800 GT and GeForce 6800, with respective retail prices of $299 and $199 (IPC ¶ 65). They were released "at the same time" (DPC ¶ 73).

- **October 3, 2005:** "Meeting involving PCI-SIG members" at PCIe Technology Seminar or Technical Training Day in Milpitas (IPC ¶ 79).

- **December 5, 2005:** "Meeting involving PCI-SIG members" at PCIe Technology Seminar or Technical Training Day in Milpitas (IPC ¶ 79).

- **February 27, 2006:** "Meeting involving PCI-SIG members" at PCIe Technology Seminar or Technical Training Day in Milpitas (IPC ¶ 79).

- **March 2006:** ATI and Nvidia attended Fabless Semiconductor Association Global Leadership Summit in Shanghai (DPC ¶ 75).

- **March 2006:** Nvidia and ATI again announced new GPU products within same time frame and at same price (DPC ¶ 76).

- **March 20–24, 2006:** ATI and Nvidia attended Game Developers Conference in San Jose (DPC ¶ 74). "[R]epresentatives of ATI and Nvidia attended" (DPC ¶ 58).

- **April 24, 2006:** ATI released Radeon X1600 "at a price of about $175" (DPC ¶ 77).

- **May 5, 2006:** Nvidia GeForce 7600 GT released for "about $175" (IPC ¶ 66). The ATI product had been released "just *two weeks earlier*" (DPC ¶ 77).

- **May 15–19, 2006:** "Meeting involving PCI-SIG members" at PCI-SIG Compliance Workshop in Milpitas or Santa Clara (IPC ¶ 79).

- **June 8–9, 2006:** "Meeting involving PCI-SIG members" at PCI-SIG conference in San Jose. These meetings "provided opportunities for representatives of ATI, Nvidia and/or AMD to conspire about the introduction and pricing of GPUs and the graphics cards in which they are used" (IPC ¶ 79).

- **June 11–14, 2006:** Nvidia and ATI attended Develop 2006 Conference in Brighton, England (DPC ¶ 78).

United States District Court

For the Northern District of California

- **July 30, 2006:** Nvidia and ATI attended and made presentations at SIGGRAPH 2006 conference in Boston, MA (DPC ¶ 79).

- **August 21, 2006:** "Meeting involving PCI-SIG members" at PCIe Technology Seminar or Technical Training Day in Milpitas (IPC ¶ 79).

- **August 21–25, 2006:** "Meeting involving PCI-SIG members" at PCI-SIG Compliance Workshop in Milpitas or Santa Clara (IPC ¶ 79).

- **August 30, 2006–September 1, 2006:** Nvidia and ATI attended and made presentations at the Computer Software Association Developers Conference in Tokyo (DPC ¶ 80).

- **September 2006:** "ATI Radeon X1650 Pro was released in September of 2006 for a price *of about $220.* The Nvidia GeForce 7900 GS was also released in September of 2006 for a price *of about $200*" (IPC ¶ 68). "The features of these products were virtually identical" (DPC ¶ 82).

- **September 14, 2006:** Nvidia GEForce 7950 GT was released at $269.99 (IPC ¶ 67).

- **October 17, 2006:** ATI Radeon X1950 Pro was released for $269.99 (IPC ¶ 67).

- **October 23, 2006:** "Meeting involving PCI-SIG members" at PCIe Technology Seminar or Technical Training Day in Milpitas (IPC ¶ 79).

- **December 4–8, 2006:** "Meeting involving PCI-SIG members" at PCI-SIG Compliance Workshop in Milpitas or Santa Clara (IPC ¶ 79).

- **February 26, 2007:** "Meeting involving PCI-SIG members" at PCIe Technology Seminar or Technical Training Day in Milpitas (IPC ¶ 79).

- **February 26–March 2, 2007:** "Meeting involving PCI-SIG members" at PCI-SIG Compliance Workshop in Milpitas or Santa Clara (IPC ¶ 79).

- **May 21–22, 2007:** "Meeting involving PCI-SIG members" at PCI-SIG conference in San Jose. These meetings "provided opportunities for representatives of ATI, Nvidia and/or AMD to conspire about the introduction and pricing of GPUs and the graphics cards in which they are used" (IPC ¶ 79).

In short, the gravamen of plaintiffs' allegations is that at some time around late 2002 or early 2003, the behavior of ATI and Nvidia changed. The GPU market itself started to show upward pricing trends even though the price of consumer electronics generally showed a downward trend. Plaintiffs conclude that ATI and Nvidia forged an agreement to fix prices. In support,

7

United States District Court

For the Northern District of California

they allege that ATI and Nvidia's employees attended the same trade shows and industry meetings which gave them the opportunity to meet and to conspire. Contrary to their individual economic interests, ATI and Nvidia began to delay introduction of their new products. They also released products at approximately the same times and at approximately the same prices, allegedly releasing like products within weeks or within one to three months of one another. In conclusory manner, plaintiffs allege that this was unprecedented in the industry. As a result, plaintiffs and other putative class members have paid super-competitive prices for GPUs and consumer electronics.

On November 30, 2006, AMD and Nvidia both announced that they had received subpoenas from the San Francisco Office of the Antitrust Division of the United States Department of Justice in connection with an investigation regarding GPUs and graphics cards (DPC ¶¶ 35–36). In an SEC filing, AMD confirmed that the investigation was criminal in nature (*id*. at ¶ 38). To date, neither company has publicly denied allegations of antitrust violations, stated that the investigation has no basis, or revealed that it has conducted an internal investigation (*id*. at ¶¶ 39–40).

The first of these civil antitrust actions was filed on December 4, 2006. Many others quickly followed. A majority of the complaints were filed by indirect purchasers of GPUs or computers containing GPUs; the remainder were filed by direct purchasers. By order of the Judicial Panel on Multidistrict Litigation, a number of these actions were consolidated for pretrial purposes on April 18, 2007, pursuant to 28 U.S.C. 1407. Other tag-along actions have been transferred and consolidated into this multi-district litigation proceeding since then.

An initial case management conference was held on May 24, 2007. Plaintiffs agreed to refile and consolidate their complaints and submit to this Court's original jurisdiction, thus avoiding the necessity of sending any cases back to their "home" districts. An order dated May 30, 2007, appointed interim class counsel for the indirect-purchaser and direct-purchaser plaintiffs. Defendants' motion for a stay of discovery was filed on June 7, 2007, and consolidated complaints for both the direct and indirect purchasers were filed on June 14, 2007. The direct purchasers plead a claim for violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

They ask for an injunction under the Clayton Act, treble damages, and the costs of suit. The indirect purchasers plead the following claims: (1) violation of Section 1 of the Sherman Act seeking an injunction; (2) violation of California's Cartwright Act; (3) violation of California Business and Professions Code § 17200; (4) violations of the antitrust laws of various other states; (5) violations of the consumer protection and unfair competition laws of various other states; and (6) unjust enrichment and disgorgement of profits. On July 24, 2007, an order issued staying discovery pending the outcome of these motions to dismiss. The dismissal motions were filed on July 16, 2007. A hearing was held on September 20, 2007.

### ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, ___ U.S. ____, 127 S. Ct. 1955, 1964–65 (May 21, 2007). "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff. However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) (citations omitted).

Defendants have filed three motions to dismiss. *First*, all defendants move to dismiss direct purchasers' complaint. *Second*, all defendants move to dismiss indirect purchasers' complaint. *Finally*, defendant AMD moves to dismiss on the ground that it cannot be held liable for ATI's conduct either before or after the acquisition. The motions will be addressed in that order.

### 1.   MOTION TO DISMISS DIRECT PURCHASERS' COMPLAINT.

#### A.   Legal Standard Under *Twombly*.

Defendants argue that *Twombly* requires that this action be dismissed because plaintiffs' allegations of conspiracy are simply too conclusory to state a claim. In the *Twombly* decision, the Supreme Court discussed pleading standards for antitrust conspiracy claims under Section 1

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

of the Sherman Act, 15 U.S.C. 1.  It reiterated that under Rule 8(a)(2), only a short and plain statement of the plaintiff's entitlement to relief is necessary.  127 S. Ct. at 1964.  It also acknowledged that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 1964–1965 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  The decision went on to criticize a common interpretation of the hoary "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  *Twombly* noted that "[o]n such a focused and literal reading of *Conley*'s 'no set of facts,' a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Id.* at 1968.

The *Twombly* plaintiffs pleaded an antitrust claim under Section 1 of the Sherman Act by alleging parallel conduct.  The Supreme Court noted that parallel behavior among firms is certainly admissible as circumstantial evidence of agreement in the trial or summary-judgment context, but even conscious parallel behavior is not, by itself, unlawful.  *Id.* at 1964.  Its past holdings indicated that mere parallel conduct was not sufficient to entitle a plaintiff to a directed verdict, and similarly, at the summary-judgment stage, the plaintiff's evidence "must tend to rule out the possibility that the defendants were acting independently."  *Ibid.* (citing *Theater Enterprises Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540 (1954); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).  As for the pleading standard on a motion to dismiss, the Supreme Court held that:

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.  Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement . . . .  It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that

raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Id*. at 1965–66.

The decision also reiterated that allegations of conspiracy were not subject to Rule 9(b)'s more exacting pleading standard. Such allegations are governed by Rule 8. *Id*. at 1973, n.14. The requirement under *Twombly* is only that the allegations be sufficiently particularized to "render plaintiffs' entitlement to relief plausible." *Ibid*. Accordingly, to survive a motion to dismiss, the plaintiff would have to allege more than mere instances of parallel conduct coupled with bare assertions of agreement at some unspecified time. *Twombly* did, however, note that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy." *Id*. at 1965, n.4.

**B.    Allegations of Conspiracy.**

*Twombly* concerned incumbent local exchange carriers (ILECs) that were granted localized monopolies over regional local telephone service. As of 1996, the government no longer supported such monopolies and mandated that each ILEC share its network with other customers. The upshot of the *Twombly* complaint was that the ILECs engaged in parallel conduct to prevent competition from competitive local exchange carriers (CLECs) and that the ILECs agreed not to compete with one another. The *Twombly* plaintiffs alleged that agreement could be inferred from the ILECs' failure to pursue certain business opportunities. *Id*. at 1961–63. The Supreme Court noted that the ILECs' actions were just as consistent with preserving their own markets in a natural manner as they were with an unlawful agreement. *Id*. at 1971. Each ILEC would have its own, individual incentives to keep CLECs out of their respective markets absent conspiracy with other ILECs. In particular, the decision noted that firms cannot be expected to enter every market available to them that an outside observer might consider profitable. *Id*. at 1972 (citing Areeda & Hovenkamp, *Antitrust Law*, ¶ 307d, at 155 (Supp. 2006)).

Here, the upshot of plaintiffs' complaint is that sometime between late 2002 and early 2003, Nvidia and ATI formed an agreement not to compete with one another. The agreement

11

United States District Court

For the Northern District of California

1  manifested itself in defendants' slowing the progress of research and development and releasing

2  new products at the same times and at the same price points.  Plaintiffs allege that the

3  conspiracy developed at or some time around meetings of trade associations attended by

4  defendants.  As evidence of agreement, plaintiffs allege that parallel-pricing behavior between

5  the two firms occurred shortly after the meetings.

6       At least two courts have addressed such allegations after the *Twombly* decision.  In *In re*

7  *OSB Antitrust Litigation*, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007), the plaintiffs made

8  allegations of price fixing in the market for oriented-strand board.  The plaintiffs alleged both

9  that the market was highly concentrated and that the conspiracy was maintained through secret

10  meetings and a bi-weekly published price list.  *Id.* at *4.  Judge Paul Diamond held the parallel

11  conduct by itself could have been the defendants' natural reactions to conditions in the

12  oriented-strand board market.  When combined with the plaintiffs' explicit allegations that the

13  defendants discussed price fixing at industry events and enforced the agreement through a

14  published price list, however, it was sufficient to sustain a claim under *Twombly*.  *Id.* at *6.

15  Similarly, in *In re Rubber Chemicals Antitrust Litigation*, ___ F. Supp. 2d ____, 2007 WL

16  2348715, *11 (N.D. Cal. Aug. 15, 2007), Judge Martin Jenkins of this district held that

17  allegations of meetings at trade shows that detailed who was present at the meetings and how

18  they were involved in fixing prices were sufficient to allege a conspiracy when coupled with

19  parallel pricing.  Furthermore, there were allegations of certain individuals' involvement in the

20  price-fixing meetings and the steps taken to fix prices and enforce the agreement.  *Id.* at *11.[2]

21       **C.    Parallel Action.**

22       Here, both direct and indirect plaintiffs allege that the conspiracy began at sometime late

23  in 2002.  The companies belonged to some of the same trade associations and standard-setting

24  organizations.  ATI and Nvidia's employees and executives allegedly attended their meetings at

25  the same time.  Plaintiffs do not, however, allege which persons from the companies attended or

26  _____

27       [2] In *In re Rubber Chemicals*, the plaintiffs alleged that a specific individual served as a contact between the conspirators.  They also alleged specific meetings that occurred and discussions at those meetings that involved an agreement to fix prices.  The plaintiffs also alleged that price fixing was discussed in emails between alleged conspirators.  *Id.* at *11–12.

28

United States District Court

For the Northern District of California

what their titles were.  No details are given concerning the alleged agreement.  Plaintiffs allege that "[i]n the spring and summer of 2003, pursuant to the conspiracy herein alleged, ATI and Nvidia slowed the pace at which they released new GPU products and coordinated the pricing of these new products" (DPC ¶ 49).  Significantly, however, this is the only statement that plaintiffs make regarding defendants' behavior *before* the conspiracy allegedly began.

Plaintiffs have pleaded several instances of parallel pricing and parallel releases of products.  They allege the following products were released at approximately the same times and at the same prices:

- ATI announced that its Radeon 9800 would be released in March 2003 "priced around $400," and Nvidia announced that its FX 5800 would be released in March 2003, "priced at $400 as well" (IPC ¶ 58).

- In April 2003, "it was announced" that ATI's Radeon 9600 would be "priced around $200," and Nvidia announced that its FX 5600 would appear in April of 2003, "priced at $200 as well" (*id*. at ¶ 59).

- Nvidia announced in October 2003 that it was postponing introduction of its NV40 graphics technology.  "At the same time," ATI announced the delay of its comparable R400 technology (DPC ¶ 56).

- Nvidia released its GeForce 6800 GT and ATI released its Radeon X800 Pro "within just a few weeks of each other in April and May of 2004."  "This was the first time in history that Nvidia and ATI had ever released next-generation competing technologies so close to one another" (*id*. at ¶¶ 61–62).  They were introduced at the same price of $399 (*id*. at ¶ 63).

- Nvidia announced the release of its GeForce 6600 GT at $199, and "this product was matched by ATI's Radeon X600 XT" also priced at $199 (*id*. at ¶ 66).[3]

- Nvidia released its GeForce 6200GT at a price of $140.  "This came on the heels of the introduction in April 2005 of the Radeon 9550" also priced at $140 (*id*. at ¶ 69).[4]

- ATI released its CrossFire cards with suggested retail prices of $299 and $199 in September 2005, and "[a]t the same time, Nvidia released comparable products" at $299 and $199 (*id*. at ¶ 73).

---

[3] Indirect purchasers allege that the Radeon X600 XT was released "only a few months earlier" than ATI's comparable product (IPC ¶ 62).

[4] Indirect purchasers allege that the Nvidia GeForce 6200 GT was released in July of 2005, and the Radeon 9550 was released in April 2005 (IPC ¶ 64).

13

United States District Court

For the Northern District of California

- • ATI released its Radeon X1600 at "about $175," on April 24, 2006, and Nvidia released its GeForce 7600GT on May 5, 2006, "at about $175" (*id*. at ¶ 77).

- • Nvidia released its GeForce 7950 GT on September 14, 2006, and ATI released its Radeon X1950 Pro on October 17, 2006. "The prices, as quoted by online retailer Newegg.com, were $269.99 for each graphics card" (*id*. at ¶ 81).

- • ATI released its Radeon X1650 Pro in September 2006 at about $220, while Nvidia released its GeForce 7900 GS at about $200 (*id*. at ¶ 82).

In other words, several matched products were released over a four-year period with the prices being the same and other products were released with prices close to the other.

Plaintiffs argue that this conduct falls squarely within the example identified in *Twombly* — a complex and "historically unprecedented" change in pricing structure made for no other discernable reason than a price-fixing conspiracy. *Twombly*, 127 S. Ct. at 1965, n.4. The allegations of parallel conduct, however, are not so convincing as plaintiffs contend. For instance, as stated under the last bullet point, both defendants allegedly released products in September 2006 — but with a difference in price of twenty dollars. Plaintiffs urge that other products were simultaneously released, but they actually pleaded that the products were only released within the same month. In other instances, such as the Nvidia GeForce 6200 GT and the ATI Radeon 9550, products were released within *three* months of one another. The complaints are often less than clear about when the products were actually released. Plaintiffs' allegations of parallel conduct could possibly be indicative of a conspiracy but fall short of unusual, lockstep pricing behavior. We must remember that competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing.[5]

---

[5] In *In re Elevator Antitrust Litigation*, ___ F.3d ____, 2007 WL 2471805, (2d Cir. Sept. 4, 2007), the plaintiffs' conspiracy complaint was dismissed for failing to meet the standard under *Twombly*. Plaintiffs had alleged in conclusory fashion that defendants had agreed to restrain trade by fixing prices, rigging bids, and entering long-term maintenance contracts. *Id*. at *2. They also alleged parallel conduct based on contract language, product design and product pricing. *Id*. at *3–*4. The Second Circuit held that although these actions could indicate conspiracy, the allegations of agreement were simply too conclusory and the allegations of parallel conduct were just as consistent with legal conduct. *Ibid*.

United States District Court

For the Northern District of California

1    Plaintiffs' allegations also fail to show that this behavior was "historically

2    unprecedented" because they make scant allegations of pricing behavior that came *before* the

3    alleged conspiracy.  Releasing products within three months, or even within the same month,

4    may have been the standard industry practice.  Indeed, defendants suggest innocent reasons why

5    Nvidia and ATI would release their like products at roughly the same times.  As even plaintiffs

6    allege, the majority of GPUs are incorporated into other electronics.  At the hearing, defendants

7    argued that their product releases were governed by the OEMs' product cycles.  Relying on

8    their Form 10Ks, defendants claim to have sold to the same OEMs, so naturally, one would

9    expect their product releases to have happened close in time.  Because, however, this Form 10K

10   material is extraneous to the complaint and the Form 10Ks were not cited therein, the specifics

11   in any Form 10Ks may not be considered.  Nonetheless, the general point is so well known that

12   it will be considered, namely that OEMs often do dictate the timing and specifications of the

13   next round of chips needed for their own new products, so the vendors competing to supply the

14   new chips will tend to introduce them at or about the same time and with the same

15   OEM-required features.  This characteristic of the chip industry is an independent innocent

16   explanation for parallel conduct of chip makers.

17       Defendants also contend that producers of GPUs, much like other producers of

18   electronics, are subject to a certain cycle in releasing products.  Each has its own independent

19   reasons to delay release of a new product.  To maximize revenue, they may delay the release

20   of new products to exact the most revenue out of older products, with the delay lasting until

21   their hands are forced by the competition.  As plaintiffs themselves plead, the release of new

22   GPU technology can render earlier technology obsolete (IPC ¶ 81).[6]

23

24       [6] Moreover, defendants' behavior could simply be consistent with conscious parallelism.  Where a
     small number of firms can affect the total market output and the market price, firms' pricing decisions are
25   interdependent.  In such situations, commentators have noted that "[e]ach knows that expanding its sales or
     lowering its price will reduce the sales of rivals, who will notice that fact, identify the cause, and probably
26   respond with a matching price reduction.  Unless the actor can somehow conceal its price reduction or unless
     its own position is improved by a lower market price, it will hesitate to reduce prices at all."  6 Areeda &
27   Hovenkamp, *Antitrust Law* § 1410b (2d ed. 2000).  As the Eleventh Circuit has stated, "conscious parallelism is
     the practice of interdependent pricing in an oligopolistic market by competitor firms that realize that attempts to
28   cut prices usually reduce revenue without increasing any firm's market share, but that simply price leadership in
     such a market can readily increase all competitors' revenues."  *Williamson Oil Co. v. Phillip Morris*, 346 F.3d

15

United States District Court

For the Northern District of California

1    In short, plaintiffs' allegations of parallel conduct are consistent with conspiracy but

2    they are equally consistent with lawful conduct.  Accordingly, under *Twombly*, plaintiffs have

3    not pleaded facts that would move their allegations from merely possible to plausible.

4    **D.    Direct Allegations of Agreement.**

5    Plaintiffs argue at length that their allegations are distinguishable from *Twombly*

6    because they have directly alleged an agreement.  Plaintiffs overplay their hand.  The sum of

7    their allegations of agreement is that executives from ATI and Nvidia attended the same

8    conferences and trade meetings.  Attendance at industry trade shows and events is presumed

9    legitimate and is not a basis from which to infer a conspiracy, without more.  *In re Citric Acid*

10   *Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999).  Moreover, even where some competitors have

11   admitted to meeting to fix prices at or near trade shows and conferences, it is not reasonable to

12   infer that another competitor in attendance at the same meeting had done likewise.  *Id.* at 1097.

13   Defendants point out that there are no allegations that representatives from ATI and

14   Nvidia actually met or spoke with one another during those widely-attended conferences.

15   Here, plaintiffs have pleaded no facts indicating that defendants' attendance at trade shows and

16   conferences was part of a conspiracy.

17   Plaintiffs do attempt to correlate the trade shows to the release of products at certain

18   price points, implying that defendants must have met and made the decisions to do so.

19   The upshot of plaintiffs' allegations is that defendants attended a certain meeting which gave

20   them an "opportunity" to meet secretly.  Shortly thereafter, both companies released new

21   products at similar prices (DPC ¶¶ 52–55).  Missing, however, is any specific allegation that

22   defendants' representatives actually met to fix prices.  Moreover, plaintiffs allege that

23   defendants attended up to nine of the same trade events in the same year.  Plaintiffs allege that

24   two or three products were released in tandem in those years.  It is almost axiomatic that a

25   product release would fall within a few months of one trade meeting or another, there having

26

27   1287, 1299 (11th Cir. 2003) (citation omitted).  Such conscious parallelism may well be anticompetitive but it is
     not illegal.  Here, plaintiffs have alleged that the GPU market is highly concentrated between ATI and Nvidia.
28   Defendants simply may not have much of an incentive to cut prices or rush their new products to market.

been so many of them.  Plaintiffs' allegations are just as consistent with coincidence as they are with conspiracy.

This is not to say that to survive a motion to dismiss, plaintiffs must plead specific back-room meetings between specific actors at which specific decisions were made.  Nor is this order imposing the stricter pleading standard set forth in Rule 9(b) to allegations of conspiracy.  The *Twombly* decision reiterated that allegations of antitrust conspiracy are governed by Rule 8, and not the heightened standard of Rule 9(b).  The Supreme Court's concern in that instance was that the allegations were insufficiently particularized to "render plaintiffs' entitlement to relief plausible."  127 S. Ct. 1973, n.14.

Plaintiffs allege in conclusory fashion that defendants fixed prices pursuant to an agreement, but that allegation is simply too conclusory to show a plausible entitlement to relief.  As the Supreme Court noted in *Twombly*, "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id*. at 1966.  Plaintiffs have not pleaded that defendants ever met and agreed to fix prices; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings.  They then attempt to correlate the release of products with those meetings.  Given the sheer number of meetings attended by both defendants, every product release will follow on the heels of a meeting.

Plaintiffs also contend that defendants have erred in mincing their allegations too finely.  Instead of separately looking at their allegations of parallel pricing and agreement, they should be analyzed as a whole.  Even doing so, plaintiffs have not pleaded a claim for antitrust conspiracy.  They have failed to make well-pled allegations that, taken true, tend to raise a "reasonable expectation that discovery will reveal evidence of illegal agreement." *Id*. at 1265.  At most, they have suggested that defendants' employees and executives attended the same meetings, and thereafter, defendants engaged in parallel behavior that could be explained by each firm acting in their own self-interest.  As demonstrated above, their allegations of parallel behavior do not go nearly so far as they contend in their briefs.

17

United States District Court

For the Northern District of California

In support of their allegations, plaintiffs point out that the Antitrust Division of the Department of Justice has served defendants with subpoenas and is conducting a grand jury investigation. The investigation, however, carries no weight in pleading an antitrust conspiracy claim. It is unknown whether the investigation will result in indictments or nothing at all. Because of the grand jury's secrecy requirement, the scope of the investigation is pure speculation. It may be broader or narrower than the allegations at issue. Moreover, if the Department of Justice made a decision *not* to prosecute, that decision would not be binding on plaintiffs. The grand jury investigation is a non-factor.

Although the existing allegations fall short, *Twombly* may light the way for an amended pleading, at least if counsel can deliver on the amendments promised at the hearing. *Twombly* held that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy." *Id.* at 1965, n.4. Although the complaints are replete with allegations about defendants' pricing behavior *after* the conspiracy allegedly began, they say next to nothing about defendants' pricing behavior *before* the conspiracy began. Plaintiffs' conclusory allegation that the changes in pricing were unprecedented is insufficient because on these facts, no before-and-after comparison of pricing behavior can take place. At the hearing on this motion, counsel stated that they could make stronger "before" allegations, evidently drawn from publicly available trade journals and public filings, so as to spell out such "unprecedented changes." Accordingly, defendants' motion to dismiss direct-purchaser plaintiffs' complaint is **GRANTED**, but an avenue for seeking leave to amend will be described below.

### 2. MOTION TO DISMISS INDIRECT PURCHASERS' COMPLAINT.

Turning to the indirect purchasers' claims, this order has already held that these allegations of a price-fixing conspiracy are insufficient to state a claim under Rule 8(a)(2). Federal pleading standards govern in federal court, even as to state claims. *See AlliedSignal, Inc. v. City of Phoenix*, 182 F.3d 692, 696 (9th Cir. 1999). Since plaintiffs' federal and state-law antitrust claims are predicated on the same allegations of conspiracy, they likewise

are insufficient to state a claim for conspiracy.  Accordingly, defendants' motion to dismiss is **GRANTED** with respect to the federal and state antitrust claims, including the claim asserted on behalf of a purported nationwide class under California's Cartwright Act.  This order now addresses defendants' standing arguments and plaintiffs' state-law consumer-protection claims.

### A.    State Antitrust Laws.

The Supreme Court has held that indirect purchasers may not sue for money damages under Section 4 of the Clayton Act (with rare exceptions).  *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730 (1977).  Thus, there is virtually no monetary federal antitrust remedy for indirect purchasers.  After the *Illinois Brick* decision, some states passed statutes expressly allowing indirect purchasers to recover damages for antitrust violations under state law. *See, e.g.,* Cal. Bus. & Prof. Code § 16720.  Since our indirect purchasers are barred from asserting federal claims for monetary relief, they mainly rely on the law of those states that have repealed *Illinois Brick*.

In moving to dismiss indirect purchasers' state-law antitrust claims, defendants argue that plaintiffs who purchased finished computers, as opposed to GPUs or graphics cards, do not have standing and that claims brought in states where no named plaintiff resides should be eliminated.

### *(1)    Standing.*

The argument is that those who purchased products containing GPUs, instead of purchasing GPUs themselves, have injuries that are simply too remote to support antitrust standing.  *Federal* antitrust standing is determined by the five-part test set forth in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536–39 (1983).  The factors to consider are:  (1) whether the alleged conspirators intended to injure plaintiffs; (2) the directness or indirectness of the asserted injury; (3) the character of the claimed damages (including risk of duplicative recovery, complexity of apportionment and speculative nature of damages); (4) the existence of more direct victims; and (5) the nature of plaintiffs' claimed injury and whether it was a participant in the relevant market.

19

United States District Court

For the Northern District of California

As noted, *Associated General Contractors* arose under the federal Clayton Act.  It is far from clear that *Associated General Contractors* should be automatically read into the substantive antitrust law of each and every state.  To be sure, some states, such as West Virginia, have so-called harmonization provisions that incorporate federal interpretations of similar federal antitrust statutes into state statutes.  W. Va. Code § 47-18-16.  Some federal courts have applied *Associated General Contractors* to limit the standing of indirect purchasers under state law.  *See, e.g., In re DRAM Antitrust Litig.*, 2007 U.S. Dist. LEXIS 44354, at *53 (N.D. Cal. June 1, 2007).

On the other hand, a recent decision by the Supreme Court of Minnesota held that *Associated General Contractors* did *not* apply to claims brought under that state's law, so it did not govern standing.  *Lorix v. Crompton*, 736 N.W. 2d 619, 627–28 (Minn. Aug. 2, 2007). Other courts have found conflicts between *Associated General Contractors* and state-law provisions.  *See D.R. Ward Const. Co. v. Rohm & Haas, Co.*, 470 F. Supp. 2d 485, 500–02 (E.D. Pa. 2006) (Davis, J.) (finding that Vermont's harmonization provision did not require it to adopt all federal antitrust precedent and casting doubt on whether *AGC* applied).

Standing under each state's antitrust statute is a matter of that state's law.  It would be wrong for a district judge, in *ipse dixit* style, to bypass all state legislatures and all state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust laws. The rule urged by the defense may (or may not) be sound policy but that is a matter for the state policy makers to decide, not for a federal judge to impose by fiat.  This order's rejection of the blanket nationwide proposal is without prejudice to a later state-by-state analysis of the extent to which *Associated General Contractors* has actually been adopted by state officials.  It is worth stating that under Rule 23, this would be a formidable challenge and, along with other state-by-state dissections of local law, militate against the predominance of common issues and against manageability.[7]

-------

[7] Further clouding the standing issue is that not all plaintiffs or putative class members purchased their computers in the same way.  Indirect purchasers plead that consumers often have the option of upgrading their graphics processor when purchasing a computer (IPC ¶¶ 50–52).  Sometimes the GPU is a separate entry on the invoice.  Even considering only plaintiffs who purchased computers, some of them decided to pay more for a

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### (2)   Claims Under Non-California Law In States Where No Named Plaintiff Resides.

Defendants move to dismiss plaintiffs' state-law antitrust claims under the laws of Iowa, Maine, Mississippi, Nebraska, North Dakota, Tennessee, and West Virginia because no named plaintiff resides in those states.  Each claim under each state statute must be analyzed separately.  A class cannot assert a claim on behalf of an individual that they cannot represent. *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1671 (S.D. Fla. 2001). Plaintiffs argue that the standing issue should be postponed until class certification. The Ninth Circuit, however, has held that standing can be addressed before class certification where, as here, the court is not considering a global class settlement.  *Easter v. Am. West Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (holding that the Supreme Court's decision in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), did not require considering class certification before standing).  Accordingly, no named plaintiff has standing to bring antitrust claims in those states, and defendants' motion to dismiss those claims will be **GRANTED**.

Defendants present similar arguments with respect to claims under the consumer-protection laws of those same states.  Again, there is no named plaintiff from those states who has suffered injury as a result of defendants' conduct, so those claims must be dismissed.  Defendants' motion to dismiss is **GRANTED** as to plaintiffs claims under the consumer-protection laws of Arkansas, Iowa, Maine, Mississippi, Nebraska, Nevada, North Dakota, Rhode Island, Tennessee, and West Virginia.

### B.   Nationwide Class Under California Law.

Indirect plaintiffs also purport to bring claims on behalf of a nationwide class under California's Cartwright Act and California's Business and Professions Code § 17200. Defendants in effect move to strike all references to a nationwide class in these claims

---

computer with a faster GPU.  Other plaintiffs may have merely purchased a computer from a retail store "as is," accepting whatever features the manufacturer decided to provide.  This has serious implications for the question of whether or not any overcharges were passed on to the consumer.  In the first instance, the overcharge is more likely to have gone to the consumer because the GPU is a separately-invoiced, traceable part of the finished computer.  In the second instance, the overcharge may have been absorbed by the manufacturer, the retailer, or at other steps in the distribution chain.  The individual decisions that appear to go into purchasing a computer containing a GPU might cloud class certification.

United States District Court
For the Northern District of California

because extraterritorial application of California's antitrust law would violate due process.
For a nationwide class to invoke the law of a particular state, the chosen state's law must both
(1) not conflict with the law of another jurisdiction that has an interest in the case, and
(2) have a significant contact or significant aggregation of contacts to claims asserted by each
member of the plaintiff class to insure that the choice of the forum state's law is not arbitrary
or unfair. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985).

### *(1)      Conflict of Law.*

As stated, after the *Illinois Brick* decision, some states, including California, passed
statutes that expressly permitted indirect purchasers to recover damages for antitrust violations
under state law, repealing *Illinois Brick*'s holding.  *See, e.g.,* Cal. Bus. & Prof. Code § 16720.
Other states have declined to do so.  In those states, indirect purchasers are barred from
bringing antitrust claims, other than for injunctive relief.  Defendants contend that applying the
law of California to a nationwide class would squarely conflict with the laws of these states.
Here, allowing a nationwide class based on California antitrust law would allow residents of
some states who abide by *Illinois Brick* to have claims where their respective state governments
have declined to allow them.  Plaintiffs attempt to harmonize the conflict by saying that
California  merely confers an additional right on purchasers to sue for damages.  This order
holds that there is a conflict between the two camps, each camp having come out in opposite
ways on the repealer issue.

Plaintiffs characterize this issue as a mere choice-of-law issue under California law.
The *Shutts* test, however, deals with whether the application of a certain state's law to a
nationwide class violates due process and the full faith and credit clause, while a choice-of-law
analysis is a nonconstitutional question under the common law of the state, here California.
*Shutts* cannot be swept under the rug.  Nonetheless, California's choice-of-law test also happens
to consider whether there is a conflict between the law of California and the laws of other states.
Here, the conflict looms large.  Again, some states allow their citizens to sue for antitrust
injuries as indirect purchasers (like California) and some do not.  Each state had the ability to
repeal *Illinois Brick* as to its local law.  Some chose yes.  Some chose no.  Plaintiffs have not

United States District Court

For the Northern District of California

1    shown that California has a greater interest in applying its law than other states.  Any

2    Cartwright Act class would, at most, have to be limited to states with laws like California's law.

3    If and when class certification is on the table, the multiplicity of issues in working through the

4    fifty state laws will also weigh in the analysis.  *See Kakani v. Oracle*, 2007 WL 1793774, *8

5    (N.D. Cal. June 19, 2007) (Alsup, J.).

6                          *(2)      Significant Contacts.*

7            Next under *Shutts* is the question of significant contacts.  Defendants point out that not

8    all plaintiffs have alleged that they bought graphics cards in California, or that defendants

9    produced graphics cards in California, or even that the alleged secret meetings between

10   defendants' representatives took place in California.  This is so.  Plaintiffs reply, however,

11   that conduct in furtherance of the conspiracy took place in California.  Nvidia is allegedly

12   headquartered in California.  ATI has at least some business operations here in California.

13   Representatives from both companies attended meetings in California, or so it is alleged.

14   It remains, however, that plaintiffs have never alleged the specific locations of any of the

15   meetings between defendants.  Moreover, ATI is organized in Canada and has its headquarters

16   there.  Even if there was no conflict in applying California law to states without *Illinois Brick*

17   repealer statutes, plaintiffs have not pleaded or otherwise shown sufficient contacts to warrant

18   the application of California law to other states.

19           Even where substantial contacts to the forum state have been pled, courts have declined

20   to apply a single state's laws to a nationwide antitrust class.  *In re Relafen Antitrust Litig.*,

21   221 F.R.D. 260, 276–77 (D. Mass. 2004) (Young, J.).  In *In re Relafen Antitrust Litigation*,

22   the plaintiffs attempted to apply Pennsylvania law to a nationwide class because the company

23   producing the drug was headquartered in Pennsylvania and the product was sold and distributed

24   from that state.  *Relafen* noted that because "the primary aim of antitrust and consumer

25   protection laws generally — and those of indirect purchaser states particularly — is

26   compensating consumers, not policing corporate conduct," the court determined that the more

27   significant factor was the location of the injury, or where the plaintiff was located when the

28

United States District Court

For the Northern District of California

1    injury occurred from purchasing the products.  Most of the sales happened outside

2    Pennsylvania, so the court declined to apply Pennsylvania law to out-of-state sales.  *Id*. at 277.

3          The *Relafen* decision seems persuasive.  It is hard to see why the laws of other states

4    should be tossed overboard and their residents remitted to California law for transactions that,

5    for individual consumers, are local in nature.  Plaintiffs contend that this issue should not be

6    decided at this time.  Specifically, they point to *In re Intel Corp. Microprocessor Antitrust*

7    *Litig*., 496 F. Supp. 2d 404, 418 (D. Del. July 13, 2007) (Farnan, J.), in support.  That decision

8    left the issue of whether California's unfair competition laws could apply to other states until a

9    later stage of the litigation.  This order, however, sees merit in disposing of this issue at an early

10   stage of the litigation, particularly where the issue of whether the different state's laws conflict

11   will not change significantly as this action progresses.

12         Accordingly, defendants' motion is **GRANTED**, and all references to a nationwide class

13   in indirect purchaser's claims under California's Cartwright Act and California's

14   unfair-competition law are **STRICKEN**.  This particular ruling is without prejudice to a potential

15   class of California's residents or a potential class of residents in the states of the named

16   plaintiffs under their respective state laws.

17           **C.**    **Unjust-Enrichment Claims.**

18         Plaintiffs also have a claim for unjust enrichment on behalf of a nationwide class.

19   They argue that there is no material difference between the unjust-enrichment laws of all

20   fifty states.

21         Disagreeing, defendants point out that the various states differ on whether unjust

22   enrichment can survive on its own as a separate claim versus a remedy that relies on another

23   claim.  Indeed, California courts are split on whether unjust enrichment can exist as a separate

24   claim.  *Compare Melchoir v. New Line Productions, Inc.*, 106 Cal. App. 4th 779, 793 (2003)

25   (quoting *Lauriedale Assocs. Ltd. v. Wilson*, 7 Cal. App. 4th 1439, 1448 (1992) ("The phrase

26   'unjust enrichment' does not describe a theory of recovery, but an effect:  the result of a failure

27   to make restitution under circumstances where it is equitable to do so.")); *with Ghirardo v.*

28   *Antonioli*, 14 Cal. 4th 39, 50 (1996) (holding that a plaintiff may state a claim for unjust

United States District Court

For the Northern District of California

1   enrichment where his claim seeks restitution and other remedies are inadequate).  Other states

2   preclude independent unjust-enrichment claims altogether.  *In re Abbott Labs. Norvir Antitrust*

3   *Litig.*, 2007 WL 1689899, *10 (N.D. Cal. June 11, 2007) (Wilken, J.) (noting that Indiana and

4   Ohio do not recognize independent claims for unjust enrichment).

5        Defendants contend that these claims should be dismissed as an attempt to circumvent

6   the holding of *Illinois Brick*.  If a nationwide free-standing claim for unjust enrichment

7   survives, it would create a monetary remedy for plaintiffs in states that had never chosen to

8   create one.  They cite *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 350 F.

9   Supp. 2d 160, 208 (D. Me. 2004) (Hornby, J.), for the proposition that allowing a restitution

10  claim in all fifty states would undermine the purposes of substantive antitrust law and

11  consumer-protection law.  The Restatement is in accord and explains that "[a]llowing

12  Customers to recover Manufacturers' overcharges on a theory of unjust enrichment would

13  conflict with the remedial regime established by the law that makes the defendants' acts

14  illegal."  Restatement (Third) of Restitution § 44.  Defendants, however, seem to forget that the

15  Restatement is not the law in every state.  Some states have adopted it.  Some have not.  Once

16  again, defendants must address their state-policy arguments to the state legislatures and state

17  courts rather than to lead a district judge to force it on them.

18       Once again, the dismissal argument is cast as a nationwide blanket proposal.  So cast,

19  it cannot be granted, given the vagaries of the many state laws involved.  To be sure, these

20  vagaries will raise serious issues of commonality and manageability on class certification.

21  On this motion, however, this order declines to adopt the sweeping position proposed by

22  defendants.  The motion to dismiss all unjust-enrichment claims is **DENIED**.

### D.       State Consumer-Protection Statutes.

24       Defendants move to dismiss certain of plaintiffs' claims under state consumer-protection

25  statutes because they have not alleged all elements of those claims.

26       First, defendants argue that plaintiffs have not alleged "unconscionable conduct" under

27  the state consumer-protection laws of Arkansas, the District of Columbia, Kansas, and

28  New Mexico.  Each of the above-mentioned statutes prohibits deceptive and unconscionable

United States District Court

For the Northern District of California

conduct in consumer transactions.  *See* Ark. Stat. Ann. § 4-88-107(a); D.C. Code Ann.
§ 28-3904; Kan. Stat. Ann. § 50-626; N.M. Stat. Ann. § 57-12-2(D).  Likewise, in each of
these states, pleading unconscionability requires something more than merely alleging that the
price of a product was unfairly high.  *State v. R & A Inv. Co*., 985 S.W.2d 299, 302 (Ark. 1999)
("Two important considerations are whether there is a gross inequality of bargaining power
between the parties to the contract and whether the aggrieved party was made aware of and
comprehended the provision in question."); *Riggs Nat'l Bank of Washington D.C. v. D.C.*,
581 A.2d 1229, 1251 (D.C. 1990) ("To establish unconscionability, however, the District must
prove not only that one of the parties lacked a meaningful choice but also that the terms of the
contract are unreasonably favorable to the other party.").  Here, plaintiffs argue that they have
pleaded that defendants engaged in unconscionable conduct.  They have not, however, pleaded
the kind of grossly unequal bargaining power prohibited by these statutes.  This is not to say
that allegations of price fixing are not serious.  It is only to say that they are not the kind of
conduct prohibited under these statutes.  Defendants' motion to dismiss as to these claims is
**GRANTED**.  Accordingly, plaintiffs' claims under these statutes should be dismissed.

Defendants assert that plaintiffs cannot recover under the New York Consumer
Protection Act because they have not alleged that defendants engaged in fraudulent or deceptive
conduct.  Under New York General Business Law § 349(a), "deceptive acts or practices in the
conduct of any business, trade or commerce or in the furnishing of any service in this state are
hereby declared unlawful."  Antitrust-type claims have been recognized under §349(a).
*See, e.g., Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 179–80 (W.D. N.Y. 2003)
(Curtin, J.); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (1st Dep't 2004).  Plaintiffs have alleged
at least in a conclusory fashion that defendants engaged in deceptive conduct.  They contend
that defendants have engaged in deceptive acts to conceal the alleged agreement to fix prices.
Here, it would seem that such allegations would be sufficient to state a claim under such law.
Defendants hid the alleged conspiracy from plaintiffs, resulting in plaintiffs paying higher
prices.  Assuming that plaintiffs had pleaded the existence of a conspiracy, plaintiffs can state a
claim under this statute.  Defendants' motion is **DENIED**.

United States District Court

For the Northern District of California

Defendants also move to dismiss plaintiffs' claims under the Oregon Unfair Trade Practices Act and the West Virginia Consumer Credit and Protection Act. Oregon's Unfair Trade Practices Act lists a number of practices proscribed by the statute; price fixing is not among them. Or. Rev. Stat. § 646.608. Plaintiffs argue that their allegations should be covered by the "catch-all" section that proscribes "other unfair and deceptive trade practices." Or. Rev. Stat. § 646.608(u). That provision, however, is subject to the requirement that the state attorney general must first establish a rule stating that such practice is prohibited. Or. Rev. Stat. § 646.608(4). Plaintiffs have pointed to no such rule established by the Oregon state attorney general. Accordingly, this claim must be dismissed. Similarly, West Virginia's statute lists a number of unfair and deceptive practices in trade or commerce; price fixing is not among them. W. Va. Code § 46A-6-102(7). These claims must be dismissed. Defendants' motion is **GRANTED**.

Defendants contend that Rhode Island's unfair-competition statute has been interpreted to foreclose claims based on antitrust violations. The statute is instead targeted at deceptive trade practices that would deceive the customer into purchasing products. *ERI Max Entm't Inc. v. Streisand*, 690 A.2d 1351, 1354 (R.I. 1997). Moreover, Rhode Island does not permit state-law antitrust claims by indirect purchasers. *See Siena v. Microsoft Corp.*, 796 A.2d 461, 464–65 (R.I. 2002). Accordingly, defendants' motion as to plaintiffs' claims under Rhode Island consumer-protection law is **GRANTED**.

Finally, defendants contend that plaintiffs cannot plead the requirements of a claim under the Maine Unfair Trade Practices Act, which prohibits unfair methods of competition and deceptive acts or practices in trade and commerce. The Maine Supreme Court has held that "[i]n pricing cases under the Act the inquiry is whether the price has the effect of deceiving the consumer, or inducing her to purchase something that she would not otherwise purchase." *Tungate v. Maclean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998). Here, the *higher* prices plaintiffs allegedly paid for GPUs because of the price-fixing conspiracy could not have induced plaintiffs to purchase them. Arguing that higher prices induced consumers to make

United States District Court

For the Northern District of California

1    purchases simply does not make sense.  Accordingly, defendants' motion as to this claim is

2    **GRANTED**.

3        **3.        MOTION TO DISMISS COMPLAINTS AGAINST AMD.**

4        Defendant AMD moves to dismiss all claims against it.  AMD acquired ATI on

5    September 25, 2006.[8]  AMD argues that it cannot be held liable for ATI's conduct *before* the

6    acquisition because it did not assume liability.  AMD argues that it cannot be held liable for

7    ATI's conduct *after* the acquisition because it is merely a shareholder, once or twice removed

8    at that.

9                    **A.        Liability for Behavior Before the Acquisition.**

10        Both direct and indirect purchasers allege that AMD assumed the prior and continuing

11   liabilities of ATI once the acquisition closed.  A purchaser of a company does not assume the

12   seller's liabilities unless:  (1) there is an express or implied agreement of assumption; (2) the

13   transaction amounts to a merger or consolidation of the corporations; (3) the purchasing

14   corporation is a mere continuation of the seller; or (4) the transfer of assets to the purchaser is

15   for the fraudulent purpose of escaping liability for the seller's debts.  *Ray v. Alad Corp.*,

16   19 Cal. 3d 22, 28 (1977).  Plaintiffs allege that the first exception is present here — that by

17   agreement AMD assumed ATI's existing liabilities pursuant to the purchase.

18        Trouble is, no agreement seems to assume any such liabilities.  Plaintiffs assert that

19   AMD's Form 10K for 2006 indicated that it has assumed all of ATI's liabilities.  Plaintiffs only

20   quote half of the statement.  It actually stated "as a result of [AMD's] acquisition of ATI, we

21   have assumed responsibility for ATI's legal proceedings which include a securities litigation

22   proceeding and a consumer class action" (Lebsock Decl. Exh. 1, 35).  The Form 10K also

23   discussed tax-related liabilities and other legal proceedings related to the acquisition (*id*. at 56).

24   Plaintiffs also point out that the Form 10K stated that "we may be subject to significant damage

25   awards which could have a material adverse effect on our financial condition" (*id*. at 45).

26   "We" and "us" were defined elsewhere in the Form 10K as "Advanced Micro Devices, Inc. and

27   ────────────────

28        [8] Direct purchasers refer to the acquisition as a "merger" in their complaint (DPC ¶ 19).  They also
     refer to the same transaction as an "acquisition" (*ibid*.).  At the hearing and in the briefs, however, all parties
     seem to agree that AMD acquired ATI and that no merger took place.

1   our consolidated subsidiaries, including ATI and its subsidiaries" (*id*. at 2).  The Form 10K

2   makes clear that it refers to those entities together, so these passages do not indicate that AMD

3   assumed all of the liabilities for any action that might arise against ATI.

4           Although it is clear to the Court that the Form 10K is no admission of AMD's liability

5   for an ATI antitrust conspiracy, this begs the question whether discovery into the acquisition

6   would unearth an agreement to assume.  At the hearing, moreover, counsel discussed the

7   particulars of AMD's acquisition of ATI.  An Alberta, Canada, unlimited liability corporation

8   (ULC) acquired ATI's shares.  They also stated that AMD Finance, an Alberta ULC, is the

9   actual owner of ATI's shares, and that in turn, AMD, Inc., owns AMD Finance.  The corporate

10   organization of these entities is now unclear.  Because of this uncertainty in the form of the

11   acquisition, granting AMD's motion to dismiss is not appropriate at this time.  Subject to the

12   stay already in effect, discovery into the acquisition, and the entities involved, may be taken to

13   determine the role of AMD Finance and whether AMD is a proper defendant.  For now,

14   however, defendants' motion to dismiss any claims against AMD for conduct occurring before

15   the acquisition is **DENIED**.

16          **B.**     **Liability for Behavior After the Acquisition.**

17           AMD contends that it cannot be held liable for actions after the acquisition because

18   AMD is merely ATI's parent corporation.  "It is a general principle of corporate law deeply

19   ingrained in our economic and legal systems that a parent corporation (so-called because of

20   control through ownership of another corporation's stock) is not liable for the acts of its

21   subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  Plaintiffs, however, point out

22   that ATI is actually organized under the laws of Canada.  They allege that ATI is an unlimited

23   liability corporation organized under the Alberta Business Corporations Act.  For unlimited

24   liability corporations, liability of shareholders for any liability, act, or default is unlimited in

25   extent and joint and several in nature.  R.S.A., c. B-9, § 15.2(1).

26           Plaintiffs allege that AMD is liable for ATI's actions after the acquisition because it

27   participated in the conspiracy "through its operation of ATI in the period following the

28   acquisition" (DPC ¶ 2).  Indirect plaintiffs allege that ATI became an indirect, wholly-owned

United States District Court

For the Northern District of California

1  subsidiary of AMD after the acquisition, and that they have since "pursued an integration plan"

2  to eliminate duplicative facilities between the two companies (IPC ¶¶ 40–41).  As with liability

3  before the acquisition, the corporate structure of AMD, AMD Finance, and ATI make it unclear

4  whether AMD is a proper defendant.  Accordingly, if and when the general stay of discovery is

5  lifted, plaintiffs will be allowed to take discovery regarding the acquisition and the entities

6  involved.  If plaintiffs contend that AMD's own employees were co-conspirators with other

7  non-AMD defendants, they should make this clear in any amended complaint.  For now,

8  AMD's motion to dismiss all claims against it is **DENIED**.

9  **CONCLUSION**

10          To the extent stated above, defendants' motion to dismiss direct purchasers' antitrust

11  complaint is **GRANTED**.  Defendants' motion to dismiss indirect purchasers' antitrust complaint

12  is **GRANTED**.  Plaintiffs' allegations regarding a nationwide class under California's Cartwright

13  Act and unfair-competition laws are **STRICKEN** from the complaint.  Defendants' motion to

14  dismiss plaintiffs' state-law consumer-protection claims is **GRANTED IN PART AND DENIED IN**

15  **PART**.  Defendant AMD's motion to dismiss claims against it is **DENIED**.

16          Turning to the issue of discovery and leave to amend, direct and indirect purchasers may

17  file motions to propound limited discovery and for leave to amend (each limited to 25 pages).

18  The motion should identify what plaintiffs intend to find through discovery and how their

19  proposed amendments to the complaint will remedy the problems identified in this order.

20  A copy of the proposed pleading should be appended to the motion, using italics or bold font to

21  identify the new material.  Please take nothing for granted and make the best case for a

22  sustainable complaint.  The motion should specify each additional fact that could be asserted

23  even if discovery is *not* allowed and why such additional fact would make a difference.

24  This additional information will be considered in deciding whether discovery will be permitted

25  before having to replead.  The motions should be filed no later than **OCTOBER 11, 2007**.

26  Defendants' joint opposition will be due no later than **OCTOBER 18, 2007**.  Defendants may file

27  one joint opposition limited to 25 pages in response to the direct purchasers and one joint

28  opposition limited to 25 pages in response to the indirect purchasers.  This round of submissions

will, in effect, serve as a dismissal motion as well as for the proposed pleadings, so the oppositions should include all Rule 12-type arguments.  Plaintiffs' replies will be due no later than **OCTOBER 25, 2007**.  Each reply is limited to fifteen pages.  The Court will then determine if a hearing is necessary.  Please do not ask for extensions or page enlargements.

       **IT IS SO ORDERED.**

Dated:  September 27, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

31