1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE GRAPHICS PROCESSING UNITS
ANTITRUST LITIGATION

——————————————————————/

This Order Relates To:

ALL ACTIONS

——————————————————————/

No. C 06-07417 WHA

MDL No. 1826

**PRETRIAL ORDER NO. 6**

**ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFFS' MOTION FOR
LEAVE TO FILE AN AMENDED
COMPLAINT**

**INTRODUCTION**

In this antitrust multi-district litigation proceeding, direct-purchaser plaintiffs and

indirect-purchaser plaintiffs move for leave to file amended complaints. Earlier in this action,

defendants' motions to dismiss were granted, and plaintiffs were allowed leave to file these

motions. Direct purchasers have added allegations that, if taken true, would show that an

antitrust conspiracy was plausible. Indirect purchasers have added the same allegations, so they

are allowed leave to amend insofar as their claims rely on an antitrust conspiracy. Indirect

purchasers will also be permitted to add named plaintiffs for states where they previously had

no class representative. They have also pleaded facts that would show, at least at the pleading

stage, that indirect purchasers who bought finished computers have standing. Since indirect

purchasers did not propose any amendments to their previously dismissed state-law claims, later

amendment of those claims will not be permitted absent a showing of good cause. Accordingly,

direct purchasers' motion for leave to file an amended complaint is **GRANTED**.  Indirect
purchasers' motion for leave to file an amended complaint is **GRANTED IN PART AND DENIED
IN PART**.  The discovery stay is lifted effective immediately.  Defendants are directed to provide
to plaintiffs' lead counsel all materials produced to the government in its current antitrust
investigation within **TEN CALENDAR DAYS**.

## STATEMENT

Defendants Nvidia Corporation, ATI Technologies, Inc., and Advanced Micro Devices,
Inc., are producers of graphics processing units, or GPUs.  GPUs are dedicated
graphics-rendering devices used in computers, servers, workstations, game consoles, and
mobile devices such as cellular phones and personal digital assistants.  Defendants sell GPUs to
original equipment manufacturers, original design manufacturers, and directly through retail
channels.  Direct-purchaser plaintiffs allege that they purchased GPUs directly from defendants
or their co-conspirators.  Indirect-purchaser plaintiffs allege that they purchased GPUs through
intermediaries.  Some indirect purchasers allege that they purchased graphics cards, while
others allege that they purchased GPUs incorporated into consumer electronics such as
computers.

To summarize, plaintiffs allege that defendants engaged in an illegal conspiracy to fix
the prices of GPUs starting late in 2003.  Before that time, ATI and Nvidia hotly competed with
one another for market share.  They would rush new products to the market as soon as possible
and undercut each other's prices to capture market share.  After 2003, ATI and Nvidia slowed
the pace at which they released products and began to release products at nearly the same times
and at the same prices.  Additionally, plaintiffs allege that defendants had numerous
opportunities to hold meetings in furtherance of their illegal conspiracy because defendants'
employees attended the same conferences and trade-association meetings.

The first of these civil antitrust actions was filed on December 4, 2006.  Many others
quickly followed.  A majority of the complaints were filed by indirect purchasers of GPUs or
computers containing GPUs; the remainder were filed by direct purchasers.  By order of the
Judicial Panel on Multidistrict Litigation, a number of these actions were consolidated for

United States District Court

For the Northern District of California

1  pretrial purposes on April 18, 2007, pursuant to 28 U.S.C. 1407.  Other tag-along actions have

2  been transferred and consolidated into this multi-district litigation proceeding since then.

3         An initial case management conference was held on May 24, 2007.  Defendants' motion

4  for a stay of discovery was filed on June 7, 2007, and consolidated complaints for both the

5  direct and indirect purchasers were filed on June 14, 2007.  The direct purchasers pleaded a

6  claim for violation of Section 1 of the Sherman Act, 15 U.S.C. 1.  They asked for an injunction

7  under the Clayton Act, treble damages, and the costs of suit.  The indirect purchasers pleaded

8  the following claims:  (1) violation of Section 1 of the Sherman Act seeking an injunction;

9  (2) violation of California's Cartwright Act; (3) violation of California Business and

10  Professions Code § 17200; (4) violations of the antitrust laws of various other states; (5)

11  violations of the consumer protection and unfair competition laws of various other states; and

12  (6) unjust enrichment and disgorgement of profits.  On July 24, 2007, an order issued staying

13  discovery pending the outcome of these motions to dismiss.  The dismissal motions were filed

14  on July 16, 2007.  A hearing was held on September 20, 2007.

15         On September 27, 2007, an order issued granting in part and denying in part defendants'

16  motions to dismiss.  The order held that direct purchasers had failed to plead facts that, if taken

17  true, would satisfy the standard for plausibility under the Supreme Court's decision in *Bell*

18  *Atlantic Corp. v. Twombly*, ___ U.S. ____, 127 S. Ct. 1955 (May 21, 2007).  Plaintiffs had not

19  pleaded facts that would show a plausible antitrust conspiracy.  As to indirect purchasers,

20  defendants first argued that indirect purchasers who purchased finished computers containing

21  GPUs did not have standing under the test set out in *Associated General Contractors of*

22  *California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536–39 (1983).  The

23  order held that applying the *Associated General Contractors* test to each state was inappropriate

24  where it was unclear which states had adopted it as the test for indirect-purchaser standing.  The

25  order also dismissed state-law antitrust claims in those states where a named plaintiff did not

26  reside.

27         The order struck references to indirect purchaser's purported claims on behalf of a

28  nationwide class under California's unfair competition law, California Business & Professions

United States District Court

For the Northern District of California

Code § 17200.  Applying California law to a nationwide class would risk violating due process under the test set out in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985).  The order declined to dismiss plaintiffs' claims for unjust enrichment because applying the elements set out in the restatement to each state's unjust enrichment claims was also not appropriate.  Certain claims under some state consumer-protection laws were dismissed, while certain others were allowed to go forward.  Defendants' motion to dismiss all claims against defendant AMD was denied.

Plaintiffs were given an opportunity to file a motion for leave to file an amended complaint or, in the alternative, to ask for limited discovery to replead their claims.  They were told to plead their best case and to show a good faith basis for their new allegations.  Those motions, along with proposed amended pleadings for the direct and indirect purchasers, were filed on October 11, 2007.  A full round of briefing on those motions preceded this order.

**ANALYSIS**

Leave to amend a complaint shall be freely given when justice so requires under FRCP 15(a).  This standard is applied liberally.  Rule 15(a) does not apply, however, when a district court has established a deadline for amended pleadings under FRCP 16(b).  *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–608 (9th Cir. 1992).  Once the Court has entered a scheduling order, the liberal policy favoring amendments no longer applies.  Subsequent amendments are not allowed without a request to first modify the scheduling order.  At that point, any modification must be based on a showing of good cause.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).  "Leave to amend need not be granted when an amendment would be futile."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002).

1. **DIRECT PURCHASERS.**

Direct purchasers have added a number of allegations to their complaint.  Specifically, they added allegations regarding defendants' behavior *before* the alleged conspiracy began.  Plaintiffs also pleaded more specific information regarding the timing of defendants' product releases during the period that the conspiracy was allegedly occurring.  Additionally, plaintiffs

4

United States District Court

For the Northern District of California

now allege that after defendants learned of the criminal investigation by the Antitrust Division, defendants started to release products at different times and at different prices. Finally, direct purchasers added allegations regarding the economics of the GPU market — the proposed amended complaint compares the market for GPUs to the market for central processing units, or CPUs, and adds allegations about the general structure of the GPU market.

### A.    Defendants' Request for Judicial Notice.

In support of their opposition, defendants request that the Court take judicial notice of a number of press releases and screen shots of websites appended to the declaration of David Steiner. Judicial notice of the full text of documents referenced in a complaint is proper under the doctrine of incorporation by reference. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003). The incorporation-by-reference doctrine has been extended to situations where the plaintiffs' complaint solely relies on the document. *Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005). Courts may not, however, take judicial notice of facts that are subject to reasonable dispute. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

Defendants concede that plaintiffs never directly referenced any press releases or other such information in their complaint. Despite this, they contend that plaintiffs' pleaded facts necessarily came from those press releases because, according to defendants, there were no other public sources of that information. In support, they point out that in "over fifteen instances, the product release date alleged by plaintiffs and the date appearing on the corresponding press release match *to the day*" (RJN 2). Defendants also ask that the Court take judicial notice of the full set of press releases issued by defendants because they claim that plaintiffs have selectively excluded press releases that do not favor their position.

Plaintiffs respond by arguing that the press releases themselves are not always accurate. Sometimes they are contradicted by other public information from other sources, such as review of defendants' products on websites and in trade journals. Defendants and journalists sometimes have different opinions on which products are new or equivalent to other products. Moreover, the press releases are not referenced in the complaint. Additionally, pulling in other

United States District Court

For the Northern District of California

1    press releases that may only be tangentially related to plaintiffs' allegations goes outside the

2    scope of the complaint.  Accordingly, defendants' request for judicial notice of the press

3    releases is **DENIED**.

4           Defendants repeat the same argument with regard to SEC filings they present in their

5    request for judicial notice.  They are never referenced in the complaint but, according to

6    defendants, plaintiffs *must have* gotten their information from them.  And again, defendants

7    wish to incorporate more SEC filings that were not referenced in the complaint.  For the same

8    reasons as the press releases, defendants' request for judicial notice is **DENIED**.

9                    **B.    "Historically Unprecedented" Change in Behavior.**

10          The prior order on defendants' motion to dismiss direct purchaser's complaint relied

11   heavily on the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, ___ U.S.

12   ____, 127 S. Ct. 1955 (May 21, 2007).  That decision acknowledged that "a plaintiff's

13   obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

14   conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id*. at

15   1964–1965 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  It specifically addressed the

16   pleading standard for antitrust conspiracies through parallel conduct under Section 1 of the

17   Sherman Act.  The Supreme Court held that:

18              Asking for plausible grounds to infer an agreement does not
                impose a probability requirement at the pleading stage; it simply
19              calls for enough fact to raise a reasonable expectation that
                discovery will reveal evidence of illegal agreement . . . .  It makes
20              sense to say, therefore, that an allegation of parallel conduct and a
                bare assertion of conspiracy will not suffice.  Without more,
21              parallel conduct does not suggest conspiracy, and a conclusory
                allegation of agreement at some unidentified point does not
22              supply facts adequate to show illegality.  Hence, when allegations
                of parallel conduct are set out in order to make a § 1 claim, they
23              must be placed in a context that raises a suggestion of a preceding
                agreement, not merely parallel conduct that could just as well be
24              independent action.

25   *Id*. at 1965–66.  Despite endorsing the plausibility standard, the decision went on to reiterate

26   that allegations of conspiracy are governed by Rule 8, not the heightened pleading standard of

27   Rule 9(b).  *Id*. at 1973, n.14.  *Twombly* did note that "complex and historically unprecedented

28   changes in pricing structure made at the very same time by multiple competitors, and made for

                                                        6

United States District Court

For the Northern District of California

no other discernible reason would support a plausible inference of conspiracy." *Id*. at 1965, n.4.

Direct purchasers argue that their new allegations fit squarely into the complex and

unprecedented changes contemplated by *Twombly*.

### (1)    *Behavior Before the Alleged Conspiracy.*

Direct purchasers' previous complaint was replete with allegations of defendants'

behavior after the alleged conspiracy began.  The upshot of plaintiffs' allegations was that

defendants released products at the same times and at the same prices.  This, according to

plaintiffs, was unprecedented behavior which could form the basis of an illegal conspiracy.

Notably absent from the complaint, however, were allegations of defendants' behavior *before*

the alleged conspiracy started.  Even taking plaintiffs' allegations as true, they could not have

shown that defendants' behavior was unprecedented.  Indirect purchasers provided no baseline

of earlier behavior by which to judge defendants' behavior during the alleged conspiracy.  This

point was raised during the hearing on defendants' motion to dismiss, and direct plaintiffs'

counsel represented that they could make allegations about defendants' prior behavior based on

publicly available information.

Plaintiffs' new allegations state that, in the pre-conspiracy era (1997 to late 2003),

defendants introduced equivalent products at different times and at different prices.  They make

the following allegations in their new complaint:

- In 1997, Nvidia introduced its first generation 3-D graphics card, the Riva 128, in September 1997, which used Nvidia's NV3 graphics technology, at a price of $199.  ATI released its competing 3D Rage II four months later on January 12, 1998, priced at $149 (Compl. ¶ 59).

- On March 23, 1998, Nvidia introduced its second generation 3-D graphics card, the Riva TNT 16MB, which used its NV4 graphics technology, at a price of $170.  ATI released its comparable Rage Fury graphics card eleven months later, which included its Rage 128 graphics technology, on February 26, 1999, at $229 (*id*. at ¶ 60).

- On March 15, 1999, Nvidia introduced its third generation 3-D graphics card, the Riva TNT2 Ultra, using its NV5 graphics technology, at a price of $230.  ATI responded on August 5, 1999, introducing its Rage Fury Pro graphics card, using its Rage 128 Pro technology, at a price of $149 (*id*. at ¶ 61).

- On August 31, 1999, Nvidia introduced its first DirectX7 (a graphics programming interface created by Microsoft) compliant graphics card, the GeForce256 DDR, priced at $300. On July 17, 2000, ATI released its Direct X7 compliant card at a price of $399 (*id*. at ¶ 62).

- On March 6, 2001, Nvidia released its GeForce2 MX400 at $115. ATI released its Radeon 7500 on August 27, 2001, priced at $199 (*id*. at ¶ 63).

- On February 27, 2001, Nvidia released its first Direct X8 compliant graphics card, the GeForce3, priced at $500. ATI followed on August 14, 2001, introducing its Direct X8 compliant graphics card, the Radeon 8500, at $399 (*id*. at ¶ 64).

- Nvidia responded to the Radeon 8500 seven months later. On March 18, 2002, it released its GeForce Ti4400, at a price of $267, to replace the GeForce3 and to compete with the Radeon 8500 (*id*. at ¶ 65).

- On October 1, 2001, Nvidia introduced three new GeForce3 graphics cards, priced at $399, $349, and $199. ATI released three new Radeon graphics cards on July 22, 2002, ten months later, priced at $149, $129, and $109 (*id*. at ¶ 66).

Plaintiffs made these allegations to chronicle defendants' behavior before the conspiracy allegedly started. Taking plaintiffs' allegations as true, before the conspiracy started, defendants released similar products at different times, as far apart as eleven months in some instances. The products also differed in price by over $100 at some points. By contrast, after the conspiracy started, defendants released products close in time to one another and at the same prices.

Defendants attack the pairings of graphics cards in direct purchasers' complaint. In some instances, defendants argue that some of the products that direct purchasers present as comparable were actually comparable to other products. Those products were released closer in time and closer in price. These pairings rely on defendants' press releases for which judicial notice is not appropriate. ATI and Nvidia also argue that a consumer walking into an electronics store would not consider products at radically different price points released at different times to be equivalent. The evidence, once it is developed, may show this to be true. For now, at the pleadings stage, plaintiffs have pleaded that these products are comparable, and those allegations must be taken as true.

**United States District Court**

For the Northern District of California

1    Defendants also claim that plaintiffs did not include some product pairings that were

2    unfavorable to their position in the complaint.  There were, according to defendants, some

3    instances in the pre-conspiracy period where ATI and Nvidia released products close in time to

4    one another and at similar prices.  For instance, defendants argue that in one instance, Nvidia

5    and ATI released products within two weeks of one another, and in another instance, products

6    hit the market within three weeks of one another.  Again, defendants rely on material that is

7    outside of the complaint and not subject to judicial notice.  Moreover, two instances would not

8    scuttle direct purchaser's allegations.  Since the firms were competing, it is possible that two

9    out of many product releases occurred fairly close in time.

10    In response, plaintiffs argue that they looked at product reviews, websites, and trade

11    journals to develop their allegations.  Moreover, plaintiffs contend that before the conspiracy

12    started, one defendant lagged behind the other in releasing products.  The second to market had

13    an incentive to introduce a product with additional features to take market share from the other.

14    Once the facts in this action are developed more fully, defendants' comparisons of their product

15    lines may prove convincing.  At this stage, however, plaintiffs' well-pled allegations must be

16    taken true.

17    Defendants also take issue with direct purchasers' price comparisons.  In some cases, the

18    second-to-market product was released at a considerably higher price than the first product.

19    Given that electronics generally decrease in price over time, according to defendants, the

20    second competitor to market would need to release its product at a lower price, not a higher one.

21    Here, however, this ignores the possibility that, as plaintiffs explain, the second competitor to

22    market added additional features to its products in an attempt to gain market share.

23    Additionally, defendants fault plaintiffs for not alleging the price of the allegedly competing

24    products at the time as the competitors' follow-on product.  For instance, defendants note that

25    generally, the price of electronics decreases over time.  The price of the first product to market

26    likely fell over time and was probably much closer to the price of the second product to market,

27    according to defendants.  A real-time comparison of prices may have been more illuminating,

28

1  but the proposed pleading still does show a marked change in behavior around the time that

2  direct purchasers allege that the conspiracy started.

3        *(2) **Behavior During the Conspiracy.***

4    Plaintiffs also included additional detail regarding their allegations of defendants'

5  behavior while the conspiracy was allegedly taking place.  They contend that these allegations

6  show more instances of "lockstep" pricing during the alleged conspiracy.  In particular, they

7  allege:

8     • ATI announced on March 5, 2003, that its Radeon 9800 would
    go on sale that month at a price of $399.  The Nvidia GeForce
9      FX5800 was scheduled to go on sale that month at $399 as well
    (Compl. ¶ 79).

11     • ATI announced in April 2003 that its Radeon 9600 would be
    priced around $200; while Nvidia announced that its GeForce
12      5600 would be in stores in April 2003 priced at $200 (*id*. at
    ¶ 80).

13     • Nvidia released its GeForce 6800 Ultra graphics card on or about
    April 14, 2004, for $499; while ATI released its Radeon X800
14      XT PE on May 4, 2004, for $499.  Also on May 4, 2004, Nvidia
    introduced the GeForce 6800 GT at $399, and ATI released the
15      Radeon X800 Pro on the same day also for $399.  These cards
    both used new technology — Nvidia's new NV40 graphics
16      technology and ATI's new R420 technology (*id*. at ¶ 89).

17     • On August 12, 2004, Nvidia announced the release of the
    GeForce 6600 GT at $199, while ATI released its Radeon X600
18      XT on September 21, 2004 (*id*. at ¶ 92).

19     • Finally, on September 6, 2006, Nvidia released its GeForce 7900
    GS at $200, while ATI released its Radeon X1650 Pro on
20      September 15, 2006 (*id*. at ¶ 108).

21  Plaintiffs have included these additional allegations of product releases close in time and price

22  to further highlight the difference between defendants' behavior before and after the conspiracy

23  allegedly started.  Plaintiffs have also added allegations that defendants' behavior changed

24  again after the commence of the Department of Justice's criminal investigation.  Allegedly,

25  Nvidia and ATI introduced their first DirectX10 compliant graphics cards about six months

26  apart and with a price difference of $200.  Nvidia went first on November 8, 2006 with its

27  GeForce 8800 GTX priced at $599, while ATI followed on May 14, 2007, with its Radeon HD

28  2900 XT at $399 (*id*. at ¶ 111).

United States District Court

For the Northern District of California

1    Defendants are correct that plaintiffs' allegations do not show absolute lockstep

2  behavior in all situations.  Even in plaintiffs' new allegations, defendants released products

3  sometimes as much as a month or more apart.  Taking plaintiffs' allegations as true, and

4  accepting that plaintiffs' product pairings are accurate, a pattern emerges.  Defendants released

5  products at different times and at different prices before the conspiracy started, then began to

6  release products much closer in time after it allegedly began.  Given the marked shift in

7  behavior, it appears that there were "complex and historically unprecedented changes in pricing

8  structure made at the very same time by multiple competitors, and made for no other discernible

9  reason," much like the scenario identified in *Twombly*.  127 S. Ct. at 1965, n.4.

10    **B.    Market Structure and Economics.**

11    Plaintiffs also added more allegations regarding the structure of the market for GPUs.

12  The proposed amended complaint compares the GPU market to the market for CPUs, or central

13  processing units.  The complaint adds allegations in an attempt to address plaintiffs' arguments

14  regarding product cycles and other economic counterexamples discussed in defendants' motions

15  to dismiss.

16    *(1)    The CPU Market.*

17    Plaintiffs compare the GPU market to the CPU market to show that defendants'

18  behavior was consistent with a conspiracy.  According to the proposed pleading, CPUs are

19  physical components that are made from similar components to GPUs (Compl. ¶ 131).  Much

20  like in the GPU market, two companies — Intel and AMD — supply the majority of the market

21  for CPUs in Windows-based personal computers (*id*. at ¶ 126).  Prices in the CPU market have

22  shown a downward trend, with Intel and AMD rushing new products to market at ever-lower

23  prices (*id*. at ¶ 127).  Plaintiffs plead that this further shows that defendants' behavior was a

24  sharp departure from previous market activity.

25    Defendants respond by arguing that both the CPU and GPU markets are highly complex

26  and subject to any number of economic forces, so any comparison between the two is spurious.

27  Later-found evidence may not support the comparison.  For now, plaintiffs have pleaded that

28

the two industries both use similar components, sell to similar suppliers, and have two major players. Taking these allegations as true, the comparison holds up at the pleading stage.

### *(2)      The GPU Market.*

Plaintiffs also added more allegations about the GPU market itself. The order on defendants' motions to dismiss noted that in many cases economic forces dictate that like products be offered at like prices. Also, in some highly concentrated markets, competitors' incentives to undercut one another's prices are decreased. In response, plaintiffs now allege that identical pricing is not the norm for the GPU market because of differences in performance, reliability, brand image, and consumer perception. Consumers thus value similar goods differently (*id*. at ¶ 134). Additionally, plaintiffs now allege that in the pre-conspiracy period, ATI struggled to turn a profit, and Nvidia's profits fell to nearly zero before the conspiracy started. During the alleged conspiracy, both companies' profit margins grew considerably (*id*. at ¶¶ 137–38). These new allegations lend more support to plaintiffs' complaint.

Finally, defendants point out that plaintiffs have still not come up with specific allegations of meetings or actions in furtherance of the alleged conspiracy. Plaintiffs so concede. But as the prior order on defendants' motions to dismiss noted, direct allegations of conspiracy are not always possible given the secret nature of conspiracies. Nor are direct allegations necessary. *See Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1450–51 (9th Cir. 1998) (noting that direct evidence of concerted action in violation of the antitrust laws is rare). Again, *Twombly* specifically held that the plaintiff must plead facts that would make his entitlement to relief plausible. 127 S. Ct. at 1973, n.14. Taken as true, plaintiffs' allegations show that there was a marked change in defendants' behavior in the market around the time the conspiracy allegedly started. Before the conspiracy, ATI and Nvidia released products at different times and at different price points. After the conspiracy, ATI and Nvidia started releasing products at the same time and at the same prices. Accordingly, direct-purchaser plaintiffs have pleaded allegations that if true would make an antitrust conspiracy plausible. Direct purchaser's motion for leave to file a third amended compliant is **GRANTED**. Direct

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

purchasers are ordered to file their proposed pleading forthwith.  The stay on discovery is lifted as of the date of this order.

**2.      INDIRECT PURCHASERS.**

Indirect purchasers also made changes to their complaint.  They amended some of their claims, but for others, they ask for discovery in order to replead their claims at a later date. Indirect purchasers amended their allegations of antitrust conspiracy in much the same manner as direct purchasers, adding similar allegations about defendants' behavior before the conspiracy allegedly started and the economic structure of the GPU market.  Since this order has already found direct purchasers' conspiracy allegations to be sufficient, indirect purchasers allegations of conspiracy are adequate as well.

**A.      Class Representatives for Additional States.**

The prior order dismissed claims under the state antitrust and consumer-protection laws of Arkansas, Iowa, Maine, Mississippi, Nebraska, Nevada, North Dakota, Rhode Island, Tennessee, and West Virginia because there was no class representative from those states.  To their proposed pleading, indirect purchasers have added named plaintiffs residing in Iowa, Maine, Mississippi, Nebraska, Tennessee, and West Virginia.  In addition, named plaintiffs have added claims under the consumer-protection laws of Massachusetts and New Hampshire. Plaintiffs will be allowed leave to add these named plaintiffs and claims.

**B.      State-Law Antitrust Claims.**

Defendants' motion to dismiss was denied as to indirect plaintiffs' antitrust claims under state law to the extent that the motion was based on standing.  Defendants argued that indirect purchasers who bought GPUs incorporated into computers, as opposed to GPUs or graphics cards themselves, suffered injuries that were too remote to support standing.  In doing so, they sought to apply the *federal* standard for antitrust standing as set out in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536–39 (1983).  The order noted that states varied in whether or not they adopted *AGC* as their rule for standing.  Since standing to bring a state antitrust law claim was a matter of state law, the blanket application of federal precedent was improper.

13

*(1)* ***Status of Associated General Contractors Under State Law.***

As before, plaintiffs plead claims under the antitrust laws of Arizona, California, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Mexico, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia.  Defendants have now taken this opportunity to repackage their *AGC* arguments.  Specifically, they argue that fourteen of those states have adopted *AGC* as their test for standing, with Minnesota as the only exception.

Defendants argue that seven of those states have explicitly held that *AGC* applies. Defendants appear to rely on a combination of so-called harmonization provisions and state-court decisions applying the test.  The Supreme Court of Iowa has explicitly endorsed using the test.  *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 199 (Iowa 2007).  Similarly, Nebraska explicitly endorsed using the test under its state antitrust statutes.  *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 302–03 (Neb. 2006).  The Supreme Courts of Nebraska and Iowa have endorsed the *AGC* test for standing, so applying it to claims under those states' law is proper.

In the other states, the law is less clear cut.  California's Cartwright Act contains a harmonization provision, and some California appellate courts have used the *AGC* test as well. Cal. Bus. & Prof. Code § 16721.6; *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814–15 (1995).  Arizona, the District of Columbia, Maine, Michigan, South Dakota are in similar situations.  Defendants, in their opposition, cite those states' harmonization provisions and one decision from an intermediate appellate court of each state that used the *AGC* test.  This is not the same as showing that *AGC* has been adopted as the law of those states.  This order declines to undertake the back-breaking labor involved in deciphering the state of antitrust standing in each of those states on this motion — particularly since, as shown below, indirect purchasers have shown standing under *AGC* for consumers who bought finished computers.  It may yet prove correct to apply the federal test for standing in those states, but that question is reserved for a later date and a more fully developed legal and factual record.

United States District Court

For the Northern District of California

1    As to the remaining states, defendants concede that no state court in New Mexico or

2    West Virginia has reached the question of whether *AGC* applies.  Both of those states have

3    harmonization provisions, or statutes that require or urge that state antitrust statutes should be

4    interpreted consistent with federal antitrust precedent.  Not all such statutes are equivalent in

5    language or in application, and defendants do not argue how much those statutes require in

6    terms of harmonization.  Absent clearer directive from the courts and legislatures of those

7    states, this order declines to hold that *AGC* is the law of those states at this time.  Finally,

8    defendants also acknowledge that the antitrust statutes of Mississippi, Kansas, and Tennessee

9    do not contain harmonization provisions.  The "favorable citations" and references to federal

10   antitrust standing are not sufficient to mandate that the *AGC* test applies.

11                          *(2)    Application of the Test.*

12   In the event that the *Associated General Contractors* test did apply, plaintiffs have

13   alleged facts that would show that they have standing, at least at the pleading stage.  The factors

14   to consider are:  (1) the nature of plaintiffs' alleged injuries and whether plaintiffs were

15   participants in the relevant markets; (2) the directness of the alleged injury; (3) the speculative

16   nature of the alleged harm; (4) the risk of duplicative recovery; and (5) the complexity in

17   apportioning damages.  459 U.S. at 536–39.

18   Looking at the first factor, defendants argue that plaintiffs are not participants in the

19   relevant market.  This may be so, as indirect purchasers must concede that ATI and Nvidia did

20   not sell products directly to them.  Plaintiffs who bought finished computers participated in the

21   market for finished computers, not for GPUs.  Indirect purchasers have, however, alleged that

22   GPUs are separate components of a computer and that any costs attributable to them are

23   traceable through the chain of distribution.  Moreover, in purchasing a computer, consumers are

24   allegedly told that it contains an ATI or Nvidia graphics card of a certain type.  A graphics card

25   having certain speed and performance characteristics can be a selling point to a consumer.

26   Accordingly, this factor slightly favors standing.

27   Turning to the second factor, directness of injury, defendants contend that plaintiffs'

28   injuries are too remote to confer standing because too many factors go into the pricing of a

15

United States District Court

For the Northern District of California

1   finished computer.  Plaintiffs respond and argue that an overcharge would be traceable through

2   the chain of distribution.  The GPU is a separately-invoiced component of a finished computer,

3   and it is severable from the computer itself, according to plaintiffs.  Whether or not they can

4   ultimately prove that an overcharge would be passed on remains to be seen.  At least at the

5   pleading stage, plaintiffs have pleaded that the price of the GPU is traceable, so this factor

6   favors standing.

7          The third factor looks at the speculative nature of the alleged harm.  Defendants note the

8   many layers of production and distribution between themselves and a consumer purchasing a

9   finished computer.  Plaintiffs note that some courts have declined to find damages to be too

10  speculative at the pleading stage because determining damages is an intensely factual process.

11  *See D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485, 504 (E.D. Pa. 2006)

12  (Davis, J.).  Moreover, plaintiffs have pleaded that since it is a separate and removable part of a

13  finished computer, any overcharge would be passed on to the consumer.  Here, this factor

14  favors finding standing.

15         Turning to the fourth factor, defendants argue that the risk of duplicative recovery is

16  high particularly since there is a direct-purchaser action going on at the same time.  Moreover,

17  indirect purchasers of computers actually bought a wide variety of products from different

18  sources.  Again, plaintiffs have pleaded that damages are traceable because the GPU is a

19  separate component.  Similarly, as to the fifth factor, apportioning damages, and determining

20  which parties were harmed at each stage of the chain of distribution could prove difficult.  Still,

21  at the pleading stage, it appears that apportioning damages and accounting for duplicative

22  recoveries could be done.  On balance, and taking the pleaded facts as true, the factors under the

23  *Associated General Contractors* test favor finding standing.

24         Other courts have been in accord at the pleading stage.  In *In re Dynamic Random*

25  *Access Memory Antitrust Litigation*, 2007 WL 2385112, *3 (N.D. Cal. Aug. 17, 2007),

26  Judge Hamilton of this district granted the plaintiffs' motion for leave to file an amended

27  complaint.  A prior order had noted deficiencies in the plaintiffs' pleadings regarding the

28  directness and traceability of the injury.  The plaintiffs sought to add allegations that the price

16

United States District Court

For the Northern District of California

1  of DRAM was traceable through the chain of distribution and that overcharges would show up

2  in the price paid by end users.  This was held sufficient, at least at the pleading stage, to

3  demonstrate standing.  Judge Hamilton's decision left open the question of whether the

4  plaintiffs would ever actually be able to prove their allegations.

5       Also, in *In re Intel Microprocessor Antitrust Litigation*, 496 F. Supp. 2d 404, 408–10

6  (D. Del. 2007) (Farnan, J.), the defendant's motion to dismiss state-law antitrust claims by

7  indirect purchasers was denied.  The consumer plaintiffs in that action could satisfy standing

8  requirements because they alleged the kind of injury that the antitrust laws were intended to

9  address. So too here.  Indirect purchasers here have alleged similar injuries — that they were

10  overcharged for GPUs as a result of a horizontal price-fixing agreement.  It remains to be seen

11  whether or not the facts will support standing for plaintiffs who purchased computers, but at the

12  pleading stage, plaintiffs have demonstrated standing.

13                    *(3)     Intrastate Conduct.*

14       Defendants also argue that plaintiffs cannot state claims under the laws of Mississippi,

15  South Dakota, and Tennessee because those states' antitrust laws do not reach alleged

16  conspiracies that are predominantly interstate in nature.  Tennessee uses the "predominant

17  effects" standard under which a court must weigh the effects of conduct on commerce within

18  the state versus the effects on commerce without the state.  *Freeman Indus. LLC v. Eastman*

19  *Chemical Co.*, 172 S.W.3d 512, 522–23 (Tenn. 2005).  Under South Dakota's antitrust statute,

20  "a contract, combination or conspiracy between two or more persons in restraint of trade or

21  commerce any part of which is within this state is unlawful."  S. D. Codified Laws § 37-1-3.1.

22  Similarly, Mississippi law requires that the majority of an antitrust conspiracy occur within the

23  state.  *See Standard Oil Co. of Kentucky v. State*, 65 So. 468, 471 (Miss. 1914), *overruled in*

24  *part on other grounds sub nom. Mlandinic v. Kohn*, 164 So. 2d 785 (Miss. 1964).

25       Plaintiffs have alleged that defendants' conspiracy substantially affected commerce in

26  each of those states, injured residents in those states, that defendants promoted and sold GPUs

27  and graphics cards in each of those states, and that defendants harmed competition in those

28  states (IPC ¶¶ 53–56).  Here, plaintiffs have alleged that defendants' conspiracy affected

17

**United States District Court**
For the Northern District of California

1    commerce within these states.  As with many other portions of their complaint, indirect

2    purchasers will still have to prove those pleaded facts.  At this stage, however, plaintiffs have

3    shown that they can plead this claim.  Accordingly, indirect purchasers' motion for leave to

4    amend their antitrust claims under state law is **GRANTED**.

5                    **C.      Nationwide Classes Under California Law.**

6          Plaintiffs have omitted any references to a nationwide class under California's

7    Cartwright Act or California's unfair-competition law.  The prior order struck those references

8    because of due process concerns under the Supreme Court's decision in *Phillips Petroleum v.*

9    *Shutts*, 472 U.S. 797 (1985).  Under that decision, for a nationwide class to invoke the law of a

10   particular state, the chosen state's law must both (1) not conflict with the law of another

11   jurisdiction that has an interest in the case, and (2) have a significant contact or significant

12   aggregation of contacts to claims asserted by each member of the plaintiff class to insure that

13   the choice of the forum state's law is not arbitrary or unfair.  *Id*. at 821–22.  Plaintiffs now wish

14   to take discovery to later plead those claims such that they can be certified for a nationwide

15   class.

16         Since plaintiffs have not pleaded any new allegations with regard to this claim, it cannot

17   be determined at this time whether or not they have stated sufficient facts to state a plausible

18   nationwide class claim.  Moreover, plaintiffs asked for certain broad categories of documents to

19   support their arguments for a nationwide class.  They did not identify exactly what they hope to

20   find in the discovery that they requested.  Discovery will still proceed because indirect

21   purchasers have been granted leave to amend other claims, but since indirect purchasers did not

22   take this opportunity to try and replead their claim, subsequent attempts to do so will be

23   disfavored.

24                    **D.      Unjust-Enrichment Claims.**

25         Plaintiffs made no changes to their claims for unjust enrichment.  In the prior complaint,

26   plaintiffs alleged a claim for unjust enrichment on behalf of a nationwide class.  Much like

27   antitrust standing, defendants cast their arguments against the purported nationwide class using

28   a nationwide application of the Restatement (Third) of Restitution.  The prior order rejected this

**United States District Court**
For the Northern District of California

1    argument because not every state had adopted the restatement.  Also, some states recognize

2    unjust enrichment as a separate, free-standing claim, while others do not.

3         In this motion, defendants claimed confusion as to whether plaintiffs were again

4    pleading an unjust-enrichment claim on behalf of a nationwide class.  Plaintiffs responded,

5    saying that the claim is pleaded on behalf of named plaintiffs and members of the subclass,

6    referring to consumers in nineteen states and the District of Columbia (Compl. ¶ 119).  They

7    have excised unjust-enrichment claims for states that do not recognize antitrust remedies for

8    indirect purchasers, so this claim is no longer attempting to circumvent the laws of states that do

9    not recognize claims for damages by indirect purchasers.  Accordingly, defendants' concern

10   that plaintiffs are still pleading an unjust-enrichment claim on behalf of a nationwide class is

11   unfounded.

12        Defendants also argue that since plaintiffs cannot allege a claim for antitrust violations,

13   they also cannot state a claim for unjust enrichment.  The laws of different states vary on

14   whether unjust enrichment can be an independent claim.  This order, however, has already

15   determined that indirect plaintiffs can state a claim for an antitrust violation.  Accordingly,

16   plaintiffs' motion for leave to file an amended unjust-enrichment claim is **GRANTED**.

17                    **E.    State Consumer Protection Laws.**

18        The prior order dismissed plaintiffs' claims under the state consumer-protection laws of

19   Arkansas, the District of Columbia, Kansas, New Mexico, Rhode Island, Oregon, West

20   Virginia, and Maine.  These claims were dismissed because those states' statutes required a

21   showing of deceptive or unconscionable conduct to state a claim.  Indirect purchasers omitted

22   claims under these statutes in their proposed pleading.  Instead, they ask for discovery to

23   replead the claims, including information about defendants' costs of manufacturing and

24   producing GPUs, wholesale and retail pricing schemes, explanations of how they set prices, the

25   extent to which charges are passed on to consumers, and traceability of damages up the retail

26   chain.

27        Plaintiffs, however, fail to explain what information they could find that would address

28   the flaws in their pleadings.  Put differently, they do not identify how discovery could allow

                                        19

them to plead deceptive or unconscionable conduct where they have only alleged an antitrust conspiracy.  In support, they cite to *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 418 (D. Del. 2007).  In that decision, Judge Farnan allowed certain claims under state consumer-protection laws to go forward.  There, however, plaintiffs alleged that in addition to conduct that violated the antitrust laws, Intel had purposefully used compiler programs to degrade the performance of programs run on its rival AMD's platform.  That was held to be a deceptive trade practice.  No such allegations have ever appeared in this action.  In fact, indirect purchasers have only ever alleged an agreement to fix prices.  Accordingly, plaintiffs have not shown how, even with the aid of discovery, they could plead viable claims under these state consumer statutes.  Given this, it is unlikely that any subsequent attempts to amend would be successful.  Indirect purchasers' motion is **DENIED** as to these claims.

### F.     New Entity Defendants.

Indirect purchasers' proposed pleading adds AMD US Finance, Inc., and 1252986 Alberta ULC as defendants.  The prior order denied defendants' motions to dismiss claims against AMD for liability based on its acquisition of ATI, but noted that there seemed to be some confusion as to the exact structure of the transaction.  Because the structure was unclear, so too was AMD's liability.  According to defendants, ATI is a wholly-owned subsidiary of the Alberta ULC, an unlimited liability corporation organized under Canadian law.  It in turn is a wholly-owned subsidiary of AMD Finance, a Delaware corporation wholly owned by AMD.

Defendants do not object to the addition of AMD Finance and the Alberta ULC to the complaint.  Instead, they argue again that claims against AMD should be dismissed.  The same arguments were rejected on their earlier motion to dismiss.  Accordingly, leave to amend indirect purchasers' complaint to add AMD Finance and the Alberta ULC as defendants is **GRANTED**.

### CONCLUSION

For all of the above-stated reasons, direct purchasers' motion for leave to file an amended complaint is **GRANTED**.  Indirect purchasers' motion for leave to file an amended complaint is **GRANTED IN PART AND DENIED IN PART**.  Direct purchasers and indirect

1   purchasers shall immediately file their proposed pleadings in conformity with this order, and the

2   answers are due **TWENTY DAYS** thereafter.  The stay of discovery in this action is lifted.  Within

3   **TEN CALENDAR DAYS**, defendants shall produce to plaintiffs' lead counsel all documents

4   produced to the government in its current antitrust investigation.  To save expense and to move

5   this case along as per Rule 1, a separate case management order shall issue, the Court being

6   fully up to speed on this case.

7                                                                                                          .

8

9        **IT IS SO ORDERED**

10   Dated:  November 7, 2007.



11                                              WILLIAM ALSUP
                                                UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California