1  BOIES, SCHILLER & FLEXNER LLP
   WILLIAM A. ISAACSON (*pro hac vice*)
2  5301 Wisconsin Ave. NW, Suite 800
   Washington, D.C. 20015
3  Telephone: (202) 237-2727
   Facsimile: (202) 237-6131
4  Email: wisaacson@bsfllp.com

5

6  BOIES, SCHILLER & FLEXNER LLP          BOIES, SCHILLER & FLEXNER LLP
   JOHN F. COVE, JR. (CA Bar No. 212213)   PHILIP J. IOVIENO (*pro hac vice*)
   DAVID W. SHAPIRO (CA Bar No. 219265)    ANNE M. NARDACCI (*pro hac vice*)
7  DEAN M. HARVEY (CA Bar No. 250298)      10 North Pearl Street
   1999 Harrison St., Suite 900            4th Floor
8  Oakland, CA 94612                       Albany, NY 12207
   Telephone: (510) 874-1000               Telephone: (518) 434-0600
9  Facsimile: (510) 874-1460               Facsimile: (518) 434-0665
   Email: jcove@bsfllp.com                 Email: piovieno@bsfllp.com
10        dshapiro@bsfllp.com                      anardacci@bsfllp.com
          dharvey@bsfllp.com

11

12 *Attorneys for Plaintiff Jordan Walker*
   *Class Counsel for Direct Purchaser Plaintiffs*

13            **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15

16  IN RE GRAPHICS PROCESSING UNITS    ) Case No.: M:07-CV-01826-WHA
    ANTITRUST LITIGATION               )
17                                     ) MDL No. 1826
                                       )
18  This Document Relates to:          ) **DIRECT PURCHASER PLAINTIFFS'**
    ALL DIRECT PURCHASER ACTIONS       ) **NOTICE OF MOTION AND MOTION**
19                                     ) **FOR FINAL APPROVAL OF**
                                       ) **SETTLEMENT, PLAN OF**
20                                     ) **DISTRIBUTION, AND AWARD OF**
                                       ) **EXPENSES**
21                                     )
                                       ) Hon. William H. Alsup
22                                     ) Courtroom 9, 19th Floor
                                       )
23                                     ) March 26, 2009
                                       ) 2:00 p.m.
24                                     )
25                                     )

26

27

28

**<u>TABLE OF CONTENTS</u>**

MOTION AND NOTICE OF MOTION ..................................................................1

STATEMENT OF ISSUES TO BE DECIDED...................................................1

MEMORANDUM OF POINTS AND AUTHORITIES...........................................2

    I.      INTRODUCTION...................................................................................2

    II.     BACKGROUND ....................................................................................4

        A.    Overview of the Litigation.................................................................4

        B.    Allegations in the Complaint and Motions to Dismiss...........................5

        C.    Efforts in Discovery .......................................................................5

        D.    Class Certification and Notice............................................................6

    III.    THE SETTLEMENT...............................................................................8

        A.    Summary of the Settlement Terms.......................................................8

        B.    Preliminary Approval and Notice to the Class.......................................9

    IV.    THE COURT SHOULD GRANT FINAL APPROVAL OF THE
        SETTLEMENT .....................................................................................9

        A.    Standard for Approval .....................................................................9

        B.    The Settlement Meets All The Criteria for Approval............................10

            1.    The Settlement Exceeds 100% of the Class's Projected
                Damages.........................................................................10

            2.    Extensive Discovery and the Advanced Stage of the
                Litigation Supports Finding the Settlement Fair, Adequate,
                and Reasonable.................................................................12

            3.    The Risk, Complexity, and Expense of Further Litigation
                 Demonstrate that Final Approval of the Settlement is Proper .......14

            4.    In the View of Experienced Counsel, this Settlement is in
                the Best Interests of the Class ..........................................15

            5.    The Reaction of Class Members to the Proposed Settlement
                Favors Approval................................................................16

    V.    THE PLAN OF DISTRIBUTION SHOULD BE GRANTED FINAL
        APPROVAL ........................................................................................16

ii

**VI.    THE REQUESTED EXPENSES SHOULD BE FINALLY APPROVED** ...................................................................................17

    **A.    Lead Counsel's Expense Request is Reasonable** ...................................18

    **B.    If the Court Does Not Award 35% of the Gross Settlement Fund in Expenses, Attorneys' Fees Should be Awarded as a Percentage of the Settlement Fund** ...........................................21

    **C.    Awarding Attorneys' Fees Would Be Fully Justified Under the Relevant Criteria** ....................................................................22

        1.    The Results Achieved ..................................................22

        2.    The Risks of Further Litigation.....................................22

        3.    The Skill Required and the Quality of the Work ...........22

        4.    The Contingent Nature of the Fee and the Financial Burden Carried By Plaintiffs .......................................23

        5.    Awards in Similar Cases ..............................................24

        6.    Reaction of the Class....................................................24

        7.    Lodestar Comparison ...................................................25

**VII.   CONCLUSION**................................................................................25

iii

DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF DISTRIBUTION, AND AWARD OF EXPENSES--M:07-CV-01826-WHA

# TABLE OF AUTHORITIES

## CASES

*Axelrod v. Saks & Co.*,
 Nos. 76-3805, 76-4011, 77-172, 1981 WL 2031 (E.D. Pa. Feb. 23, 1981) ..........................12

*Bagel Inn, Inc. v. All Star Dairies*,
 No. 80-2645, 1981 WL 2185 (D.N.J. Dec. 21, 1981) ............................................................12

*Churchill Village LLC v. Gen. Elec.*,
 361 F.3d 566 (9th Cir. 2004)..................................................................................................16

*Cintech Industrial Coatings, Inc. v. Bennett Indus., Inc.*,
 85 F.3d 1198 (6th Cir. 1996)..................................................................................................12

*City Partnership Co. v. Atlantic Acquisition Ltd. P'ship*,
 100 F.3d 1041 (1st Cir. 1996) ................................................................................................13

*Fischel v. Equitable Life Assur. Society of U.S.*,
 307 F.3d 997 (9th Cir. 2002)....................................................................................22, 24, 25

*Fisher Bros. v. Mueller Brass Co.*,
 630 F. Supp. 493 (E.D. Pa. 1985) ..........................................................................................12

*Hanlon v. Chrysler*,
 150 F.3d 1011 (9th Cir. 1998)................................................................................................10

*Harris v. Marhoefer*,
 24 F.3d 16 (9th Cir. 1994)......................................................................................................18

*In re Anthracite Coal Antitrust Litig.*,
 79 F.R.D. 707 (M.D. Pa. 1978)..............................................................................................12

*In re Armored Car Antitrust Litig.*,
 472 F. Supp. 1357 (N.D. Ga. 1979) .......................................................................................12

*In re Art Materials Antitrust Litig.*,
 100 F.R.D. 367 (N.D. Ohio 1983) .........................................................................................12

*In re Auto. Refinishing Paint Antitrust Litig.*,
 MDL Docket No. 1426, 2007 WL 4570918 (E.D. Pa. Dec. 28, 2007)...................................12

*In re Chicken Antitrust Litig.*,
 560 F. Supp. 957 (N.D. Ga. 1980) .........................................................................................12

*In re Citric Acid Antitrust Litig.*,
 145 F. Supp. 2d 1152 (N.D. Cal. 2001) ............................................................................12, 17

*In re Critical Path, Inc.*,
 No. C 01-00551 (WHA), 2002 WL 32627559 (N.D. Cal. June 18, 2002) .....................10, 19

iv

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
No. M-02-1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007)....................................19

*In re Gas Meters Antitrust Litig.,*
500 F. Supp. 956 (E.D. Pa. 1980) ........................................................................................12

*In re International Air Transport Surcharge Antitrust Litig.,*
No. C 06-01793-CRB, 2008 WL 4766824 (N.D. Cal. Oct. 31, 2008)................................19

*In re Linerboard Antitrust Litig.,*
296 F. Supp. 2d 568 (E.D. Pa. 2003) ...................................................................................14

*In re Linerboard Antitrust Litig.,*
321 F. Supp. 2d 619 (E.D. Pa. Apr. 21, 2004) ..............................................................12, 25

*In re Mego Fin. Corp. Securities Litigation,*
213 F.3d 454 (9th Cir. 2000)................................................................................................11

*In re Omnivision Techs., Inc.,*
559 F. Supp. 2d 1036 (N.D. Cal. 2008) .........................................................................passim

*In re Oracle Sec. Litig.,*
No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) .................................17

*In re Remeron Direct Purchaser Antitrust Litig.,*
No. 03-CV-0085-FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005).....................................25

*In re Sorbates Direct Purchaser Antitrust Litig.,*
Nos. C 98-4886MMC et al., 2002 WL 31655191 (N.D. Cal. Nov. 15, 2002).....................19

*In re Tableware Antitrust Litig.,*
No. C-04-3514 VRW, 2007 WL 4219394 (N.D. Cal. Nov. 28, 2007) ...............................20

*In re Vitamins Antitrust Litig.,*
No. 99-197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000).............................................11

*In re Zoran Corp. Derivative Litig.,*
No. C 06-05503 WHA, 2008 WL 941897 (N.D. Cal. Apr. 7, 2008)....................................14

*Jaffe v. Morgan Stanley,*
No. C 06-3903 TEH, 2008 WL 346417 (N.D. Cal. Feb. 7, 2008)........................................11

*Kakani v. Oracle Corp.,*
No. C 06-06493 WHA, 2007 WL 2221073 (N.D. Cal. Aug. 2, 2007) ...............11, 19, 24, 25

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.,*
221 F.R.D. 523 (C.D. Cal. 2004) ...............................................................................12, 14, 16

*Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,*
117 F.R.D. 670 (E.D. Cal. 1987) ...........................................................................................11

*Officers for Justice v. Civil Serv. Comm'n of San Francisco.,*
688 F.2d 615 (9th Cir. 1982)......................................................................................10, 13, 16

v

DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF DISTRIBUTION,
AND AWARD OF EXPENSES--M:07-CV-01826-WHA

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir. 1989)............................................................................................18, 24

*Service Spring, Inc. v. Cambria Spring Co.*,
   Nos. 81 C 1835, 32 C 3901 & 82 C 3371, 1984 WL 2872 (N.D. Ill. Nov. 30,
   1984) ...........................................................................................................................12

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993).......................................................................................10

*Vincent v. Hughes Air W., Inc.*,
   557 F.2d 759 (9th Cir. 1977).......................................................................................21

*Vista Healthplan, Inc, v. Warner Holdings Co.*, III. Ltd.,
   246 F.R.D. 349 (D.D.C. 2007)..................................................................................14

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002)....................................................................22, 23, 25


## STATUTES

Federal Rule of Civil Procedure 23(e) .........................................................................1, 9

Federal Rule of Civil Procedure 23(h) .............................................................................1


## OTHER AUTHORITIES

4 Newberg on Class Actions § 14:6 (4th ed. 2008) .....................................................25

U.S. Sentencing Guidelines § 2R1.1, Application Note 3 .......................................2, 12

**MOTION AND NOTICE OF MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 26, 2009, at 2:00 p.m., in the above-entitled

Court, Plaintiffs Jordan Walker and Michael Bensignor, d/b/a Mike's Computer Services, on

behalf of themselves and all others similarly situated in the United States, by undersigned

counsel, will and hereby do respectfully move the Court for an order granting final approval of

the Settlement, the Plan of Distribution, and an award of expenses in this action.

**STATEMENT OF ISSUES TO BE DECIDED**

The issues to be decided are whether the Court should approve: (1) the Settlement and

Plan of Distribution between the Class and the Defendants pursuant to Federal Rule of Civil

Procedure 23(e); and (2) the expenses sought by Class Plaintiffs' Counsel pursuant to Federal

Rule of Civil Procedure 23(h).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Direct Purchaser Plaintiffs Jordan Walker and Michael Bensignor ("Plaintiffs"), by undersigned counsel, respectfully submit this memorandum of points and authorities in support of their motion for an order: (i) finally approving the Settlement of this class action with all Defendants—Nvidia Corp., ATI Technologies, Inc. (now known as ATI Technologies ULC), Advanced Micro Devices, Inc., AMD US Finance, Inc., and 1252986 Alberta ULC, (collectively "ATI") as fair, adequate, and reasonable; (ii) approving the Plan of Distribution for the Settlement proceeds; and (iii) approving reimbursement of a portion of the expenses incurred by Class Counsel in the prosecution of this action.

After more than two years of hard-fought litigation, Plaintiffs and Lead Counsel have obtained an outstanding result for the certified Class, securing a settlement of more than 100% of the Class's estimated damages. Pursuant to a settlement agreement between Plaintiffs and Defendants, executed on October 2, 2008 (the "Settlement Agreement"),[1] Defendants agreed to pay Class members $1.7 million in cash in order to resolve this action and have deposited these funds in an interest-bearing escrow account. This payment amounts to 17.35% of the approximately $9.8 million in affected sales to the Class during the class period, a recovery of more than 100% of the estimated damages by Plaintiffs' expert.[2] This was achieved despite the fact that Defendants would dispute Plaintiffs' expert's estimate of damages and deny both liability and that there are any damages in this case. This recovery and the damages estimate of Plaintiffs' expert is higher than the estimate of damages in the average price fixing case. *See* U.S. Sentencing Guidelines § 2R1.1, Application Note 3 ("It is estimated that the average gain from price-fixing is 10 percent of the selling price."). The Settlement Agreement was achieved

---

[1] Previously filed with the Court as Exhibit 1 to the Direct Purchaser Plaintiffs' Motion for Preliminary Approval of the Settlement. (Docket No. 617.)

[2] This was detailed in Exhibit A (Report of J. Douglas Zona (economic and damages issues)) to the Declaration of Kevin J. Barry in Support of the Motion for Preliminary Approval of the Settlement ("Barry Decl."). (Docket No. 618.) Using alternative benchmarking methodologies, Dr. Zona calculated actual damages ranging from 8.62% to 28.93% of the total class sales, with an average of 17.13%. (Docket No. 618-2 at 3, 43, Ex. 8.)

through arms-length negotiations by experienced counsel and was based on the parties' comprehensive knowledge of the relative strengths and weaknesses of their respective positions.

The risks of continued litigation for the Class are high because litigation could lead to a recovery substantially smaller than the Settlement, or to no recovery at all. Defendants have denied all liability and, represented by able counsel, have expended substantial resources defending the case. This case has been vigorously litigated from motions to dismiss, through class certification, document and deposition discovery, and settlement. While Plaintiffs believe that they have developed a case that could ultimately succeed in front of a jury, the Defendants have mounted a strong defense, key witnesses have all denied fixing prices under oath, and the jury's verdict would hinge on credibility determinations of both fact and expert witnesses, and the weighing of conflicting inferences. Thus, a settlement that recovers approximately the entire damages for the Class is an outstanding resolution of this case for the certified Class.

In light of this result, Lead Counsel also respectfully requests an award of 35% of the Gross Settlement Fund for expenses incurred during prosecution of this action on behalf of the Class. Because the expenses of litigating this case far exceed 35% of the Gross Settlement Fund, Class Counsel's request for reimbursement is limited to expenses and does not include the millions of dollars in attorneys' fees expended. If the Court finds that reimbursable expenses are less than 35% of the Gross Settlement Fund, Class Counsel respectfully request that the difference between the expenses awarded and 35% of the Gross Settlement Fund be awarded as attorneys' fees. The total amount requested, $595,000 (before interest), is less than 20% of the over $3 million in out-of-pocket expenses incurred by Lead Counsel alone.[3] This amount is less than Lead Counsel spent just on electronic document management and hosting services to process and manage the 12-million page document production and does not include the time attorneys and others spent reviewing the documents.

Moreover, even deducting the expenses and costs of administration, the Class will still obtain an exceptional recovery. If the Court approves the requested necessary expenses, plus the

---

[3] Declaration of John F. Cove, Jr. in Support of the Motion for Final Approval of the Settlement ("Cove Decl.") at ¶ 39.

costs of administration, the Net Settlement Fund will total approximately $1 million, which would mean that every class member will receive a cash recovery of at least 10% of their purchase price, e.g., $20 if they purchased a $200 GPU.  This will result in a very meaningful recovery for Class members, most of whom are gamers who regularly purchase GPUs.  For example, one Class member who purchased 545 GPUs during the Class period for a total of $129,663 could recover at least $12,966.30.  Both the gross and net recoveries are at the high end of the range of recoveries in similar settlements, and are eminently reasonable in light of the tremendous expense incurred in obtaining any recovery for the class.

Further, the settlement is not based on the number of claims made and does not permit any settlement monies to be returned to Defendants.  Because the settlement requires that the entire Net Settlement Fund be disbursed to class members, class members who submit a claim will divide the entire Net Settlement Fund among each other, even if their cash recovery exceeds 10% of their purchases.

## II.      BACKGROUND

### A.      Overview of the Litigation

Graphics Processing Units ("GPUs") are dedicated graphics rendering devices for computers, workstations, servers, game consoles, and mobile devices.  GPUs consist of a highly specialized semiconductor and related components that increase the speed, complexity, and visual fidelity of digital images that can be displayed on graphical interfaces, such as computer monitors.

Class Counsel's investigation began in November 2006 after Nvidia and ATI announced that they were the subjects of a criminal grand jury investigation for fixing the prices of GPU products.  Plaintiff Michael Bensignor filed a complaint on January 19, 2007.  Plaintiff Jordan Walker filed a complaint on April 18, 2007.  These and other cases relating to the same subject matter were coordinated by the Judicial Panel on Multidistrict Litigation and assigned to the Northern District of California.  The Court consolidated the cases for pretrial purposes, appointed Interim Lead Counsel for the direct and indirect purchasers, and ordered Interim Lead Counsel to file consolidated complaints.

## B. Allegations in the Complaint and Motions to Dismiss

In their Complaint, the Direct Purchaser Plaintiffs alleged that Defendants conspired to fix the prices for GPU products and to coordinate the introduction of new products. Plaintiffs alleged that prior to the conspiracy, Nvidia and ATI competed vigorously on innovation, speed-to-market, and price, with product introductions at varying times and price points, often leapfrogging each other in product advances. However, during the conspiracy, Plaintiffs alleged that Defendants conducted secret meetings and engaged in communications in which they conspired to fix, raise, maintain, and stabilize prices of GPUs sold in the United States and began a pattern of introducing products into the market simultaneously or near simultaneously. After Defendants' original motion to dismiss was granted, Plaintiffs filed an amended complaint with substantial additional factual detail. The Court denied Defendants' motion to dismiss this complaint, and lifted the discovery stay.

## C. Efforts in Discovery

The Court set an aggressive schedule for the case, with nine months of fact discovery and trial set in 14 months. (Pretrial Order No. 7, November 7, 2007 (Docket No. 247.)) Shortly after the Court lifted the discovery stay, Plaintiffs began to review the more than 2.4 million pages of documents that Defendants had produced to the grand jury. Plaintiffs also engaged in extensive independent discovery, propounding 95 document requests and 18 interrogatories upon the Defendants.[4] After extensive meet and confer efforts and actual and threatened motions practice regarding the scope of the requests and the timing and adequacy of Defendants' production, Defendants produced a total of more than 12 million pages of documents, including extensive data on the sales and costs of their GPU products, and written interrogatory responses. These millions of pages of documents were processed, reviewed, and analyzed by Class Counsel. To handle the 12 million-page production, Lead Counsel utilized an online document hosting and processing system.[5]

In addition to this document discovery, Lead Counsel deposed nineteen current and

---

[4] Cove Decl. at ¶ 12.
[5] Cove Decl. at ¶ 13-14.

former executives and employees of Defendants. These depositions included the top executives of ATI and Nvidia who, document review revealed, engaged in significant communications with each other, as well as lower-level employees knowledgeable about the development, pricing, and introduction of GPU products and relevant technical issues.[6]

Lead Counsel also deposed Defendants' class certification economics expert.[7] In addition, Plaintiffs' Counsel or their investigators interviewed a number of former employees and third party witnesses.[8] Lead Counsel also defended the depositions of the class representatives and their expert economist and responded to Defendants' discovery demands.

Further, Lead Counsel worked with technical and economic experts and consultants to develop evidence both of liability and damages. Lead Counsel submitted lengthy expert reports in conjunction with its motion for class certification on April 24, 2008 (Docket No. 326), and Reply Memorandum on June 2, 2008 (Docket No. 420). Lead Counsel also submitted two merits expert reports and supporting documents, totaling over 900 pages, to Defendants on September 19, 2008.[9] Plaintiffs refer the Court to the September 19, 2008 expert report of Dr. J. Douglas Zona (Docket No. 618-2) for a good overview of the evidence that the Plaintiffs developed in discovery.

In short, extensive fact and expert discovery took place before the parties reached a settlement. The parties negotiated the settlement with detailed knowledge of the evidence, the identity of likely witnesses at trial, and the strengths and weaknesses of their respective positions.

**D.     Class Certification and Notice**

On April 24, 2008, Plaintiffs submitted their motion for class certification, seeking to certify a class of all direct purchasers of Defendants' GPU products from December 2002 to the present. (Docket No. 326.) The Plaintiffs supported their motion with extensive expert analysis of the marketplace and sales data, including econometric analyses. Defendants opposed

---

[6] Cove Decl. at ¶ 15-18.
[7] Cove Decl. at ¶ 17-18.
[8] Cove Decl. at ¶ 15.
[9] Cove Decl. at ¶ 26; *See also* Docket Nos. 618-2 (Zona Report) and 618-3 (Ferraro Report) (filed under seal).

certification of any class, with an extensive expert submission of their own. On July 18, 2008, the Court granted in part and denied in part the motion for class certification. (Docket No. 509.) The Court found that a class of direct purchasers who purchased GPUs from the Defendants via their websites was an appropriate class. The Court did not certify the broader class sought by Plaintiffs, finding that, due to negotiated discounts and other variables affecting the different proposed class members' purchases, the requested class lacked typicality and impact could not be shown on a class-wide basis. Thus, the Court certified a class of those persons who purchased GPU products online from Defendants' websites in the United States from December 4, 2002 to November 7, 2007. (*Id.*) Plaintiffs filed a timely 23(f) petition to the Ninth Circuit, seeking review of this Court's decision.[10]

In its class certification order, the Court directed that notice be given to all Class members and, in addition, required that direct purchasers who were not part of the certified Class be given notice of their right to intervene. On July 30, 2008, the parties submitted a Joint Proposal for Dissemination of Notice of Pending Class Action (Docket No. 552), which the Court approved on August 5, 2008. (Docket No. 563.) Plaintiffs sent 190 notices of the right to intervene to non-class member direct purchasers by first-class mail on August 21, 2008, and e-mailed notice to 39,982 Class members on August 29, 2008.[11] On September 4, 2008, Plaintiffs re-sent notice via first class mail to 7,919 Class Members whose email notices were returned as undeliverable, and used the National Change of Address service and credit reporting agencies to obtain a current address for Class Members whose first class mail notice was returned as undeliverable.[12]

Plaintiffs also furnished notice by publication in the U.S. version of PC Gamer magazine, through banner ads linked to the full text of the notice that appeared on www.tomshardware.com and www.gearlog.com, and through links to the full text of the notice that appeared on www.gpureview.com.[13] All of these publication sites were approved by the Court's Order of

---

[10] On December 15, 2008, the Ninth Circuit stayed the 23(f) petition pending this Court's final approval of the Settlement.
[11] Declaration of Nathan Weil in Support of the Motion for Final Approval of the Settlement ("Weil Decl.") at ¶ 4, 6.
[12] Weil Decl. at ¶ 6.
[13] Cove Decl. at ¶ 24.

August 13, 2008.  (Docket No. 588.)

Of the nearly 40,000 notices mailed to potential Class members, only 77 individuals (less than 2/100th of one percent), some of them current or former employees of the Defendants, opted out of the Class.

## III.    THE SETTLEMENT

### A.    Summary of the Settlement Terms

Lead Counsel engaged in settlement negotiations on behalf of the certified Class and reached a settlement of this action with the Defendants.  The settlement negotiations took place over a number of weeks during which Class Counsel continued to pursue discovery and prepare expert reports.  Throughout the settlement process, Class Counsel and the class representatives insisted that they would take the case to trial absent an excellent result for the Class.

As a result of the settlement, subject to Court approval, Nvidia will pay $850,000 and ATI will pay $850,000, for a total of $1.7 million, to settle Plaintiffs' claims on behalf of a nationwide class of persons who made direct purchases of GPU products from Defendants' websites during the Class Period.  Plaintiffs' expert estimated that approximately $9.8 million in total sales were made to the certified Class. [14]   (Docket No. 618.)  The $1.7 million settlement represents a recovery of approximately 17.35% of total sales to the Class during the Class Period, a percentage which slightly exceeds the 17.1% overcharge Plaintiffs' expert calculated as damages resulting from Defendants' alleged anticompetitive conduct.[15]  Thus, the settlement represents a recovery of over 100% of the Class's projected damages.

In exchange for these payments, Plaintiffs and the Class members will release all claims, known and unknown, related to the purchase of graphics cards online from Defendants' websites from December 4, 2002, to November 7, 2007, or any conduct alleged in the complaints in this case, including, but not limited to, all claims under the Sherman Act.[16]  This release does not

---

[14] Some portion of these direct website sales are to employees of Defendants, who are not class members.  The $9.8 million estimate, however, does not reflect a deduction for sales to employees of Defendants because there is no systematic way to identify the total sales to these individuals.

[15] *See* Docket No. 618-2 at 3, 43 (Zona Report).

[16] *See* Docket No. 617, Exhibit 1.

release claims against Defendants for product liability, breach of contract, breach of warranty or personal injury unrelated to the allegations in the complaint.

### B. Preliminary Approval and Notice to the Class

On December 18, 2008, the Court preliminarily approved the Settlement as within the range of reasonableness such that notice of the proposed settlement should be provided to the Class. (Docket No. 647.) Pursuant to the Court's Preliminary Approval Order, Lead Counsel emailed or mailed the Notice of Class Action Settlement and Claim Form and Release to Class Members on January 5, 2009.[17] Counsel also published a summary notice in the U.S. version of PC Gamer magazine, placed banner ads linked to the full text of the notice on www.tomshardware.com and www.gearlog.com, and placed links to the full text of the notice on www.gpureview.com.[18] To receive a payment from the Settlement Fund, Class Members must submit an online Claim Form or mail a Claim Form via first class mail postmarked on or before March 5, 2009. The Settlement Notice informed the Class Members of the terms of the Settlement and of their right to object to any part of the Settlement, as well as their right to attend the Settlement Hearing on March 26, 2009. The notice also informed Class Members that Lead Counsel would request up to 35% of the gross settlement fund for attorneys' fees and litigation expenses. As of February 18, 2009 there have been 1,816 Claim Forms received and zero objections to the proposed settlement.[19]

## IV. THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

### A. Standard for Approval

Federal Rule of Civil Procedure Rule 23(e) requires that a class action only be settled with the approval of the Court. *See Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 623-24 (9th Cir. 1982). Before approving a settlement, the Court must determine whether the settlement is "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler*, 150 F.3d 1011, 1026 (9th Cir. 1998). The Court conducts a balancing of several factors in

---

[17] Weil Decl. at ¶ 7.
[18] Cove Decl. at ¶ 32.
[19] Weil Decl. at ¶10.

making this assessment, such as: (1) the risk, expense, complexity, and likely duration of further litigation; (2) the risk of maintaining class action status throughout the trial; (3) the amount offered in settlement; (4) the extent of discovery completed and the stage of the proceedings; (5) the experience and views of counsel; and (6) the reaction of the Class members to the proposed settlement. *Officers for Justice*, 688 F.2d at 625; *In re Critical Path Inc.*, No. C 01-00551 (WHA), 2002 WL 32627559, at *5 (N.D. Cal. June 18, 2002). The Court can give varying weight to these or other factors, depending on the circumstances of the particular case. *Officers for Justice*, 688 F.2d at 625. Ultimately, review is limited to the extent necessary "to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Id.* "Ultimately, the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Id.* (citations omitted).

**B. The Settlement Meets All The Criteria for Approval**

1. The Settlement Exceeds 100% of the Class's Projected Damages

First and foremost, the most important factor supporting this settlement is the large amount offered by Defendants in relation to Plaintiffs' damages. Although the other criteria are also met, the fact that the settlement amounts to over 100% of the Class's projected damages is sufficient by itself to demonstrate that the settlement warrants approval.[20] Assuming that the requested 35% of the Gross Settlement Fund for necessary litigation expenses, and settlement notice and administration costs are deducted, the Net Settlement Fund would still represent approximately 10% of total sales to the class and almost 60% of total estimated damages.

This is an outstanding result, especially in a case where there is no prospect of a guilty plea or indictment by the government. In the context of settlement, "it is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the

---

[20] In certain circumstances, a single factor can demonstrate the appropriateness of approving a settlement. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("Here one factor predominates to make clear that the district court acted within its discretion [in approving the settlement].").

settlement inadequate or unfair." *In re Mego Fin. Corp. Securities Litigation*, 213 F.3d 454, 459 (9th Cir. 2000) (affirming a settlement that, under one methodology, was roughly one-sixth of the potential recovery). Indeed, class plaintiffs typically accept some fraction of their damages in exchange for avoidance of the risks and costs of trial. *See, e.g., Jaffe v. Morgan Stanley*, No. C 06-3903 TEH, 2008 WL 346417, at *9 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater [40% of predicted damages], but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial."); *see also Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 2221073, at *3 (N.D. Cal. Aug. 2, 2007) (granting preliminary approval to settlement for 12.3% of maximum claims); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement that would give Plaintiffs just over 9% of the maximum potential recovery).

The settlement is not only notable in that it provides a settlement fund of more than 100% of projected damages, but also for the fact that it is based on recovery of over 17% of sales to the Class during the Class Period. That figure places this case among "the highest tier of settlements for price-fixing class actions." *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867, at *2 (D.D.C. Mar. 31, 2000) (describing a settlement recovery of 18 to 20 percent of purchases).

Numerous other cases approving settlements at rates substantially below 17 percent of total sales (before the award of attorneys' fees and expenses), many in which defendants had already pled guilty to related charges, show the tremendous benefit of this settlement to the Class.[21] And on a net basis, a recovery of at least 10 percent of class member purchases matches

---

[21] *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 117 F.R.D. 670, 671 (E.D. Cal. 1987) (stating that settlement is unusually favorable as a percentage of defendants' sales in that the settlement amounted to **15% of the settling defendants' total revenues** over the four-year statute of limitations period **before attorneys' fees and expenses were awarded**); *In re Gas Meters Antitrust Litig.*, 500 F. Supp. 956, 957, 961 (E.D. Pa. 1980) (settlement **equal to 8% of total class purchases before attorneys' fees and expenses were awarded**; described as "excellent as to amount"); *Service Spring, Inc. v. Cambria Spring Co.*, Nos. 81 C 1835, 32 C 3901 & 82 C 3371, 1984 WL 2872, at *3 (N.D. Ill. Nov. 30, 1984) (settlement represented **4% of settling defendants' sales** over a four-year period **before attorneys' fees and expenses were awarded**); *In re Armored Car Antitrust Litig.*, 472 F. Supp. 1357, 1368 (N.D. Ga. 1979) (settlement amounts equaled **3.88% of sales before attorneys' fees and expenses were**

11

what the United States Sentencing Commission has characterized as the "average gain from price-fixing."  U.S. Sentencing Guidelines § 2R1.1, Application Note 3.

Moreover, these estimates of the damages suffered by the Class are based on the damages report of Plaintiffs' expert.  Defendants would contest not only liability, but also would vigorously challenge Plaintiffs' expert report and would argue that the proper estimate of damages is no damages.  If a jury or the Court were to determine that the actual damages suffered by the Class were less than that estimated by Plaintiffs' expert, the Class could recover far less than they are recovering here.

    2.    <u>Extensive Discovery and the Advanced Stage of the Litigation Supports Finding the Settlement Fair, Adequate, and Reasonable</u>

"A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) (citations omitted).  Settlement "following sufficient discovery and genuine arms-length negotiation is presumed fair." *Id.* at 528 (citing *City Partnership Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)).

This Settlement was reached at an appropriate stage of the litigation.  The parties have

---

**awarded**), *modified on other grounds*, 645 F.2d 488 (5th Cir. 1981); *Axelrod v. Saks & Co.*, Nos. 76-3805, 76-4011, 77-172, 1981 WL 2031, at *1 (E.D. Pa. Feb. 23, 1981) (settlement amounting to **3.7% of sales before attorneys' fees and expenses were awarded**, described as an "excellent result"); *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1155 (N.D. Cal. 2001) (settlements based on **approximately 10% of defendants' sales**); *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 962 (N.D. Ga. 1980) (settlement recovery of **approximately 1% of sales** during a two-year period); *Bagel Inn, Inc. v. All Star Dairies*, No. 80-2645, 1981 WL 2185, at *3 (D.N.J. Dec. 21, 1981) (recovery of **less than 1% of sales** during a four year period); *Fisher Bros. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving settlement of **0.2% of sales**; noting settlements in related cases of **0.1%, 0.3%, 0.65%, 0.88%, and 2.4% of sales**; largest settlements followed indictments); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL Docket No. 1426, 2007 WL 4570918, at *6 (E.D. Pa. Dec. 28, 2007) (approving settlement of **1.5% of sales**); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (approving settlement equal to **1.62% of the settling defendant's sales**); *Cintech Industrial Coatings, Inc. v. Bennett Indus., Inc.*, 85 F.3d 1198, 1200 (6th Cir. 1996) (individual defendants settled for **4% of gross sales** during one year of the alleged conspiracy period); *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 369 (N.D. Ohio 1983) (settlement amount represents **less than 4.3% of defendants' sales** during the "focus years" of 1973-76); *In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707, 711 (M.D. Pa. 1978) (approving recovery of **3.08% of estimated sales**), *modified on other grounds*, 612 F.2d 576 (3d Cir. 1979).

engaged in extensive fact discovery and substantial expert discovery.[22]  Defendants produced over 12.2 million pages of documents, including massive amounts of data related to their direct sales of GPUs and costs pertaining to those products.  Plaintiffs' Lead Counsel processed and analyzed these documents with the help of an online document hosting and processing system and made effective use of relevant documents during depositions and in its expert reports.[23]  Lead Counsel also retained economic and technical consultants and experts to review Defendants' sales and cost data, to help interpret and evaluate the Defendants' documents and witness testimony, to conduct product comparisons, and to analyze the GPU market.  Lead Counsel's experts produced reports for class certification, on the nature of competition in the GPU market and specifically between the Defendants' various generations and families of GPUs, the meaning and effect of the Defendants' meetings, communications and agreements, Plaintiffs' damages, and on other topics.  Plaintiffs conducted twenty depositions, including the top executives of the Defendants who, Defendants' documents showed, met and communicated with each other on competitive issues.  Defendants deposed the Class Representatives and Plaintiffs' class certification economics expert.

While the settlement was reached a few days before Lead Counsel submitted Dr. Zona's damages and liability reports, Lead Counsel had the benefit of his liability and damages analyses in the settlement process, as evidenced by the final report submitted to the Court.  Thus, the parties were in an excellent position to make a realistic assessment of the strengths and weaknesses of Plaintiffs' case.  The settlement also reflects the result of arms-length negotiation between experienced counsel, and is not the product of fraud or collusion.  *See Officers for Justice*, 688 F.2d at 625.

In terms of collusion, the Court has expressed concern regarding settlements that benefit defendants by broadly releasing claims and providing large cash payments to lead counsel, but which furnish little benefit to absent class members.  *See, e.g.*, *In re Zoran Corp. Derivative Litig.*, No. C 06-05503 WHA, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008).  There is absolutely no hint of any such collusion here.  First, the settlement releases only the claims of

---

[22] Cove Decl. at ¶ 12-18, 26-27.
[23] Cove Decl. at ¶ 13-14.

members of the certified Class—those persons who directly purchased GPU products from Defendants' websites during the Class Period.  Second, the expenses sought by Lead Counsel amount to far less than the actual costs incurred by Counsel, and are at the discretion of the Court in any event.  Third, as seen above, the settlement is based on recovery of over 100% of the Class's projected damages, so the settlement confers a sizeable benefit upon absent Class members.

> ### 3.  The Risk, Complexity, and Expense of Further Litigation Demonstrate that Final Approval of the Settlement is Proper

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomm. Coop.,* 221 F.R.D. at 526.  Antitrust cases in particular are notoriously complex and difficult to litigate.  *See*, *e.g.*, *Vista Healthplan, Inc, v. Warner Holdings Co.*, III. Ltd., 246 F.R.D. 349, 360 (D.D.C. 2007) ("antitrust conspiracy cases are complex and difficult, making victory uncertain"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (stating that antitrust class actions are "arguably the most complex action to prosecute. . . . [T]he legal and factual issues involved are always numerous and uncertain in outcome") (citations omitted).

In this case, the risk, expense, complexity, and likely duration of the litigation all fully support settling this action.  The only potential benefit of continuing litigation through summary judgment and trial would be the possibility of obtaining statutory trebling of Plaintiffs' estimated damages and a separate award of attorneys' fees.  Were the case to proceed, however, Plaintiffs risk the possibility of their claims being narrowed or their potential damages being reduced through summary judgment, or even the defeat of their claims on the merits during summary judgment or trial, in which case the Class would recover nothing.  The Department of Justice has closed its investigation into the Defendants' pricing and marketing practices without taking any action, so there is no possibility of additional evidence emerging from the grand jury process. (Docket No. 626.)  Further, even a successful jury verdict might be reversed by the trial court or overturned on appeal.

In particular, summary judgment and trial will be expensive, complex, and uncertain as to

14

the result. The Court, sitting in summary judgment—and the jury, sitting in trial—will need to evaluate inferences of agreement and conspiracy, as well as the actual effects of any such agreement. Defendants have offered a variety of explanations for their communications, some of which may require the Court to determine whether *per se* or rule of reason analysis is applicable to the evidence developed through discovery. The Court and the jury will also need to assess complex and competing economic and econometric analyses of a mountain of data and documents. The jury will need to weigh the credibility of numerous witnesses, and will have to assess testimony relating to a number of meetings and communications between Nvidia and ATI, including the subjects of those meetings and communications, whether those meetings and communications constituted anticompetitive conduct or resulted in an illegal agreement, and what effect, if any, that conduct had upon the prices paid for GPU products by the Class.

In terms of cost, the detailed Quarterly Reports submitted by Lead Counsel show the considerable expense of this litigation. Lead Counsel has already expended over $3 million in out-of-pocket expenses alone, and has incurred legal fees orders of magnitude beyond the settlement amount. The primary out-of-pocket costs include Plaintiffs' economic and technical expert fees (over $1.8 million), and the amounts paid to the document management contractor (over $600,000) for processing, loading, and hosting the millions of pages of discovery documents.[24] It is likely that Defendants, who have retained sophisticated and able counsel, have devoted similar financial resources to their defenses.

In light of the risks, complexity, and expense of continued litigation, this settlement which provides for substantial and meaningful recovery for members of the Class offers the best opportunity for Plaintiffs to maximize recovery on behalf of the Class. This is especially true because voluntary resolution and settlement are the preferred means of resolving disputes, particularly in the case of complex class action litigation. *Officers for Justice*, 688 F.2d at 625.

        4.    <u>In the View of Experienced Counsel, this Settlement is in the Best Interests of the Class</u>

"Great weight is accorded to the recommendation of counsel, who are most closely

---

[24] Cove Decl. at ¶ 39.

15

DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF DISTRIBUTION, AND AWARD OF EXPENSES--M:07-CV-01826-WHA

acquainted with the facts of the underlying litigation.  This is because parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Nat'l Rural Telecomm. Coop.,* 221 F.R.D. at 528 (citations omitted); *see also In re Omnivision Techs.*, 559 F.Supp.2d at 1043 ("the recommendations of plaintiffs' counsel should be given a presumption of reasonableness"). Plaintiffs' Lead Counsel, Boies, Schiller & Flexner LLP, and Defendants' counsel, Latham & Watkins LLP and Cooley Godward Kronish LLP, are knowledgeable of the facts underlying the allegations in this case and the arguments that could be made by both sides.  These experienced counsel believe this Settlement should be approved, a fact that should be afforded substantial consideration by the Court.

> 5.  The Reaction of Class Members to the Proposed Settlement Favors Approval

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs.*, 559 F. Supp. 2d at 1043; *see also Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement with only 45 objections out of 90,000 notices sent).  As of February 18, 2009, there have not been any objectors.  However, the deadline to submit an objection is March 5, 2009.  Lead Counsel will update the Court as to the number of objectors after the deadline has passed, and will respond to any objectors by March 19, 2009 as provided in the Court's preliminary approval Order (Docket No. 647.)

## V.  THE PLAN OF DISTRIBUTION SHOULD BE GRANTED FINAL APPROVAL

"Approval of a plan for the allocation of a class settlement fund is governed by the same legal standards that are applicable to approval of the settlement: the distribution plan must be fair, reasonable and adequate." *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d at 1154 (citations omitted); *In re Omnivision Techs.*, 559 F. Supp. 2d at 1045 (citations omitted).  A plan of allocation that reimburses class members based on the type and extent of their injuries is

generally reasonable. *Id.* (citing *In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994)).

The $1.7 million (plus interest) settlement fund will be applied as follows: (i) to pay the costs of locating Class members and providing them with notice of the settlement;[25] (ii) to pay costs associated with processing and administering claims against the settlement by Class members;[26] (iii) to pay any taxes related to the settlement; (iv) to pay any litigation expenses awarded by the Court; and (v) the entire balance (the "Net Settlement Fund") shall be distributed to members of the Class, according to the following proposed distribution plan.

The proposed distribution plan will distribute the Net Settlement Fund *pro rata* to Class members who submit valid claims forms by the March 5, 2009 deadline. As detailed in the Claim Form, each Class member's *pro rata* share will be based on the purchase data contained in the database of Defendants' customers maintained by the Claims Administrator or, if the Class member so chooses, on purchase data that the Class member submits with the Claim Form. Therefore, each Class member who submits a valid and timely claim form will receive an identical and proportional percentage of their total purchases as payment. This distribution plan is straightforward and fair and should be approved.

## VI.     THE REQUESTED EXPENSES SHOULD BE FINALLY APPROVED

Plaintiffs' Lead Counsel respectfully requests that the Court award expenses equal to 35% of the Gross Settlement Fund, as well as interest earned on that amount. Lead Counsel's aggressive prosecution of this case resulted in an outstanding result on a gross and net basis. In achieving this outcome, Class Counsel successfully overcame the Defendants' *Twombly* motions, engaged in exhaustive investigation and discovery, obtained class certification, and developed evidence that, in Class Counsel's opinion, would have been more than sufficient to succeed before a jury. Moreover, a total award of 35% of the $1.7 million Gross Settlement Fund would equal $595,000 (before interest), which represents less than 20% of the out-of-pocket expenses

---

[25] Cove Decl. at ¶ 34-35.
[26] Cove Decl. at ¶ 34-35.

(not including attorneys fees) incurred by Lead Counsel alone.[27]

This settlement translates into a very substantial recovery of approximately $1 million dollars for the class members, even if the Court grants Lead Counsel's request for expenses.[28] Each and every Class member who submits a valid and timely claim form should receive at least 10% of his or her purchase price, and likely will receive more. In short, because the expenses requested are fair and reasonable, particularly in light of the exceptional recovery for the Class, Lead Counsel respectfully requests that the Court award the expenses sought.

### A. Lead Counsel's Expense Request is Reasonable

"Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." *In re Omnivision Techs.*, 559 F. Supp. 2d at 1048 (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (counsel may recover out-of-pocket expenses that "would normally be charged to a fee-paying client"); *see also Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989) (the common fund doctrine permits the burden of litigation expenses "to be *shared* among those who are benefited by the litigant's efforts") (emphasis in original). Expenses relating to photocopying, printing, postage and messenger services, court costs, legal research, experts and consultants, and travel costs are all properly reimbursable from the Settlement Fund. *Id.*

Expenses are generally awarded in addition to any award of attorneys' fees. This Court granted expenses on top of attorneys' fees in *Kakani*, 2007 WL 4570190, at *5 (approving attorneys' fees equaling a 2.0 multiplier and an additional $75,000 for costs) and *In re Critical Path*, 2002 WL 32627559, at *11 (awarding one firm $2.1 million in fees and over $73,000 in expenses and the other firm $350,000 in fees and over $28,000 in expenses). Other courts in the Northern District of California have done similarly. *See*, *e.g.*, *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486-PJH, 2007 WL 2416513, at *1 (N.D. Cal. Aug. 16, 2007) (awarding attorneys' fees of 25% of the Settlement Fund and over $4.2 million for

---

[27] Cove Decl. at ¶ 39.

[28] Subtracting $595,000 for litigation expenses and $50,000 for the settlement notice and administration costs (*See* Cove Decl. at ¶ 43) would leave $1.055 million in the Net Settlement Fund, not including accrued interest.

litigation costs and expenses); *In re International Air Transport Surcharge Antitrust Litig.*, No. C 06-01793-CRB, 2008 WL 4766824, at *2 (N.D. Cal. Oct. 31, 2008) (awarding $22.2 million in attorneys' fees and $800,000 for costs); *In re Sorbates Direct Purchaser Antitrust Litig.*, Nos. C 98-4886MMC et al., 2002 WL 31655191, at *3 (N.D. Cal. Nov. 15, 2002) (awarding 25% of Settlement Fund in attorneys' fees and nearly $60,000 for litigation costs and expenses).[29]

Lead Counsel respectfully requests 35% of the $1.7 million Gross Settlement Fund as reimbursement for litigation expenses, which equals $595,000 (before interest).[30]

This amounts to less than 20% of the total expenses incurred by Lead Counsel alone. Indeed, this amount is less than Lead Counsel spent just on electronic document management and hosting services to process and manage the 12-million page document production (which figure does not include the time attorneys and others spent reviewing the documents).[31] As of January 31, 2009, Lead Counsel spent a total of over $3 million dollars in out-of-pocket expenses.[32] Lead Counsel spent more than $1.8 million dollars to retain consultants and experts with the technical, industry and economic expertise necessary to obtain Class certification, assist counsel in securing and evaluating the evidence, and prove liability and damages.[33]

Expert fees aside, Lead Counsel's other expenses are still more than double the expense award sought.[34] Other expenses incurred include costs relating to computer research, messenger services, court reporting services and transcripts, document reproduction services, and travel expenses, among others.[35] The total expenses incurred by Class Counsel are as follows:

---

[29] *DRAM, Air Transport* and *Sorbates* all also involved at least one guilty plea and/or amnesty applicant related to the charged conduct, a factor not present here.

[30] As explained in section V above, the expenses sought here do not include the costs of providing notice of the settlement to the Class, the costs associated with processing claims against the Settlement by Class members, or any taxes related to the Settlement.

[31] Cove Decl. at ¶ 14. Lead Counsel's document vendor provided electronic document management, processing and hosting services only; all substantive review and analysis of the Defendants' production was performed by lawyers, law clerks, and paralegals employed by Plaintiffs' Counsel.

[32] Cove Decl. at ¶ 39.

[33] Cove Decl. at ¶ 39-41.

[34] Cove Decl. at ¶ 42.

[35] Cove Decl. at ¶ 39.

DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF DISTRIBUTION, AND AWARD OF EXPENSES--M:07-CV-01826-WHA

| | |
|---|---|
| Computer Research | $126,995.11 |
| Conference Expenses | $939.18 |
| Courier/Messenger Services | $14,339.01 |
| Court Reporting Services and Transcripts | $72,504.58 |
| Document Reproduction Services | $265,501.75 |
| Expenses Incident to Overtime | $2,463.50 |
| Experts and Consulting Fees | $1,861,279.78 |
| Filing Fees | $421.73 |
| Local Transportation | $1,822.92 |
| Outside Services | $36,437.05 |
| Postage | $515.86 |
| Special Supplies | $1,876.35 |
| Telephone/Facsimile | $4,021.66 |
| Travel Expenses | $108,083.16 |
| WAN/Wireless Connectivity – Wireless Modems | $250.93 |
| LLM (Document Management Contractor) | $632,485.12 |
| Lead Counsel Total | $3,129,937.69 |
| Spector Roseman Kodroff & Willis P.C. Expenses | $12,173.65 |
| | |
| Total Expenses | $3,142,111.34 |

In an analogous situation in this district, Judge Walker awarded the *entire* settlement amount to Class Counsel when the litigation expenses alone far exceeded the amount of the settlement fund. *In re Tableware Antitrust Litig.*, No. C-04-3514 VRW, 2007 WL 4219394, at *8 (N.D. Cal. Nov. 28, 2007). In that case, Class Counsel requested that the entire settlement amount be allocated towards expert witness fees, which exceeded the amount of the settlement fund. *Id.* at *2. Class Counsel spent over $900,000 in out-of-pocket expenses, over $600,000 of which went to expert fees. *Id.* at *4. However, after the notice costs were deducted, only $427,072.35 remained in the settlement fund. *Id.* In response to Class Counsel's request for the remainder of the settlement fund, Judge Walker held that:

> There is no significant unfairness here in giving the entire remaining recovery to class counsel. Counsel did not bring a frivolous or dubious lawsuit; the New York Attorney General's investigation more or less invited the suit, and private follow-on litigation is a long accepted practice in antitrust enforcement. Counsel acted responsibly and professionally throughout the litigation. Even accounting for the remaining settlement funds, counsel suffered a substantial loss financially. Although they assumed that risk, it is unlikely that had the class negotiated for the contingency at the outset, a different bargain would have been struck.

20

*Id.* at *8.[36]

Therefore, Lead Counsel respectfully requests that the Court approve payment of 35% of the Gross Settlement Fund to reimburse Plaintiffs' Counsel for litigation expenses incurred in the prosecution of this action. However, should the Court find that reimbursable expenses are less than 35% of the Gross Settlement Fund, Lead Counsel respectfully requests that the difference between the expenses awarded and 35% of the Gross Settlement Fund be awarded as attorneys' fees. An award of attorneys' fees would be fully justified under the relevant legal standards.

**B.     If the Court Does Not Award 35% of the Gross Settlement Fund in Expenses, Attorneys' Fees Should be Awarded as a Percentage of the Settlement Fund**

It is well established that "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). To the extent the Court does not award the requested 35% in expenses, Class Counsel requests that attorneys fees up to 35% of the Gross Settlement Fund be awarded.

In the Ninth Circuit, the district court has discretion in common fund cases to apply either the percentage-of-the-fund or the lodestar method in calculating a fee award. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). Because attorneys fees based on hours worked on this case amount to over $9 million, if the Court uses the lodestar method, the lodestar multiplier would be less than 0.1, a multiplier that is, needless to say, more than fair to the class in light of the efforts counsel expended.[37]

If the court uses a benchmark approach, the Ninth Circuit established a 25% benchmark in percentage-of-the-fund cases that can be "adjusted upward or downward to account for any unusual circumstances" involved in the case. *Fischel v. Equitable Life Assur. Society of*

---

[36] Judge Walker found it useful to inquire whether a class member would have negotiated a similar arrangement at the outset. Clearly in this case, with total sales of only $9.8 million to the Class, with potential damages some fraction of that, any class member would have been happy to negotiate an award of 35% of the eventual recovery in light of the tremendous amount of time, expense, work, and risk that would necessarily be involved in prosecuting a complicated antitrust class action with millions of documents, complex economic issues, and determined defendants.
[37] Cove Decl. at ¶ 44.

21

DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF DISTRIBUTION, AND AWARD OF EXPENSES--M:07-CV-01826-WHA

*U.S.*, 307 F.3d 997 at 1006.  However, "in most common fund cases, the award exceeds that benchmark."  *Omnivision*, 559 F. Supp. 2d at 1047.  Courts may compare the lodestar and percentage methods in determining whether fees are reasonable.  *Fischel*, 307 F.3d at 1007.

### C. Awarding Attorneys' Fees Would Be Fully Justified Under the Relevant Criteria

The Ninth Circuit has developed several factors as relevant criteria for evaluating the reasonableness of a fee request: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of the work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.  *Vizcaino*, 290 F.3d at 1048-50; *Omnivision*, 559 F. Supp. 2d at 1046.  Some courts also consider the reaction of the class to the requested fee award, and/or conduct a lodestar comparison to ensure the reasonableness of the award.  *Omnivision*, 559 F. Supp. 2d at 1048.  Each of these factors weighs in favor of awarding Lead Counsel attorneys' fees if its expense request is not granted.

#### 1.    The Results Achieved

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award."  *Omnivision*, 559 F. Supp. 2d at 1046; *see also Vizcaino*, 290 F.3d at 1048 ("Exceptional results are a relevant circumstance.").  As previously discussed, the Settlement amounts to more than 100% of the estimated overcharges to the Class.  This is an outstanding recovery and would warrant an award of attorneys' fees.

#### 2.    The Risks of Further Litigation

The risk that further litigation might result in Plaintiffs not recovering at all, especially in a case involving complicated legal issues, is a significant factor in the award of fees.  *Omnivision*, 559 F. Supp. 2d at 1046 (citing *Vizcaino*, 290 F.3d at 1048).   As discussed above, proceeding with this case through summary judgment, trial and appeal would be lengthy, expensive and, most importantly, uncertain as to the result.   Considering the substantial risks overcome by Lead Counsel in obtaining this Settlement, and in light of the significant risks inherent in continuing this action, attorneys' fees would be justified.

#### 3.    The Skill Required and the Quality of the Work

The "prosecution and management of a complex national class action requires unique

22

legal skills and abilities." *Omnivision*, 559 F. Supp. 2d at 1046 (citation omitted).

As the Court recognized in selecting Boies, Schiller & Flexner LLP as Interim Lead Counsel, Lead Counsel are among the most experienced and skilled practitioners in the field of antitrust law and class actions. In this case, Lead Counsel engaged in an extensive and thorough investigation of Defendants' behavior relating to the pricing and marketing of GPU products both before and during the alleged conspiracy, and met the higher pleading standard established by *Twombly*. (Docket No. 246.) Further, Class Counsel successfully navigated this case to a settlement involving more than 100% of projected damages for the Class against defense counsel from two of the most experienced law firms in the country. Indeed, even in certifying a more limited direct purchaser class than Lead Counsel sought, this Court noted that "counsel in this case are excellent." (Docket No. 509.) The skill and quality of Lead Counsel's work directly resulted in the favorable settlement in this case, and therefore this factor would support an award of attorneys' fees.

4. <u>The Contingent Nature of the Fee and the Financial Burden Carried By Plaintiffs</u>

"It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." *Fischel*, 307 F.3d at 1008; *see also In re Omnivision Techs.*, 559 F. Supp. 2d at 1047 ("[T]he importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee."). As this Court has noted, "in common-fund cases, a lodestar may be enhanced to reflect the risk of non-payment." *Kakani*, 2007 WL 4570190, at *4.

Plaintiffs' Counsel invested thousands of hours and millions of dollars in this case on a contingency basis with no guarantee of recovery. Plaintiffs' Counsel bore the entire risk of this case being dismissed at the pretrial stage, or not prevailing at trial, or losing on appeal, as well as the risk that the class certification decision would not be favorable. Moreover, Lead Counsel pursued this case just as vigorously after the Court's class certification order as it did before that

decision, continuing to press Defendants for full discovery, reviewing additional documents, taking numerous depositions (some multi-day), and preparing two thorough and well-supported expert reports.

Of course, Class Counsel here do not seek any enhancement of their lodestar, in fact quite to the contrary, but do respectfully submit that the risk Counsel undertook and the large financial loss it suffered should be considered.

### 5. Awards in Similar Cases

The benchmark award for attorneys' fees alone established by the Ninth Circuit in percentage-of-the-fund cases is 25%. *See, e.g.*, *Fischel*, 307 F.3d at 1006; *Paul, Johnson, Alston & Hunt*, 886 F.2d at 276. This benchmark is typically awarded over and above any expense award. *See* section VI(A), *infra*, and *Paul, Johnson, Alston & Hunt*, 886 F.2d at 272-73 (law firm entitled to reasonable expenses on top of attorneys' fees); *Fischel*, 307 F.3d at 1006 n.6 (lower court awarded expenses in addition to attorneys' fees, which was not disputed on appeal).

Although 25% is the established benchmark for attorneys' fees, "in most common fund cases, the award exceeds that benchmark." *Omnivision*, 559 F. Supp. 2d at 1047 (awarding attorneys' fees totaling 28% of the Settlement Fund); *see also Vizcaino*, 290 F.3d at 1048 (affirming fee award of 28% of the Settlement Fund); *Fischel*, 307 F.3d at 1009 (citing Federal Judicial Center's report of a mean award rate of 27% and a median rate of 29% for class settlements approved in district courts in the Northern District of California from 1992 to 1994); 4 Newberg on Class Actions § 14:6, at 551 (4th ed. 2008) ("empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery).[38]

### 6. Reaction of the Class

The reaction of the class may also be a factor in determining a fee award. *Omnivision*, 559 F. Supp. 2d at 1048. The notice informed the Class that Lead Counsel would request up to

---

[38] *See, e.g., In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-CV-0085-FSH, 2005 WL 3008808, at *17 (D.N.J. Nov. 9, 2005) (awarding one-third of $75 million settlement plus interest); *In re Linerboard Antitrust Litig.*, No. Civ.A. 98-5055, 2004 WL 1221350, at *15 (approving 30% fee from a $202 million settlement).

35% of the Gross Settlement Fund for attorneys' fees and litigation expenses.  The top of the first page of the notice also informed the Class of the estimated net recovery after an award of expenses or fees.  As noted, Lead Counsel has not received a single objection to the proposed settlement as of February 18, 2009.

### 7.    Lodestar Comparison

As a final check on the reasonableness of an award, courts often compare the fee counsel seek as a percentage of the fund with what their hourly bills would amount to under a lodestar analysis.  *Fischel*, 307 F.3d at 1007; *Omnivision*, 559 F. Supp.2d at 1048.  This Court has noted that an "overwhelming majority" of district courts have used between 1.0-4.0 as the multiplier.  *Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 4570190, at *2 (N.D. Cal. Dec. 21, 2007).  As noted above, the lodestar for attorneys' fees here is zero and the expenses lodestar is less than 0.2, figures that compel the conclusion that the requested expenses are fair to the class.

In sum, should the Court find that Class Counsel's reimbursable expenses are less than 35% of the Gross Settlement Fund, Lead Counsel respectfully requests that the difference between the expenses awarded and 35% of the Gross Settlement Fund be awarded as attorneys' fees.

## VII.    CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court grant final approval to the proposed Settlement and the Plan of Distribution, award expenses in the amount requested, and enter the proposed Order or any other order satisfactory to the Court.

Dated:  February 19, 2009

By:_____/s/  William A. Isaacson_____.
William A. Isaacson
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC   20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131
Email:  wisaacson@bsfllp.com

## Attestation of Filer

The signatory to this document is <u>William A. Isaacson</u>, and I have obtained his concurrence to file this document on his behalf.

Dated:  February 19, 2009                    By: ___/s/  John F. Cove, Jr._____.
                                             John F. Cove, Jr.
                                             BOIES, SCHILLER & FLEXNER LLP
                                             1999 Harrison St., Suite 900
                                             Oakland, CA  94612
                                             Telephone: (510) 874-1000
                                             Facsimile: (510) 874-1460
                                             Email:  jcove@bsfllp.com

1

DIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, PLAN OF DISTRIBUTION, AND AWARD OF EXPENSES--M:07-CV-01826-WHA